UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN ("JACK") YANG,

                 Plaintiff,

-against-

THE BANK OF NEW YORK MELLON
CORPORATION, ALCENTRA NY, LLC,
and ALCENTRA LIMITED,

                 Defendants.

Civil Action No. _____

ECF Case

**COMPLAINT AND
DEMAND FOR JURY TRIAL**

John ("Jack") Yang ("Mr. Yang"), for his Complaint against Defendants, The Bank of New York Mellon Corporation ("BNY Mellon"), Alcentra NY, LLC ("Alcentra NY"), and Alcentra Limited (Alcentra Limited together with Alcentra NY, "Alcentra," and together with BNY Mellon, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.     Mr. Yang, a senior executive in the banking industry, brings this action against Defendants, his former employers, for retaliation in violation of Section 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ("Sarbanes-Oxley").  Defendants subjected Mr. Yang to a hostile work environment and ultimately terminated him in retaliation for his good-faith reporting to in-house counsel and management of actions that he reasonably believed constituted violations of the Investment Advisers Act of 1940 and the Investment Company Act of 1940, and breaches of Defendants' fiduciary duties and contractual obligations.  Mr. Yang made his reports solely to protect the investing public and the legitimate interests of Defendants.  Upon his termination, Defendants failed to pay Mr. Yang compensation owed to him, in violation of their contracts with him, and in further retaliation for his protected activity under Sarbanes-Oxley.

2.      BNY Mellon is a publicly-traded global financial services company.  BNY Mellon is the parent company to BNY Alcentra Group Holdings, Inc. ("BNY Alcentra Group"), a sub-investment grade credit asset manager focusing on the U.S. and European markets.  Alcentra NY and Alcentra Limited are both wholly owned subsidiaries of BNY Alcentra Group.  At times relevant to this Complaint, Alcentra NY and Alcentra Limited were each registered as investment advisers under the Investment Advisers Act of 1940 with the Securities and Exchange Commission (the "SEC").

3.      Mr. Yang has thirty-six years of professional experience in investment banking and alternative investment management.  Mr. Yang was employed by Defendants for over five years, from March 2013 to January 2019.  Mr. Yang began his employment with Defendants in March 2013 as Managing Director and Head of Business Development for the Americas for Alcentra NY.  Mr. Yang was swiftly promoted and named Global Head of Business Development for Alcentra in April 2014.  In January 2016, Mr. Yang was promoted again to Head of the Americas for Alcentra NY.  Mr. Yang also served as the FINRA Series 24 Supervisor for Alcentra NY and Mellon Bank Securities Corporation.  In these positions, Mr. Yang was responsible for leading a team in attracting and securing investors to increase Alcentra's assets under management ("AUM").  Mr. Yang and his team brought in record investor capital commitments to Alcentra NY.  During Mr. Yang's tenure with Alcentra, the total AUM grew from approximately $15 billion to $40 billion.

4.      Starting in mid-2018, Mr. Yang fell victim to retaliation by Defendants after he raised concerns about the legality of Defendants' asset management practices.  These concerns related to Alcentra NY's role as subadvisor to the Stira Alcentra Global Credit Fund (the "Stira Fund"), an interval fund and non-diversified, closed-end management investment company

registered under the Investment Company Act of 1940.  In its role as subadvisor to the Stira Fund, Alcentra NY was responsible for managing the investment portfolio, making investment decisions, and executing on trading strategies.  Alcentra NY also was responsible for keeping the Stira Fund and the fund's advisor, Stira Investment Adviser, LLC (the "Stira Adviser"), informed about the status of the market and portfolio through regular reports, presentations, and participation in meetings of the Stira Fund's Board of Trustees.  Alcentra NY's decision to serve as a subadvisor to Stira Adviser, a non-BNY Mellon affiliate, had been criticized within BNY Mellon, which preferred partnering with BNY Mellon affiliates.  The Stira Fund's modest growth after its launch in 2017 due, in part, to overall declining demand in the market and regulatory delays further compounded this criticism.  Throughout the Summer of 2018, BNY Mellon's Chief Executive Officer ("CEO") of Investment Management, to whom the CEO of Alcentra (David Forbes-Nixon) reported, expressed his opinion that the subadvisory role was a mistake and pressured Mr. Forbes-Nixon to address the Stira Fund's lackluster performance.  Mr. Yang's concerns about the legality of Defendants' practices stemmed from the resulting discussions among Alcentra NY's management in Summer 2018 about ceasing its subadvisor services to the Stira Fund.

5.      During an August 21, 2018 meeting of Alcentra's management committee—which consisted of Mr. Yang, Alcentra's CEO (Mr. Forbes-Nixon), Alcentra's then-Chief Investment Officer ("CIO") (Vijay Rajguru), and Alcentra's Chief Financial Officer ("CFO"), who collectively managed Alcentra's global business—Mr. Forbes-Nixon stated that Alcentra NY should resign as subadvisor to the Stira Fund as soon as possible.  The CFO responded that Alcentra NY could not immediately resign, as it was obligated to give at least ninety days' notice pursuant to its subadvisor agreement.  Nevertheless, following the meeting, Mr. Rajguru, acting at Mr. Forbes-Nixon's direction, directed the co-heads of U.S. direct lending and Mr. Yang to

*immediately* stop acting as subadvisor and to cease investments, meetings, and updates. This meant that the co-heads of direct lending would not participate in the next Stira Fund's Board meeting, scheduled for August 23, 2018, or provide the market and portfolio updates required of them during that meeting.

6.      Mr. Yang was concerned that Alcentra NY's unilateral and immediate cessation of its subadvisor services for the Stira Fund would breach Alcentra NY's obligations under the Investment Company Act of 1940 and the Investment Advisers Act of 1940; its obligations under its subadvisor agreement; its fiduciary duties to the Stira Fund, the Stira Advisor, and the Stira Fund's investors; and the representations and commitments that Alcentra NY had made to the SEC and the public in SEC filings concerning its management of the Stira Fund.

7.      To ensure that Alcentra NY would not breach these obligations and duties, on or about August 21 or August 22, 2018, Mr. Yang informed both BNY Mellon's Counsel for the Stira Fund, and the Head of U.S. Compliance at Alcentra NY, of the directive by Alcentra's management committee to Alcentra NY to effectively resign immediately from its position as subadvisor. Mr. Yang also told BNY Mellon Counsel for the Stira Fund that Alcentra NY's immediate cessation of its subadvisor activities would violate the 1940 Acts, breach Alcentra NY's contractual and fiduciary duties, and subject Alcentra to liability from shareholder lawsuits and regulatory penalties. Mr. Yang requested that BNY Mellon Counsel for the Stira Fund intervene, explain to Mr. Forbes-Nixon and Mr. Rajguru, Alcentra's CEO and CIO respectively, their obligations as part of Alcentra's management committee, and provide training regarding compliance issues related to 1940 Act funds and subadvisory responsibilities generally.

8.      As a result of Mr. Yang's swift actions, BNY Mellon Counsel for the Stira Fund instructed members of the management committee that Alcentra NY could not give notice of

resignation until Spring 2019.  Consequently, Alcentra NY refrained from formally resigning as subadvisor to the Stira Fund at that time.

9.      However, even though Alcentra NY did not formally resign from its role as subadvisor in August 2018, Alcentra NY constructively resigned from its duties.  As of September 2018, Alcentra NY ceased implementing the investment strategy set forth in the interval fund's publicly-filed prospectus.  Despite the subadvisor's responsibility to originate and structure loans to place into the interval fund, Alcentra NY did not add any additional loans into the Stira Fund.  Instead, Alcentra NY, on several occasions, attempted to buy back the only two direct loans that were in the Stira Fund.

10.      As a result of Mr. Yang's reporting of his concerns about Alcentra NY's formal resignation as subadvisor in August 2018, Alcentra NY's senior management was forced to continue the subadvisory role for the Stira Fund.  Mr. Forbes-Nixon, to whom Mr. Yang reported, was visibly unhappy with Mr. Yang's whistleblowing reports to BNY Mellon Counsel for the Stira Fund and the Head of U.S. Compliance at Alcentra NY.  Mr. Forbes-Nixon retaliated against Mr. Yang by treating him in a hostile manner, giving him a negative performance review, and reducing his compensation.  Finally, in the ultimate act of retaliation, Defendants fired Mr. Yang in January 2019 on pretextual grounds.

11.      *First*, Mr. Forbes-Nixon immediately began to treat Mr. Yang in an unprofessional, hostile, and disrespectful manner.  For example, he yelled at Mr. Yang in group meetings while pounding his fist on the table.  He also exaggerated the extent and importance of low priority activities and objectives.  Despite Mr. Yang leading Alcentra to record-breaking fundraising numbers, Mr. Forbes-Nixon would upbraid Mr. Yang for minor perceived offenses, like late expense reports and investor meeting reports submitted by Mr. Yang's team members, for

example.  He also ignored significant emails Mr. Yang sent that required a timely response.  And Mr. Forbes-Nixon also declined to give Mr. Yang a required 2018 year-end review, in violation of BNY Mellon policy, or to collaborate with Mr. Yang in planning for same.

12.     *Second*, although Mr. Forbes-Nixon declined to give Mr. Yang his 2018 year-end review while he was employed by Defendants, after he was terminated, Mr. Yang learned that Mr. Forbes-Nixon had rated Mr. Yang "Below Expectations" for 2018.  This review was a marked contrast to Mr. Yang's historical year-end reviews, in which Mr. Yang had consistently received ratings of "Exceeded Expectations" or "Achieved Expectations" and been praised for his work ethic, efforts, and positive results secured for Defendants.  In the past, Mr. Forbes-Nixon had repeatedly called Mr. Yang "a star," "a game changer," and "the hardest working employee at Alcentra."  The reason for the "Below Expectations" rating was, apparently, alleged violations of BNY Mellon's email policy.  However, this was a transparent pretext to further retaliate against Mr. Yang.  The emails relied on by Defendants were entirely inconsequential and were neither intended to, nor caused, any harm to Defendants.

13.     *Third*, based on Mr. Forbes-Nixon rating Mr. Yang "Below Expectations" in his 2018 year-end review, Defendants also lowered Mr. Yang's annual incentive compensation. Despite consistently awarding Mr. Yang multi-million dollar annual incentive compensation amounts in the past, Defendants slashed his earnings by eighty percent in 2018.  To date, Defendants have failed to pay Mr. Yang even this reduced bonus amount.

14.     *Finally*, in January 2019, Defendants terminated Mr. Yang.  Defendants claimed that Mr. Yang was terminated for the alleged violations of BNY Mellon's email policy that purportedly justified his "Below Expectations" review, but this, again, was a transparent pretext to further retaliate against Mr. Yang, for the same reasons stated above.  Moreover, not only did

Defendants improperly terminate Mr. Yang, they also withheld units granted pursuant to incentive and deferred compensation plans which have since vested and are worth millions of dollars

15.     As a result of Defendants' misconduct, Mr. Yang seeks damages in an amount to be determined at trial, including but not limited to at least $4.2 million in compensation in the form of stock options and units which would have vested but for Defendants' unlawful retaliation and termination, back pay in excess of $4.8 million, front pay in excess of $7 million, special damages including for emotional distress, mental anguish, and injury to reputation, and attorney's fees and costs, for the injuries caused by Defendants' unlawful retaliation against and termination of Mr. Yang in violation of Sarbanes-Oxley, Defendants' unlawful termination of Mr. Yang without cause, and Defendants' failure to pay Mr. Yang amounts owed under their compensation contracts.

## PARTIES

16.     Plaintiff Mr. Yang is a resident of New York, New York and citizen of the United States.  Mr. Yang was employed by Defendants from March 2013 until January 2019.  At the time of his termination in January 2019, Mr. Yang was the Head of the Americas for Alcentra NY, the Global Head of Business Development for Alcentra, and the FINRA Series 24 Supervisor for Alcentra NY and Mellon Bank Securities Corporation.  Mr. Yang also held a seat on the Board of Trustees of the Stira Fund from approximately February 2018  until May 2019, when the Stira Fund was dissolved.  During his employment with Defendants, Mr. Yang's compensation was governed by contracts with Alcentra, including the Alcentra NY LLC U.S. Long Term Incentive Plan (the "LTIP") and the Alcentra Limited and Alcentra NY LLC Long-Term Incentive Cash Award Plan (the "Cash Plan").

17.     Defendant BNY Mellon is a global financial services company, organized under the laws of Delaware, with its corporate headquarters located at 240 Greenwich Street, New York, New York 10286.  BNY Mellon is a publicly-traded company within the meaning of Section 806

of Sarbanes-Oxley.  BNY Mellon issues a class of securities registered under Section 12 of the

Securities Exchange Act of 1934 (15 U.S.C. § 78*l*) and is required to file reports under Section

15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d)).  It is the parent company of BNY

Alcentra Group, and the indirect owner of Alcentra NY and Alcentra Limited.

18.     Defendant Alcentra NY is a registered investment adviser pursuant to the

Investment Advisers Act of 1940 and a limited liability company, organized under the laws of

Delaware, with its corporate headquarters located at 200 Park Avenue, 7th Floor, New York, N.Y.

10166.  Alcentra NY is a subsidiary of BNY Alcentra Group, a sub-investment grade credit asset

manager and a wholly-owned subsidiary of BNY Mellon.  As an indirect wholly-owned subsidiary

of BNY Mellon, Alcentra NY's information is included in BNY Mellon's consolidated financial

statements within the meaning of Sarbanes-Oxley.  Alcentra NY is an agent and contractor of BNY

Mellon within the meaning of Sarbanes-Oxley.  Alcentra NY is governed by BNY Mellon's

workplace policies, and reliant on BNY Mellon's services including Human Resources, Legal,

Corporate Security, and Technology.  During the relevant time period, Alcentra NY was the

subadviser to the Stira Fund, pursuant to an investment subadvisory agreement with the Stira

Adviser.  Alcentra NY is a party to the compensation agreements at issue with Mr. Yang, the LTIP

and the Cash Plan.

19.     Defendant Alcentra Limited is an asset management business and a registered

investment adviser with the Securities and Exchange Commission, incorporated under the laws of

England and Wales, with its corporate headquarters located at 160 Queen Victoria Street, London,

England, EC4V 4LA.  Alcentra Limited is a subsidiary of BNY Alcentra Group, which is a

majority-owned subsidiary of BNY Mellon.  Alcentra Limited is a party to the compensation

agreements at issue with Mr. Yang, the LTIP and the Cash Plan.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1514A(b)(1)(B), the whistleblower protection provisions of Sarbanes-Oxley, and 28 U.S.C. § 1331, insofar as Mr. Yang asserts a claim arising under the laws of the United States.  This Court has supplemental jurisdiction over Mr. Yang's state law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to Mr. Yang's Sarbanes-Oxley Act claim within the Court's original jurisdiction that they form part of the same case or controversy.

21.     This Court has personal jurisdiction over Defendants because BNY Mellon and Alcentra NY are headquartered in New York; Alcentra NY and Alcentra Limited expressly agreed in a forum selection clause to adjudicate in this District disputes arising from the LTIP; Defendants regularly transact business in New York; and this case arises from Defendants' misconduct in New York.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Mr. Yang's claim occurred in this District, BNY Mellon and Alcentra NY are residents in this District, and Mr. Yang, Alcentra NY, and Alcentra Limited agreed in a forum selection clause to adjudicate in this District disputes arising from the LTIP.

## ADMINISTRATIVE REQUIREMENTS

23.     Mr. Yang has complied with the procedural prerequisites to bringing this Action in this Court.  After Mr. Yang's termination, Mr. Yang entered into certain tolling agreements with Defendants.  On August 31, 2019, Mr. Yang timely filed a complaint against Defendants with the Occupational Safety and Health Administration ("OSHA") of the U.S. Department of Labor, alleging violations of the whistleblower provisions of Sarbanes-Oxley (the "Administrative Complaint").  More than 180 days have passed since the Administrative Complaint was filed and,

to date, the Secretary of Labor has not issued a final decision.  This delay is not due to any bad faith on the part of Mr. Yang.  Accordingly, Mr. Yang may bring this Action for *de novo* review, pursuant to 18 U.S.C. § 1514A(b)(1)(B) and 29 C.F.R. § 1980.114(a).

## FACTUAL BACKGROUND

A.  **Defendants' Investment Management Business**

24.     BNY Mellon is a publicly-traded company that provides banking and financial services.  As part of BNY Mellon's group of asset management boutiques, BNY Mellon owns Alcentra, which specializes in below-investment grade debt management.

25.     Alcentra includes Alcentra NY and Alcentra Limited, which each are registered investment advisers under the Investment Advisers Act of 1940.  Alcentra NY is Alcentra's U.S. subsidiary.  At the times relevant to this Complaint, Alcentra NY also managed the investment activities of Alcentra Capital Corporation, a BNY Mellon subsidiary and a middle-market business development corporation[1] that provided debt and equity financing solutions.

B.  **Alcentra NY's Role as Subadvisor to the Stira Fund**

26.     In the fall of 2016, Stira Adviser (a non-BNY Mellon affiliate) approached Alcentra NY about a possible collaboration on an interval fund,[2] where Alcentra NY would act as the interval fund's sub-adviser.

27.     On March 23, 2017, Alcentra NY entered into an investment subadvisory agreement with Stira Adviser.  Under this agreement, Alcentra NY would serve as subadvisor to

---

[1]     A business development corporation is a type of closed-end investment company designed to invest in small and mid-sized companies.

[2]     An interval fund is a closed-end fund whose shares are not traded on the secondary market. Rather than trade on the secondary market, interval funds periodically offer to buy back a percentage of their outstanding shares at net asset value.  Interval funds are comprised of a portfolio of pooled assets that raises a fixed amount of capital through an initial public offering.  Due to their high yields, interval fund are attractive assets to investors.

the Stira Fund. The Stira Fund was an interval fund regulated under the Investment Company Act of 1940. Stira Adviser delegated substantially all of its portfolio-management obligations to Alcentra NY. In its role as subadvisor to the Stira Fund, Alcentra NY was responsible for managing the investment portfolio, making investment decisions, executing on trading strategies, and keeping the Stira Fund and its advisor, Stira Adviser, informed about the status of the market and portfolio through regular reports, presentations, and participation in meetings of the Stira Fund's Board of Trustees.

28.    On February 5, 2018, the Stira Fund filed its prospectus with the SEC.[3]  The prospectus disclosed that the Stira Fund sought to provide "customized financing solutions to lower middle-market and middle-market companies." Stira Alcentra Global Credit Fund, Prospectus (Form 497), at 1 (Feb. 5, 2018). In its offering documents, the Stira Fund represented that it would focus its portfolio of investments "on directly originated loans," and that it would "leverage its relationship with Alcentra NY … the Fund's investment sub-adviser … , and its global sourcing and origination platform, to directly source investment opportunities." *Id*. at i.

29.    In its prospectus, the Stira Fund highlighted Alcentra NY's unique ability to leverage its relationship with BNY Mellon and its investment platform as a means to attract investment and bolster the fund's success. Specifically, the Stira Fund represented:

> The Fund intends to utilize its **proprietary access to the BNY Mellon Wealth Management platform** to source investment opportunities. *Id*. at 7, 30.

> As one of the largest sub-investment grade debt investors, Alcentra Group has relationships with a broad number of advisory firms. **The Sub-Advisor will also source deal flow and referrals from the BNY Wealth Management Platform**. In addition, the Sub-Advisor's team will proactively market the Fund's capabilities directly to businesses through local business networks, local banking relationships

---

[3]    A true and correct copy of the prospectus is available at https://www.sec.gov/Archives/edgar/data/1688479/000114420418005760/tv484811_497.htm.

and local accounting and advisory groups.  The Sub-Adviser's platform works collectively to seek differentiated deals.  *Id.* at 38.

The Fund believes that the ***breadth and depth of experience of the principals of the Sub-Adviser*** across different industries, geographic areas and transaction types, coupled with the Sub-Adviser's strong relationships built from managing private funds with similar investment objectives, ***makes the principals particularly qualified to source, analyze and execute investment opportunities***.  *Id.*

30.     The prospectus included several explicit representations regarding the responsibilities of the subadvisor and the investment strategy for the interval fund.  Specifically, the prospectus stated:

The ***management of the Fund's investment portfolio is the responsibility of the Sub-Adviser***, subject to oversight by the Adviser."  *Id.* at 64.

[T]he ***Sub-Adviser will make investment decisions*** for the Fund and ***execute on its trading strategies***.  *Id.* at 10.

The ***Sub-Adviser*** will typically ***analyze and discuss in detail*** the portfolio company's ***financial performance with management*** in addition to ***attending regular Board meetings***.  *Id.* at 35.

31.     The prospectus also set forth the investment strategy for the Stira Fund.  Capital raised for the fund was initially invested in liquid securities while Alcentra NY located and structured directly originated loans to add to the fund.  Specifically, the prospectus represented that:

Under normal market conditions, the Fund intends to invest approximately ***40% of its total assets in non-US securities***, as measured throughout the life of the Fund."  *Id.* at 25.

The Fund intends to pursue its investment objective by providing customized financing solutions to Middle-Market Companies in the form of floating and fixed rate senior secured loans, second lien loans and subordinated debt, which, under normal circumstances, will ***collectively represent at least 80% of the Fund's net assets***."  *Id.*

Such investments will be ***originated or structured by the Sub-advisor*** or its affiliates.  *Id.*

32.     The prospectus stated that the Stira Fund's offering size was up to $3 billion over an offering period of five years.  *Id*. at i, 12-13.

**C.     Mr. Yang's Background & Employment by Defendants**

33.     Mr. Yang is an executive with thirty-six years of professional experience and expertise in investment banking and alternative investment management.

34.     Mr. Yang holds a Master of Business Administration from Columbia Business School and a Bachelor of Arts in Economics from Cornell University.

35.     Prior to working with Defendants, Mr. Yang was the Managing Director at Chemical Securities, Inc. (11 year tenure), the Managing Director and Global Head of Leveraged Finance at Merrill Lynch (8 year tenure), the President of the broker dealer affiliate at Highland Capital Management (6 year tenure), and the Managing Partner at Onex Credit Partners (2 year tenure).  He also served as both the Vice Chairman and Director of the Loan Syndications and Trading Association for over a decade.

36.     In Spring 2013, Mr. Yang joined BNY Mellon and Alcentra.  Defendants recruited Mr. Yang through a search firm and hired him pursuant to an offer letter dated March 8, 2013.  The offer letter was from Alcentra NY, on letterhead reflecting the logos of both Alcentra NY and BNY Mellon.  The offer letter described Alcentra NY as "a subsidiary that is majority owned by The Bank of New York Mellon Corporation," referred to Mr. Yang's "employment with Alcentra NY" and "employment with BNY Mellon, its subsidiaries, affiliates, successors, related companies and assigns."  The offer letter further stated that, among other things, Mr. Yang would be subject to the Alcentra Incentive and Long Term Incentive Plan, the Alcentra Limited & Alcentra NY LLC Long Term Incentive Cash Award Plan, BNY Mellon Incentive Plan, the BNY Long Term Incentive Plan, the BNY Personal Securities Trading Policy, and the BNY fingerprinting and

-13-

background check policies.  Mr. Yang was also required to sign the BNY Confidentiality, Notice and Restrictive Covenants Agreement.

37.     Mr. Yang's starting position was Managing Director and Head of Business Development for the Americas at Alcentra NY.  In this role, Mr. Yang was tasked with fundraising to increase Alcentra's AUM.  To achieve this, Mr. Yang developed a "multi-channel" distribution strategy, using several investor channels to raise large amounts of money quickly.  He reorganized the marketing function and entirely redeveloped Alcentra NY's marketing materials, dramatically improving their effectiveness.

38.     Due to these early successes at Alcentra NY, Mr. Yang was swiftly promoted and in April 2014, he was named Global Head of Business Development for Alcentra.   In January 2016, Mr. Yang was again promoted, this time to Head of the Americas for Alcentra NY's business in the United States.  In these roles, Mr. Yang recruited a global business development team and directly managed a global sales team which covered institutional, retail and wealth platform investors and consultants.  Mr. Yang also had direct responsibility for many of Alcentra NY's largest, most profitable, and strategic U.S. based investors and for Alcentra's global fundraising campaigns.

39.     Further, with his promotion to Head of the Americas for Alcentra NY, Mr. Yang joined Alcentra's management committee, together with Alcentra's CEO David Forbes-Nixon, Alcentra's then-CIO Vijay Rajguru, and Alcentra's CFO.  Alcentra's management committee oversaw Alcentra entities' obligations to the various funds in which they were engaged as advisors or subadvisors and evaluated their strategic decisions.

40.     In addition to heading up Alcentra NY's businesses, starting in January 2016, Mr. Yang also oversaw the company's securities activities as the FINRA Series 24 Supervisor for

Alcentra NY and Mellon Bank Securities Corporation.  In this role, Mr. Yang was responsible for overseeing all of Alcentra NY's activities that fell under FINRA's jurisdiction, which included, among other things, establishing, managing, and enforcing procedures to supervise compliance with FINRA.

41.     With each of these promotions, Mr. Yang supervised a growing team.  Between his roles as Head of the Americas for Alcentra NY and Global Head of Business Development for Alcentra, Mr. Yang managed a team of approximately sixty-five employees, out of a total of 170 employees at the firm.

42.     Under Mr. Yang's direction from 2013 through 2018, Alcentra's growth outstripped both its historic performance and industry standards.  Mr. Yang's team brought in record investor capital commitments to Alcentra.  During Mr. Yang's tenure, the total AUM grew from approximately $15 billion to $40 billion.

43.     Alcentra's success during this period was recognized within the industry.  Between 2017 and 2018, its ranking among the largest fundraisers of private debt globally vaulted from twenty-fifth to sixteenth, as reported by *Private Debt Investor* magazine.[4]

44.     Prior to 2018, based on Mr. Yang's positive performance, his year-end bonuses consistently represented an almost ten-fold increase of his annual base salary.

45.     During the relevant time period, as Head of the Americas for Alcentra NY, Mr. Yang reported to Mr. Forbes-Nixon.  Mr. Forbes-Nixon, in turn, reported to BNY Mellon's CEO for Investment Management.

---

[4]     *Compare* James Linacre, *Mixing It Up*, PRIVATE DEBT INVESTOR MAG., Dec. 2019/Jan. 2020, at 7, *available at* https://d16yj43vx3i1f6.cloudfront.net/uploads/2019/12/PDI169_PDI50.pdf (2018 ranking) *with* THE PDI 50 RANKING REPORT, Nov. 2017, at 24 *available at* https://golubcapital.com/wp-content/uploads/2017/11/2017-PDI-50.pdf (2017 ranking).

46.     In addition to his roles within Alcentra, Mr. Yang was also named to the Board of Trustees of the Stira Fund.  Given Alcentra NY's role as subadvisor to the Stira Fund, Mr. Yang was listed as an interested trustee in the offering materials.  Stira Alcentra Global Credit Fund, Prospectus (Form 497), at B-17 (Feb. 5, 2018).  Mr. Yang served in this role from the inception of the Stira Fund in 2017 until it was sold and dissolved in May 2019.  As a Trustee, Mr. Yang attended the Stira Fund's quarterly Board meetings as well as the special meetings held in the first-half of 2019, during which time the Stira Fund was considering strategic alternatives.  The Stira Fund's prospectus highlighted Mr. Yang's "prior experience as a managing partner, president, vice chairman and director," in noting that "Mr. Yang is *highly qualified* to serve on the Board."  *Id.* at B-18 (emphasis added).

**D.     Alcentra NY's Plan to Stop Providing Subadvisory Services to the Stira Fund**

47.     Alcentra NY's role as subadvisor to the Stira Fund was the subject of internal criticism from the start.  BNY Mellon viewed the partnership with Stira Adviser, a non-BNY Mellon affiliate, as a mistake.  When Stira Adviser initially approached Alcentra NY in 2017 regarding engagement as a subadvisor to the proposed Stira Fund, BNY Mellon expressed that Alcentra NY should serve as a subadvisor instead to Dreyfus, a BNY Mellon affiliate.  Alcentra NY countered that the proposed fund product would be targeted directly at independent retail investors, whereas Dreyfus's area of expertise was distributing products through "wire houses," which include UBS, Wells Fargo, and Morgan Stanley.  Stira Adviser's expertise, relationships, and demonstrated success within the industry made it a more natural fit, much to BNY Mellon's dissatisfaction.

48.     However, by the middle of 2018, due in part to a deteriorating market and regulatory delays, the Stira Fund had been underperforming, which became a source of concern among members of the Boards of Alcentra NY and Alcentra Limited.  BNY Mellon seized upon

Stira Fund's disappointing performance as evidence that partnering with Stira Adviser was a mistake it had predicted.

49.     On August 21, 2018, Alcentra's management committee convened a meeting in London in advance of Stira Fund's upcoming quarterly Board meeting on August 23, 2018. Present at the meeting were Mr. Forbes-Nixon, Mr. Rajguru, the then-CFO, and Mr. Yang.  This represented the entirety of the management committee.

50.     During the course of the meeting, Mr. Forbes-Nixon relayed the concerns of BNY Mellon's CEO of Investment Management, including that Alcentra NY's subadvisor role was a mistake.  He also revealed that Alcentra's BNY Mellon Board members were displeased about Stira Adviser serving as advisor to the Stira Fund, as opposed to a BNY Mellon affiliate.

51.     Mr. Yang explained that the Stira Fund was only a year into a five-year fundraise, and the lagging performance was due to the declining market and regulatory delays, so it was premature to consider resignation.

52.     Mr. Forbes-Nixon nevertheless instructed that Alcentra NY should resign as the Stira Fund's subadvisor as soon as possible.

53.     In response to the proposed cessation of the subadvisor role, the CFO noted that immediate termination was not possible as Alcentra NY was obligated under the terms of its subadvisor agreement to provide Stira Adviser with ninety days' notice of resignation.

54.     Based on the tone of the meeting and the contents of the discussion, Mr. Yang believed that Mr. Forbes-Nixon and Mr. Rajguru had determined that the relationship with Stira Adviser must end immediately and were unwilling to tolerate any opposition.

55.     Indeed, following the meeting of the management committee, Mr. Rajguru emailed the co-heads of U.S. direct lending and Mr. Yang.  The email directed its recipients to cease

carrying out Alcentra NY's responsibilities as subadvisor and stated that there were to be ***no more investments, no more meetings, no more updates*** provided to the interval fund by Alcentra NY. This meant that the co-heads of direct lending would not be able to participate in the next Stira Fund's Board meeting, scheduled for August 23, or provide the market and portfolio update required of them during that meeting.

56.     On or about August 21 or August 22, Mr. Yang contacted the President of the Stira Fund.  Mr. Yang reported to the President that Alcentra's management committee discussed immediately terminating Alcentra NY's role as subadvisor to the interval fund.  The President of the Stira Fund relayed to Mr. Yang that immediate termination, along the lines Alcentra NY was considering, violated the terms of the subadvisor agreement.  The President expressed that Alcentra NY could not take this unilateral action, particularly in the light of the upcoming Stira Fund Board meeting scheduled for August 23, 2018, and given the economic impact Alcentra NY's termination would cause to the Stira Fund.

**E.     Mr. Yang's Whistleblowing Reports of Alcentra NY's Plans to BNY Mellon**

57.     Mr. Yang was reasonably concerned that if Alcentra NY unilaterally stopped its subadvisory responsibilities for the Stira Fund, it would breach Alcentra NY's legal obligations under the Investment Advisors Act of 1940 and the Investment Company Act of 1940; its contractual obligations under its subadvisor agreement; and its fiduciary duties to the Stira Adviser, the Stira Fund, and the Stira Fund's shareholders.  Mr. Yang was also concerned that this course of action would be inconsistent with the representations and commitments that had been made to the SEC and the public in SEC filings concerning Alcentra NY's management of the Stira Fund.

58.     Mr. Yang was aware of prior potential violations of the Investment Company Act of 1940 related to communications, disclosures, and valuations at Alcentra Capital Corporation,

that had required BNY Mellon Legal and Compliance departments to intervene and take corrective and/or preventative actions.  Thus, to ensure that Alcentra NY would not breach its legal obligations, contractual obligations, and fiduciary duties, Mr. Yang determined it was necessary to report the matter to BNY Mellon.

59.     On or about August 21 or August 22, 2018, Mr. Yang contacted BNY Mellon's Counsel for the Stira Fund, whose practice also focused on legal issues regarding BNY Mellon's mutual funds and funds regulated pursuant to the Investment Company Act of 1940.  Mr. Yang informed Counsel for the Stira Fund of the directive by members of Alcentra's management committee to immediately stop providing subadvisor services to the Stira Fund.

60.     Mr. Yang reported to Counsel for the Stira Fund that Alcentra NY's proposed course of action would breach its fiduciary duty to provide advice to the Stira Adviser and to monitor the Stira Fund.  The directive from Mr. Rajguru not to attend future meetings and not to provide updates would breach Alcentra NY's representation in the Stira Fund prospectus that it would keep the Stira Adviser updated with financial progress and attend regular meetings.  Further, Alcentra NY's decision to terminate its role was not in the best interests of the advisor, the interval fund, or the interval fund's shareholders but instead was based upon Alcentra's internal concerns about the Stira Fund's lagging performance.  Similarly, immediate termination would breach the representations in the Stira Fund prospectus, which discussed in detail leveraging Alcentra NY's relationship with BNY Mellon and the latter's resources.  Mr. Yang also reported that Alcentra NY's proposed course of conduct could subject Alcentra NY and BNY Mellon to liability by shareholders and to regulatory penalties.

61.     Mr. Yang viewed the August directive as part of a larger systemic problem with the management of Alcentra which had previously necessitated BNY Mellon's intervention.  As

Mr. Yang explained to Counsel for the Stira Fund, he was particularly concerned that Mr. Forbes-Nixon and Mr. Rajguru, who had spent most of their careers based in London, were unfamiliar with U.S. securities laws.  Mr. Yang's concern was based on the fact that both Mr. Forbes-Nixon and Mr. Rajguru, as members of Alcentra's management committee, were issuing directives which, if complied with, would constitute violations of U.S. laws.

62.     During his conversation with Counsel for the Stira Fund, Mr. Yang requested that Counsel contact Mr. Forbes-Nixon and Mr. Rajguru to explain Alcentra NY's obligations pursuant to the subadvisor agreement and under the 1940 Acts.  Mr. Yang also requested that someone be authorized to participate in the upcoming Stira Fund quarterly Board meeting on August 23, and that Alcentra NY prepare the requisite reports to present at that time.  He also asked Counsel that the CEO and CIO be provided guidance and receive training on U.S. compliance and legal issues for Alcentra NY's funds regulated by the 1940 Acts.

63.     Mr. Yang also forwarded the email directive he received from Mr. Rajguru (***no more investments, no more meetings, no more updates***) to Counsel for the Stira Fund.  Mr. Yang also forwarded this email to the Head of U.S. Compliance at Alcentra NY.

64.     Upon information and belief, Mr. Yang's report to BNY Mellon's Counsel for the Stira Fund was the first time anyone at BNY Mellon, Alcentra, or the Stira Fund reported Alcentra NY's plans to terminate immediately its role with the Stira Fund.

65.     Upon information and belief, Mr. Yang, through his reporting to Counsel for the Stira Fund in late August 2018, made BNY Mellon aware of Alcentra's management committee's plan to immediately cease Alcentra NY's subadvisor services.  Until then, BNY Mellon had not been party to discussions about the directed resignation.

66.     Mr. Yang's reporting was done in accordance with BNY Mellon's Code of Conduct and related policies.  BNY Mellon publishes a Code of Conduct, to which it expects all employees, including those employed by Alcentra NY, to adhere.[5]  As an employee of BNY Mellon, Mr. Yang received this Code of Conduct and was made aware of its contents.  BNY Mellon routinely circulated to its employees updates to the Code of Conduct and requested that its employees attest to their receiving and reading it.  The Code of Conduct includes a section entitled "Responsibility to ask questions and report concerns" that directs employees:

> [T]o speak up immediately if you have a question or concern about what to do in a certain situation or if you believe someone is doing—***or about to do***—***something that violates the law***, company policy or our Code of Conduct.  If you have a genuine concern, you must raise it promptly.  BNY Mellon, *Employee Code of Conduct (2019)* at 8.

67.     Following Mr. Yang's report, BNY Mellon Counsel for the Stira Fund contacted Mr. Rajguru and advised him that even if Alcentra NY were to give proper notice of termination, it was still responsible for carrying out its duties as subadvisor through the termination date, which would be no sooner than Summer 2019.  In the light of Counsel's instructions to Mr. Rajguru, when Stira Fund held its quarterly Board meeting on August 23, 2018, Alcentra NY authorized one of the co-heads of U.S. direct lending to attend on its behalf.

**F.     Alcentra NY's Failure to Implement The Stira Fund's Investment Strategy**

68.     Because of Mr. Yang's reporting to BNY Mellon, Alcentra NY did not immediately formally resign as subadvisor to the Stira Fund.  However, even though Alcentra NY could not legally provide notice of resignation until the Spring of 2019, it effectively resigned from its duties

---

[5]   A true and correct copy of the Code of Conduct is publicly available at https://www.bnymellon.com/_global-assets/pdf/csr/employee-code-of-conduct.pdf.

as subadvisor beginning in September 2018, when it stopped implementing the investment strategy set forth in the Stira Fund's publicly-filed prospectus.

69.     Following the August 23 Stira Fund Board meeting, Mr. Forbes-Nixon announced Alcentra needed to re-evaluate the situation with the Stira Fund and its relationship with the Stira Adviser.  To that end, Alcentra sent to Stira Adviser a list of questions and requests for information, including revised fundraising numbers.

70.     Stira Adviser requested that Mr. Yang review its proposed responses in advance of the scheduled conference call with the Alcentra management committee.  As detailed below, Mr. Yang's review of this presentation—on behalf of Alcentra—later became part of BNY Mellon's purported justification for terminating him.

71.     On a conference call on September 6, members of both Alcentra and Stira Adviser reviewed Stira Adviser's responses and revised fundraising numbers, during which time Mr. Forbes-Nixon made clear his dissatisfaction with the progress of the Stira Fund.  Among the proposals considered during this period, Stira Adviser proposed that Alcentra or BNY Mellon outright buy the fund, an offer which Alcentra declined.

72.     Following the joint conference call between Alcentra and Stira Adviser, Alcentra NY stopped implementing the investment strategy disclosed in the prospectus.  Upon information and belief, this decision was not formalized within Alcentra but was rather discussed in one-off emails and communications.

73.     As set forth in the prospectus, the core investment strategy for the interval fund was to invest in U.S. and European directly originated loans.  Results of the fundraise were initially invested in traded debt until the subadvisor located suitable loans.  By August 2018, the interval

fund had two direct loans, and Stira Adviser had made multiple requests to add the fund's first European loan to diversify the fund's holdings.

74.     Alcentra NY stopped implementing the investment strategy for the interval fund as described in the Stira Fund's prospectus in two key ways.  *First*, Alcentra NY attempted to buy back the only two directly originated loans already in the fund.  To purchase these loans, Alcentra NY needed Stira Adviser's approval.  Stira Adviser did not agree to Alcentra NY's request.  In declining the request, Stira Adviser noted the investment strategy provided for loans to be added to the funds and that the loans in question were good assets.

75.     *Second*, instead of investing in U.S. and European loans to middle market companies, and despite Stira Adviser's request for such loans and the investment strategy disclosed in the fund's prospectus, members of Alcentra NY's management committee decided that it would no longer place any additional loans in the interval fund.  Specifically, the decision not to add European loans was made by Mr. Forbes-Nixon and Mr. Rajguru.  The decision not to add U.S. loans was made by the co-heads of U.S. direct lending at Alcentra.

76.     Alcentra NY did not disclose to its investors that it was changing its stated investment strategy for the Stira Fund.  None of the public filings filed with the SEC disclosed this change in strategy.

77.     Mr. Yang was notified of these decisions but he did not participate in the decision-making process.  Indeed, by this point in time, Mr. Yang was the target of an aggressive retaliatory campaign led by Mr. Forbes-Nixon due to Mr. Yang's reporting to BNY Mellon about Mr. Forbes-Nixon and Mr. Rajguru's August management directive.

## G.     Defendants' Unlawful Retaliation Against Mr. Yang

78.     The BNY Mellon Code of Conduct assures employees of BNY Mellon's "Zero Tolerance for Retaliation," including that:

Anyone who reports a concern or reports misconduct in good faith, and with the reasonable belief that the information is true, is demonstrating a commitment to [Company] values and following [the Company's] Code of Conduct. ***The company has zero tolerance for acts of retaliation. Zero means zero. No one has the authority to justify an act of retaliation.*** Any employee who engages in retaliation will be subject to disciplinary action, which may include dismissal. *Code of Conduct* at 9.

79. Similarly, BNY Mellon's Employee Complaint Process, Policy Number: II-H-630-US, which Mr. Yang also received as an employee of Defendants, details the reporting process and provides that "retaliation by any employee of BNY Mellon against another employee of BNY Mellon because he or she has brought forward a Concern…will not be tolerated."

80. After Mr. Yang reported his concerns to BNY Mellon about Alcentra NY immediately resigning as subadvisor to Stira Fund, it became clear that Mr. Forbes-Nixon and Mr. Rajguru were angry that Mr. Yang had protested their plan for Alcentra NY to immediately resign as subadvisor, and were embarrassed that Mr. Yang had raised his concerns about their directive to BNY Mellon counsel. Mr. Yang's reporting to BNY Mellon painted a target on his back at a particularly sensitive time when Mr. Forbes-Nixon was already in danger of losing his own job and facing scrutiny from BNY Mellon management about Stira Adviser and the Stira Fund.

81. As a result of this reporting, Defendants, led by Mr. Forbes-Nixon, engaged in a months-long concerted effort to retaliate against and ultimately remove Mr. Yang from his positions within Alcentra. In particular, among other things, Defendants retaliated against Mr. Yang by: 1) treating him in a hostile manner, 2) giving him an unwarranted negative year-end performance review, and 3) reducing his compensation.

82. *First*, immediately following Mr. Yang's report, Alcentra's senior management began treating him in an aggressive manner. For example, Mr. Forbes-Nixon publicly berated Mr. Yang in the presence of colleagues. He also pounded the table at group meetings.

83. Mr. Forbes-Nixon also criticized Mr. Yang's performance on insignificant and low-priority issues. For example, despite Mr. Yang leading Alcentra to record-breaking fundraising numbers, Mr. Forbes-Nixon would upbraid Mr. Yang for minor perceived offenses, like late expense reports and client meeting reports submitted by his team members. Mr. Forbes-Nixon would refuse to give credit for the fundraising successes of Mr. Yang's team if the data was not promptly submitted in Alcentra's formal system.

84. In addition, Mr. Forbes-Nixon refused to engage with Mr. Yang on certain matters, even though this was contrary to both his normal practice and what was required by the business. For example, he refused to discuss how bonuses would be awarded to the members of Mr. Yang's team or to provide a response to the reviews that Mr. Yang prepared for his team members. He also routinely ignored emails sent by Mr. Yang which required a response, when he had not previously done so. Mr. Forbes-Nixon's systematic refusal to engage with Mr. Yang after he reported concerns to BNY Mellon Counsel contrasted sharply with past practices and with the professional rapport between them. Mr. Forbes-Nixon's conduct prevented Mr. Yang from effectively carrying out his daily responsibilities as a manager and impeded his ability to meet his year-end goals, as discussed further below.

85. Further, despite Mr. Yang's position as a member of Alcentra's management committee, he was side-lined from strategic discussions between September and December 2018, including from discussions about Alcentra NY's implementation of the interval fund's investment strategy.

86. *Second*, Defendants further retaliated against Mr. Yang by giving him an unfavorable year-end performance review for 2018, despite Mr. Yang meeting or exceeding his professional fundraising and corporate goals for Alcentra.

87.     During his employment by Defendants, and in accordance with BNY Mellon policy, Mr. Forbes-Nixon consistently provided Mr. Yang with mid-year and end-of-year professional evaluations, during which they would meet to discuss his performance, goals, and rating.  In 2018, Mr. Forbes-Nixon failed to provide Mr. Yang with his 2018 year-end review in violation of BNY Mellon's policies.  Mr. Yang later learned, after his termination, that he had given Mr. Yang a "Below Expectations" rating for 2018.  This rating was unwarranted, because Mr. Yang had achieved or exceeded his fundraising goals for the year, despite the challenges posed by a contracting market and declining performance on the investment management side of the business.  Mr. Yang learned that the purported justification offered by Mr. Forbes-Nixon for the rating was alleged email policy violations discussed in detail in Section H below.  This justification is pretextual, however, as those emails were entirely inconsequential and were neither intended to, nor caused, any harm to Defendants.

88.     Defendants' documentation of Mr. Yang's 2018 performance does not reflect grounds for a "Below Expectations" year-end review.  Instead, it reflects that, at year end, Mr. Yang was deemed to have "Achieved Expectations" in the categories "Corporate Goals– Diversity and Inclusion" and "Results-Based Goals."  But, based on a "Below Expectations" rating in the category of "Risk & Compliance" (based on the alleged email policy violations) and a "Below Expectations" rating in the category of "Overall Competencies" (for which no comment or explanation was provided), Mr. Yang's overall year-end rating was lowered to "Below Expectations."

89.     Mr. Yang's 2018 year-end review stood in marked contrast to his prior year-end reviews.  In every other year that he was employed by Defendants, Mr. Yang had received year-end ratings of "Exceeded Expectations" or "Achieved Expectations."  Mr. Forbes-Nixon had

repeatedly praised Mr. Yang's work ethic, his efforts, and the positive results he secured for BNY Mellon and Alcentra.  Mr. Forbes-Nixon further called Mr. Yang "a star" and "a game changer." And in the past, he had also told Mr. Yang that he was "the hardest working employee at Alcentra," and that he was "forever indebted" to Mr. Yang.

90.     Mr. Yang had received positive feedback from Mr. Forbes-Nixon as recently as mid-2018.  While Mr. Yang had been disappointed by certain of the other feedback he received from Mr. Forbes-Nixon in mid-2018, by the end of the year, Mr. Yang had largely met his goals and had a strong performance year deserving of a positive rating.  Specifically, in late July 2018, Mr. Forbes-Nixon provided Mr. Yang with a mid-year review.  This July meeting was calendared by Mr. Forbes-Nixon's assistant as Mr. Yang's "mid-year review."  Overall, the tone and contents of the review were positive and in-line with Mr. Yang's performance to date.  Mr. Yang was responsible for raising the initial funds, not managing investment performance at Alcentra.  A market downturn which, among other things, affected the demand for investment in the Stira Fund, and the fact that Alcentra's *investment* performance was below benchmark made it more difficult for Mr. Yang and his team to market Alcentra's products.  Nonetheless, Mr. Forbes-Nixon noted that Mr. Yang had done an overall "great" job with his fundraising targets, and praised an "outstanding fundraise" Mr. Yang and his team had achieved, notwithstanding the market downturn and Alcentra's investment performance.  Based on Alcentra's fundraising performance at that point, Mr. Yang was on track to meet or exceed his overall fundraising goal by year end.  It was understood, since this was a mid-year review, that Mr. Yang would not have yet met all of his targets yet, as of July 2018.  Nor was he, or any BNY Mellon employee, expected to have met their targets at that stage.  In addition, despite the unexpected departure of some senior staff, Mr. Yang was successfully rebuilding his team.

91.     While BNY Mellon employees typically receive only one mid-year evaluation with their supervisors, just a few weeks later, in August 2018, Mr. Forbes-Nixon inexplicably requested a meeting with Mr. Yang in order to give him a second, unscheduled mid-year review.  This meeting took place in London, while Mr. Yang was in town for Alcentra's August management committee meeting.  Despite no material change in Mr. Yang's performance since the late July review, at this second August review, Mr. Forbes-Nixon informed Mr. Yang that he would formally be receiving a "Below Expectations" mid-year rating.  Mr. Forbes-Nixon cited as a reason for this rating the supposed failure of Mr. Yang to hit his year-end targets by August.  As Mr. Yang pointed out to Mr. Forbes-Nixon during their meeting, it was improper to expect Mr. Yang to have met all of his year-end targets by August, four months before the end of the performance year.  As another reason for the rating, Mr. Forbes-Nixon cited a new ratings system recently adopted by BNY Mellon, which he told Mr. Yang meant that all employees would be rated on a more critical scale.  However, Mr. Yang pointed out that other employees, including those who reported to Mr. Yang, who similarly had not (entirely reasonably, given the mid-year date) completed all of their goals for the year, were not rated "Below Expectations," even though the new ratings system was in place.  Additionally, BNY Mellon implemented the new ratings system in June.  Because the new system was already in place when Mr. Forbes-Nixon gave Mr. Yang his July mid-year review, Mr. Forbes-Nixon's decision to blame the August rating on the new system made no sense.  When Mr. Yang asked Mr. Forbes-Nixon where he could improve, he did not offer constructive feedback.  Instead, Mr. Forbes-Nixon dismissed the importance of the review, telling Mr. Yang not to worry about it.  He also reiterated that Mr. Yang's rating was a function of the new, more stringent ratings curve for BNY Mellon employees.   Mr. Yang did not receive written

documentation of this mid-year rating until a few weeks later, after he reported his concerns to BNY Mellon's Counsel for the Stira Fund.

92.     After Mr. Yang reported his concerns to BNY Mellon's Counsel for the Stira Fund later in August 2018, Mr. Forbes-Nixon impeded Mr. Yang from meeting his non-fundraising goals.  As a manager himself who had, in the past, rated a report "Below Expectations," Mr. Yang was aware of the company protocol which requires managers to provide specific guidance for improvement.  Contrary to this BNY Mellon policy, Mr. Forbes-Nixon did not offer a plan to assist Mr. Yang in improving his rating.  Instead, Mr. Forbes-Nixon actively worked to undermine Mr. Yang's goals.  For example, one of Mr. Yang's non-fundraising year-end goals was to improve customer relationship management ("CRM") and to increase the number of CRM reports sent to Mr. Forbes-Nixon.  Despite Mr. Yang's improvements to, and increase in, the number of reports generated, Mr. Forbes-Nixon refused to respond to emails discussing the CRM project or to confirm that the reports were to his satisfaction.  Nor did he respond to Mr. Yang's own detailed self-evaluation with feedback.  Notwithstanding this lack of engagement or support by Mr. Forbes-Nixon, Mr. Yang nevertheless ended his year strong, having achieved or exceeded almost all of his fundraising goals and other professional goals.  Despite Mr. Yang's efforts and strong performance, Mr. Forbes-Nixon still gave him an overall negative performance rating at year end.

93.     *Third*, Defendants further retaliated against Mr. Yang by lowering his compensation.  Per the terms of Mr. Yang's March 8, 2013 offer letter from BNY Mellon and Alcentra NY, he was entitled to a base salary and annual performance-based discretionary bonuses pursuant to the LTIP.  Mr. Yang's year-end compensation was largely made up by incentive compensation, rather than base salary, and tied to his year-end performance review.  Between 2013 and 2018, Mr. Yang had consistently received multi-million dollar awards, in recognition of his

successes on behalf of Alcentra.  As a result of Mr. Forbes-Nixon's decision to rate him "Below Expectations" based on pretextual email violations and in retaliation for his reporting activity, Defendants slashed the incentive compensation he was slated to receive by eighty percent as compared to prior years.  Further, when Defendants unlawfully terminated Mr. Yang in January 2019, they also withheld even this reduced 2018 incentive compensation.

**H.     Defendants' Unlawful Termination of Mr. Yang and Fabrication of Purported Cause**

94.     After enduring five months of a hostile work environment, on January 14, 2019, Defendants terminated Mr. Yang based on pretextual violations of BNY Mellon's email policies. The emails relied on by Mr. Forbes-Nixon to terminate Mr. Yang were entirely inconsequential and were neither intended to, nor caused, any harm to Defendants.

### *The First Email*

95.     The first alleged email violation occurred in April 2018 when Mr. Yang emailed a BNY Mellon employee who was placed on "garden leave."  Between announcing his departure to join a competitor firm and actually departing BNY Mellon, this employee downloaded the entirety of the contents of his Microsoft Outlook, including contacts and calendar events.  Because this employee reported directly to Mr. Yang, BNY Mellon's Data Loss Prevention ("DLP") team directed Mr. Yang to contact his former report and advise him that DLP was aware of the data breach, would be in touch, and that he was in violation of the Company's separation agreement.

96.     Although this individual on garden leave was still a BNY Mellon employee and still on the company payroll, he was no longer was physically present in the office and no longer had access to his BNY Mellon email account or company-issued electronic devices.  As a result, Mr. Yang was forced to email his former report's personal email account to comply with DLP's directives.

97.     Upon information and belief, despite downloading his contact list and leaving BNY Mellon to work for a direct competitor, the employee on garden leave was not subjected to any discipline.  Rather, he was only required to sign a certification attesting to the destruction and/or deletion of all confidential, proprietary, or sensitive BNY Mellon information.  The employee on garden leave did not forfeit any vested incentive compensation, nor did he incur a financial penalty. BNY Mellon did not pursue subsequent legal action against him.

98.     DLP did not seek a meeting with Mr. Yang following Mr. Yang's email to his former report.

### *The Second Email*

99.     The second alleged email violation occurred on or about August 29 or 30, 2018. Mr. Yang, while traveling on business, sent a presentation he was working on involving the Stira Fund to his personal email address because it could not be accessed on his work phone or iPad. The presentation at issue was Stira Adviser's answers to Alcentra's requests for information sent following the August 23 Board meeting.   Stira Fund requested that Mr. Yang review the presentation before it was sent to Mr. Forbes-Nixon .  In turn, Mr. Forbes-Nixon was pressuring Mr. Yang to finalize the presentation and to provide him with rapid responses to his follow-up questions.

100.    Additionally, Mr. Yang was experiencing technical difficulties with BNY Mellon's remote access Citrix system.   The remote access system was incompatible with Mr. Yang's personal iPad and the iPad which BNY Mellon had provided to him.  Additionally, the software used to create the Stira Fund's presentation was not compatible with Mr. Yang's iPad.  Instead, the presentation needed to be reviewed on a desktop computer.

101.    Given that Mr. Forbes-Nixon was pressuring Mr. Yang to review the presentation in advance of the joint meeting scheduled for September 6, Mr. Yang sent a copy of the

presentation to his personal email account and accessed it in the business center of the hotel where he was staying.

102.    DLP did not seek a meeting with Mr. Yang as a result of sending a copy of the presentation to his personal email account for business purposes.  It was not until November 2018 that BNY Mellon notified Mr. Yang that his sending of the presentation to his personal email account violated BNY Mellon's email policy.

103.    Mr. Yang did not share the presentation with any unauthorized parties, nor did working on the presentation at Mr. Forbes-Nixon's direction cause harm to BNY Mellon's business or reputation.  To the contrary, Mr. Yang's efforts resulted in his efficient transmission of information Mr. Forbes-Nixon needed, particularly given the pressing deadline he set. Moreover, to ensure that future technical difficulties would not impair his ability to work, Mr. Yang invested in new desktop and laptop computers which he configured for use with BNY Mellon's remote access system.  BNY Mellon never reimbursed Mr. Yang for the costs of these new computers.

### The Third Email

104.    It was not until Mr. Yang inadvertently forwarded an attachment to his wife on November 27, 2018, that Mr. Forbes-Nixon seized on the prior two emails to justify terminating Mr. Yang.

105.    In November 2018, Mr. Yang received an email announcing that Alcentra entities had broken records for fundraising.  Mr. Yang was eager and proud to share the good news with his wife, who did not work.  Without realizing that the congratulatory email contained an attachment with Alcentra NY's client names, Mr. Yang forwarded the email to his wife.  Neither the email nor the attachment was shared with anyone other than Mr. Yang's wife.

106.     DLP flagged that Mr. Yang had shared the attachment containing a list of Alcentra NY's clients.  DLP then notified Mr. Forbes-Nixon of this fact on November 29, 2018 and followed up with him on December 4, 2018.  In its email, DLP noted that "[a]s this is Mr. Yang's third violation, Human Resources *may be notified if there is another incident report filed*."  DLP also asked Mr. Forbes-Nixon to review the email and attachment which Mr. Yang had sent, advise if they were "deemed sensitive and/or confidential information," and share with DLP any other concerns he may have.  Mr. Forbes-Nixon initially did not respond to DLP's November 29 email, prompting DLP to send him a second email on December 4.

107.     On December 4, 2018, Mr. Forbes-Nixon contacted Mr. Yang regarding the email but made no mention of any attachment.  Without understanding the context of Mr. Forbes-Nixon's email, Mr. Yang thought he was being criticized for merely sending a generic congratulatory email to his wife.  Mr. Yang learned that he had sent an attachment externally only when DLP made him aware of that fact during an investigation into the matter.  Upon learning this, he immediately instructed his wife to delete the email and confirmed the deletion to Mr. Forbes-Nixon.

108.     DLP team routinely monitors emails sent external to the BNY Mellon network, and will notify an employee's supervisor of emails sent externally.  Upon information and belief, DLP does not have the authority to terminate employees.  Such decisions are at the discretion of the employee's supervisor, who can act upon the recommendation of DLP or ignore it.  Here, Mr. Forbes-Nixon exercised his discretion and terminated Mr. Yang, allegedly "for cause" on January 14, 2019.

109.     During Mr. Yang's termination meeting, BNY Mellon's then-head of Human Resources admitted that everybody occasionally sends email to their personal email address.  She also told Mr. Yang that she disagreed with the determination to terminate him for the email

violations.  Mr. Yang noted in the meeting that other BNY Mellon employees had committed far more significant violations of company email policy without being disciplined, let alone terminated.

110.    For example, in Mr. Yang's capacity as FINRA Supervisor, he routinely reviewed emails sent by BNY Mellon employees that constituted violations of FINRA.  Mr. Yang was aware of instances where employees had over ten BNY Mellon/FINRA email infractions in a single month.  Upon information and belief, these employees were not terminated by BNY Mellon as a result.

111.    Further, during one of Mr. Yang's monthly meetings with the Head of U.S. Compliance, he raised the fact that Mr. Yang had a few email violations.  The Head of U.S. Compliance acknowledged that the bank's email policy was frequently violated and that employees routinely emailed work documents to their personal email accounts in order to work remotely.  He also observed that email policy violations that also constituted violations of FINRA regulations (unlike Mr. Yang's) were taken more seriously by the bank than email policy violations that did not run afoul of FINRA (like Mr. Yang sending work documents to his personal email account in order to work while at home or traveling for business).

112.    At no time did Mr. Yang's conduct cause harm to Defendants' business or reputation.  Further, Mr. Yang's conduct lacked any malicious intent.  Upon information and belief, BNY Mellon has not terminated employees for violations of its email policies when there has been no harm to BNY Mellon's business, or when the employee's actions were done in furtherance of their job responsibilities and not intended to harm the company.

I.  **Mr. Yang Suffers Economic and Emotional Harm as a Result of Defendants' Unlawful Retaliation and Termination**

113.   Defendants' unlawful retaliation against and termination of Mr. Yang has caused him significant economic and emotional damages.

### *Economic Harm*

114.   Defendants have denied Mr. Yang both performance-based incentive compensation and deferred compensation, including for restricted units and options that would have vested but for Defendants' unlawful retaliation against Mr. Yang.  Forfeiture of Mr. Yang's deferred and incentive compensation by virtue of his termination for purported cause constitutes further ongoing retaliation against Mr. Yang for reporting his good-faith concerns.

### Incentive Compensation

115.   As a senior-level employee at Alcentra, a portion of Mr. Yang's compensation was paid out as restricted units pursuant to the Alcentra NY LLC U.S. Long Term Incentive Plan (defined above as the "LTIP").  Mr. Yang also received units subject to option pursuant to the LTIP.

116.   Section 3.1(a) of the LTIP granting Mr. Yang restricted units sets forth the three-year vesting period for such units:

> *Vesting; Settlement*.  Subject to Sections 3.1(c), 3.2 and 4.6 of this Agreement, if you remain continuously employed by [Alcentra NY], Alcentra UK or any other Company Group Member[6] through the close of business on the third anniversary of the Grant Date, the ***Restricted Units*** shall vest in full and no longer be subject to forfeiture on the date of such anniversary.

117.   In addition, Section 3.1(a) of the LTIP granting Mr. Yang units subject to option sets forth the three-year vesting period for such units:

> *Vesting*.  Subject to Sections 3.1(e), 3.2 and 4.6 of this Agreement, if you remain continuously employed by [Alcentra NY], Alcentra UK or any other Company

---

[6]   The LTIP does not define the terms "Company Group" or "Company Group Member."

Group Member through the close of business on the third anniversary of the Grant Date, the **Option** shall vest in full and no longer be subject to forfeiture on the date of such third anniversary.

118.    On June 30, 2017, Mr. Yang was awarded 163,194 Alcentra units, each consisting of one restricted Class B Unit of Alcentra NY and one restricted stock unit with respect to a UK Share of Alcentra Limited.  Also on June 30, 2017, Mr. Yang received 1,750,000 Alcentra Units subject to option, consisting of one Class B Unit Alcentra NY and one UK Share of Alcentra Limited.

119.    The restricted units and the options vested on March 7, 2020, or would have vested on March 7, 2020 but for Defendants' unlawful termination of Mr. Yang.

120.    Defendants have wrongfully adopted the position that because Mr. Yang was terminated for purported cause, he is not entitled to the vested units.  However, the LTIP does not permit Alcentra NY to cancel Mr. Yang's units in these circumstances.  As discussed above, although Mr. Yang's termination was purportedly based on email policy violations, this was transparent pretext for Defendants' unlawful retaliation.  Section 3.1(b) of the LTIP, titled "Forfeiture upon Termination of Employment," does not provide for forfeiture upon termination of employment where, as here, such termination was in retaliation for protected conduct and prohibited by law.  Nor does Section 4.6 of the LTIP, titled "Forfeiture and Repayment," provide for forfeiture in these circumstances.  While Section 4.6 does permit Alcentra NY to cancel units when an employee has "engaged in conduct **materially adverse** to the interests of the Company Group in breach of [his or her] duties to the Company Group," here, Mr. Yang has not engaged in such conduct.  Indeed, the first two emails that allegedly violated BNY Mellon's email policy were sent at the *direction* of BNY Mellon and/or to *advance* the interests of BNY Mellon's business.  Mr. Yang inadvertently sending the third email to his wife, who subsequently deleted it, was not a

"material" event, nor was such action adverse to the interests of Defendants BNY Mellon, Alcentra

NY, and/or Alcentra Limited.  Accordingly, Mr. Yang is entitled to the vested units.

<u>Deferred Compensation</u>

121.    Mr. Yang also participated in the Alcentra Limited and Alcentra NY LLC Long-

Term Incentive Cash Award Plan (defined above as the "Cash Plan"), a component of the LTIP.

122.    Section 1.1(b) of the Cash Plan specifies the employees eligible to participate in the

Cash Plan:

> [I]n the case of any employee other than the CEO of [Alcentra NY], the CEO of
> [Alcentra NY] shall designate which Employees are eligible to receive awards
> under this Plan for such Plan Year.

123.    A portion of Mr. Yang's compensation was credited annually each March 1

following the grant of an award under the Cash Plan, which was subject to a three-year vesting

period.  Specifically, Section 2.3 of the Cash Plan provides that:

> ***Each participant shall become 100% vested*** in that portion of his or her
> Measurement Account attributable to an Award Amount ***on the third anniversary***
> ***of the Grant Date*** (with respect to each such Award Amount, its "Determination
> Date") provided s/he on such date is, and has continuously been through the vesting
> period, an Employee.

124.    On March 1 of 2016, 2017, and 2018, a portion of Mr. Yang's compensation was

deferred pursuant to the Cash Plan.  Defendants terminated Mr. Yang a mere two months before

his first payment was to vest on March 1, 2019.

125.    The awards granted on each of March 1, 2016 and 2017 vested on March 1, 2019

and March 1, 2020, respectively, or would have vested on these dates but for Defendants' unlawful

termination of Mr. Yang.

126.    Defendants have wrongfully adopted the position that because Mr. Yang was

terminated for purported cause, he is not entitled to the vested awards.  However, the Cash Plan

does not permit Alcentra NY to cancel Mr. Yang's awards in these circumstances.  As discussed

above, although Mr. Yang's termination was purportedly based on email policy violations, this was transparent pretext for Defendants' unlawful retaliation.  The Cash Plan does not provide for forfeiture upon termination of employment where, as here, such termination was in retaliation for protected conduct and prohibited by law.  While Section 3.3 of the Cash Plan, which describes how a Participant may forfeit his or her awards in the Plan, does permit BNY Mellon to reduce a Participant's awards if the Participant "has engaged in *fraud* or *conduct* that directly or indirectly causes or *contributes to any financial restatements or irregularities* of [Alcentra NY]," here, Mr. Yang's conduct falls far short of this standard for the same reasons discussed in paragraph 120 *supra*.  Accordingly, Mr. Yang is entitled to the vested awards.

### *Emotional Distress*

127.    Defendants' conduct toward Mr. Yang has also caused him to suffer emotional distress and reputational injury.  Mr. Yang, in addition to providing for his immediate family, also furnishes financial support to his extended family.  Despite actively and earnestly seeking alternative employment, Mr. Yang has been unsuccessful to date.  The seizure of Mr. Yang's compensation by Defendants BNY Mellon, Alcentra NY, and Alcentra Limited has prevented him from providing that necessary support, which has placed both Mr. Yang and those who depend upon him under considerable stress.  Further, the stresses of the past nearly two years as a result of Defendants' unlawful and retaliatory conduct have caused Mr. Yang to suffer physically.

128.    Moreover, Mr. Yang's efforts to find alternative employment have been complicated by the nature of his departure from Defendants.  Based on the retaliation that Mr. Yang has suffered, and the purported cause that Defendants have used to justify Mr. Yang's termination, Mr. Yang cannot rely on Defendants to provide an accurate reference regarding Mr. Yang to prospective employers.  Further, during the pendency of the OSHA proceedings against Defendants, Mr. Yang has been hesitant to discuss the true circumstances surrounding his

departure from Defendants with prospective employers, and Mr. Yang believes that prospective employers may be suspicious regarding the reasons for Mr. Yang's sudden unemployment.

## FIRST CAUSE OF ACTION

**For Violations of Section 806 of Sarbanes-Oxley, 18 U.S.C. § 1514A
Against BNY Mellon, Alcentra NY, and Alcentra Limited**

129.    Mr. Yang repeats and realleges each and every allegation above as though fully set forth herein.

130.    This cause of action is brought by Mr. Yang against Defendants BNY Mellon, Alcentra NY, and Alcentra Limited for violations of Section 806 of Sarbanes-Oxley, 18 U.S.C. § 1514A.

131.    BNY Mellon is a publicly traded company, the securities of which are registered under Section 12 of the Securities Exchange Act of 1934, within the meaning of 18 U.S.C. § 1514A.  BNY Mellon is required to file reports under Section 15(d) of the Securities Exchange Act of 1934, within the meaning of 18 U.S.C. § 1514A.

132.    Alcentra NY is a wholly-owned subsidiary of BNY Alcentra Group, whose financial information is included in the consolidated financial statements of BNY Mellon.  At all relevant times, Alcentra NY was acting as an agent and contractor of BNY Mellon, within the meaning of 18 U.S.C. § 1514A.

133.    Alcentra Limited is a wholly-owned subsidiary of BNY Alcentra Group, whose financial information is included in the consolidated financial statements of BNY Mellon.  At all relevant times, Alcentra Limited was acting as an agent and contractor of BNY Mellon, within the meaning of 18 U.S.C. § 1514A.

134.    At all relevant times, Mr. Yang was an employee of Defendants BNY Mellon, Alcentra NY, and Alcentra Limited.

135.    Mr. Yang engaged in a protected activity within the meaning of 18 U.S.C. § 1514A by reporting that Alcentra's management committee had issued a directive ordering the immediate resignation of Alcentra NY as subadvisor to the Stira Fund, which Mr. Yang reasonably believed would constitute violations of the Investment Advisers Act of 1940 and the Investment Company Act of 1940, and breaches of fiduciary duties and contractual obligations.

136.    Mr. Yang provided information to BNY Mellon's Counsel for the Stira Fund and Alcentra NY's Head of Compliance to assist in an investigation regarding this conduct.  Mr. Yang reported to individuals within BNY Mellon and Alcentra who had supervisory authority over Mr. Yang and/or the authority to investigate, discover, or terminate misconduct.

137.    As a direct result of the information that Mr. Yang provided to BNY Mellon Counsel for the Stira Fund and the Head of Compliance for Alcentra NY, Defendants, acting through agents including the CEO of Alcentra, harassed Mr. Yang, discriminated against Mr. Yang in the conditions of his employment, subjected Mr. Yang to a hostile work environment, took adverse employment actions against Mr. Yang, and ultimately wrongfully terminated Mr. Yang in January 2019, in retaliation for his reporting to his supervisors of Defendants' illegal plan.

138.    Defendants BNY Mellon, Alcentra NY, and Alcentra Limited are vicariously liable for the actions of its employees, including those of the CEO of Alcentra.

139.    The circumstances surrounding Mr. Yang's termination show that his protected activity was the reason for the CEO's decision to terminate Mr. Yang's employment with Defendants BNY Mellon, Alcentra NY, and Alcentra Limited.

140.    The harassment suffered by Mr. Yang, as stated above, perpetrated by Defendants was a direct violation of Section 806 of Sarbanes-Oxley.

141.    As a direct and proximate result of Defendant BNY Mellon, Alcentra NY, and Alcentra Limited's retaliatory conduct, Mr. Yang has suffered and continues to suffer significant economic damages, including but not limited to loss of his incentive and deferred compensation, emotional harm, and reputational injuries.

142.    By virtue of the conduct alleged herein, Defendants BNY Mellon, Alcentra NY, and Alcentra Limited have violated Section 806 of Sarbanes-Oxley, and are liable to Mr. Yang for damages in an amount to be determined at trial.

143.    Mr. Yang requests back pay, calculated based upon his base salary, as set forth in the March 8, 2013 offer letter, together with his historical annual bonus while employed by Defendants, of at least $4.8 million, and including the restoration of his incentive and deferred compensation of at least $4.2 million pursuant to the LTIP and Cash Plan, to which Defendants Alcentra NY and Alcentra Limited are parties.

144.    Upon information and belief, Mr. Yang does not believe he can return to work for Defendants under the circumstances.  Based on Defendants' unlawful retaliation against Mr. Yang, and the concern that Defendants will not provide a favorable reference on Mr. Yang's behalf to prospective employers, Mr. Yang's successful decades-long career at the senior-executive level has come to a standstill.  There are few alternative positions available in the industry commensurate with the seniority and compensation level Mr. Yang had while employed by Defendants.  Despite his good faith and wide-ranging efforts to secure comparable employment, Mr. Yang has been unsuccessful in finding another suitable position.

145.    Mr. Yang requests a "make whole" remedy of at least $7 million that includes a continuation of his income at his base salary, as set forth in the March 8, 2013 offer letter, together

with his historical annual bonus, along with the value of the fringe benefits provided during his employment by Defendants calculated to his expected retirement age of 65.

146.    Mr. Yang also seeks special damages for injury to his health and reputation, including but not limited to reimbursement for pain and suffering, as well as payment of all associated attorneys' fees and costs as also called for by Section 806 of Sarbanes Oxley.

## SECOND CAUSE OF ACTION

### For Breach of the Alcentra NY LLC Long-Term Incentive Plan ("LTIP") Against Alcentra NY LLC and Alcentra Limited

147.    Mr. Yang repeats and realleges each and every allegation above as though fully set forth herein.

148.    Mr. Yang entered into the valid and enforceable LTIP with Alcentra NY and Alcentra Limited, pursuant to which Mr. Yang agreed to provide services to Alcentra NY and Alcentra Limited.

149.    As a senior-level employee, a portion of Mr. Yang's compensation was paid out as units pursuant to the LTIP.  Under the LTIP, as part of his compensation, Mr. Yang was awarded restricted units and options in Alcentra NY and Alcentra Limited.  According to Section 3.1(a) of the LTIP, the restricted units and units subject to option granted under this agreement are subject to a three-year vesting period.

150.    On June 30, 2017, Mr. Yang was awarded 163,194 Alcentra Units, each consisting of one restricted Class B Unit of Alcentra NY and one restricted stock unit with respect to a UK Share of Alcentra Limited.  Also on June 30, 2017, Mr. Yang received 1,750,000 Alcentra Units subject to option, consisting of one Class B Unit Alcentra NY LLC and one UK Share of Alcentra Limited.  Both the restricted units and the options vested on March 7, 2020, or would have vested on March 7, 2020 but for Defendants' unlawful termination of Mr. Yang.

151.    Defendants have wrongfully adopted the position that because Mr. Yang was terminated for purported cause, he is not entitled to the vested units, nor is he entitled to information provided to investors to properly value the worth of the compensation he is due. However, the LTIP does not permit Alcentra NY to cancel Mr. Yang's units in these circumstances.  As discussed above, although Mr. Yang's termination was purportedly based on email policy violations, this was transparent pretext for Defendants' unlawful retaliation.  Section 3.1(b) of the LTIP, titled "Forfeiture upon Termination of Employment," does not provide for forfeiture upon termination of employment where, as here, such termination was in retaliation for protected conduct and prohibited by law.  Nor does Section 4.6 of the LTIP, titled "Forfeiture and Repayment," provide for forfeiture in these circumstances.   While Section 4.6 does permit Alcentra NY to cancel units when an employee has "engaged in conduct materially adverse to the interests of the Company Group in breach of [his or her] duties to the Company Group," here, Mr. Yang has not engaged in such conduct.  Indeed, the first two emails that allegedly violated BNY Mellon's email policy were sent at the direction of BNY Mellon and/or to advance the interests of BNY Mellon's business.  Mr. Yang inadvertently sending the third email to his wife, who subsequently deleted it, was not a "material" event, nor was such action adverse to the interests of Defendants BNY Mellon, Alcentra NY, and/or Alcentra Limited.  Accordingly, Mr. Yang is entitled to the vested units.

152.    Alcentra NY and Alcentra Limited breached their contractual obligations by holding that Mr. Yang has forfeited his units, withholding the units which have vested, and refusing to provide information regarding their present value.

153.    As a direct and proximate result of Alcentra NY and Alcentra Limited's breaches of the LTIP, Mr. Yang has suffered economic harm.

154.    Mr. Yang has suffered damages of at least $4.2 million as a result of Alcentra NY and Alcentra Limited's combined breaches of the LTIP and Cash Plan, discussed below.

**THIRD CAUSE OF ACTION**

**For Breach of the Alcentra Limited & Alcentra NY LLC U.S. Long-Term Incentive Cash Award Plan (the "Cash Plan") Against Alcentra NY LLC and Alcentra Limited**

155.    Mr. Yang repeats and realleges each and every allegation above as though fully set forth herein.

156.    Mr. Yang entered into the valid and enforceable Cash Plan with Alcentra NY and Alcentra Limited, pursuant to which Mr. Yang agreed to render services to Alcentra NY and Alcentra Limited.  The Cash Plan, which is a component of LTIP, governs deferred compensation for the CEO of Alcentra NY and any employees designated by the CEO.

157.    Under the Cash Plan, a portion of Mr. Yang's annual compensation was deferred with a three-year vesting schedule.

158.    A portion of Mr. Yang's compensation was credited each March 1 following the grant of an award under the Cash Plan, which was subject to a three-year vesting period. Specifically, Section 2.3 of the Cash Plan provides that:

> ***Each participant shall become 100% vested*** in that portion of his or her Measurement Account attributable to an Award Amount ***on the third anniversary of the Grant Date*** (with respect to each such Award Amount, its "Determination Date") provided s/he on such date is, and has continuously been through the vesting period, an Employee.

159.    On March 1 of 2016, 2017, and 2018, a portion of Mr. Yang's compensation was deferred pursuant to the Cash Plan.  Defendants terminated Mr. Yang a mere two months before his first award was to vest on March 1, 2019.  The awards granted on each of March 1, 2016 and 2017 vested on March 1, 2019 and March 1, 2020, respectively, or would have vested on these

dates but for Defendants' unlawful termination of Mr. Yang.  Upon information and belief, the deferred compensation owed Mr. Yang which has vested is worth millions.

160.    Defendants have wrongfully adopted the position that because Mr. Yang was terminated for purported cause, he is not entitled to the awards that have vested, nor is he entitled to information provided to investors to properly value the worth of the compensation he is due.  However, the Cash Plan does not permit Alcentra NY to cancel Mr. Yang's awards in these circumstances.  As discussed above, although Mr. Yang's termination was purportedly based on email policy violations, this was transparent pretext for Defendants' unlawful retaliation.  The Cash Plan does not provide for forfeiture upon termination of employment where, as here, such termination was in retaliation for protected conduct and prohibited by law.  While Section 3.3 of the Cash Plan, which describes how a Participant may forfeit his or her awards in the Plan, does permit BNY Mellon to reduce a Participant's awards if the Participant "has engaged in *fraud* or conduct that *directly or indirectly causes or contributes to any financial restatements or irregularities* of [Alcentra NY]," here, Mr. Yang's conduct falls far short of this standard.  Mr. Yang's email policy violations, the purported cause for his termination, consisted of two emails that were sent at the *direction* of BNY Mellon and/or to *advance* the interests of BNY Mellon's business, and a third email inadvertently sent to his wife, who subsequently deleted it.  Defendants have made no allegations of fraud or contribution to financial restatements or irregularities with respect to these emails, or with respect to any other conduct of Mr. Yang.  Accordingly, Mr. Yang is entitled to the vested awards.

161.    Alcentra NY and Alcentra Limited breached their contractual obligations by holding that Mr. Yang has forfeited his awards, withholding the awards which have vested, and refusing to provide information regarding their present value.

162.    As a direct and proximate result of Alcentra NY and Alcentra Limited's breaches of the Cash Plan, Mr. Yang has suffered economic harm.

163.    Mr. Yang has suffered damages of at least $4.2 million as a result of Alcentra NY and Alcentra Limited's combined breaches of the LTIP and Cash Plan.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Yang prays for relief and judgment as follows:

A.    An order entering judgment in favor of Mr. Yang against Defendants;

B.    An order awarding Mr. Yang back pay, reflecting bonuses and base pay of at least $4.8 million, deferred compensation of at least $4.2 million, raises, and benefits in an amount to be determined at trial together with pre- and post-judgment interest as may be provided by contract or law;

C.    An order finding that reinstatement is not appropriate;

D.    An order awarding Mr. Yang front pay of at least $7 million, together with pre- and post-judgment interest as may be provided by contract or law;

E.    An order awarding special damages for Mr. Yang's emotional distress and loss of reputation;

F.    Pre-judgment and post-judgment interest on all amounts due;

G.    An order awarding costs and expenses, as well as reasonable attorneys' fees, incurred by Mr. Yang in this action to the fullest extent permitted by law;

H.    An order requiring Defendants to refrain from any further violations of the whistleblower provisions of Sarbanes-Oxley; and

I.    Such other relief, including equitable or injunctive relief, as is just and proper under the circumstances.

DATED:   New York, New York
         April 22, 2020                      QUINN EMANUEL URQUHART &
                                                SULLIVAN, LLP


                                             By:/s/ Peter E. Calamari
                                                Peter E. Calamari
                                                Manisha M. Sheth
                                                Kimberly E. Carson
                                                petercalamari@quinnemanuel.com
                                                manishasheth@quinnemanuel.com
                                                kimberlycarson@quinnemanuel.com

                                             51 Madison Avenue, 22nd Floor
                                             New York, New York 10010-1601
                                             (212) 849-7000

                                             *Attorneys for Plaintiff John ("Jack") Yang*