**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN ("JACK") YANG, | |
| Plaintiff, | Case No. 1:20-cv-03179-AJN |
| v. | *Electronically Filed* |
| THE BANK OF NEW YORK MELLON CORPORATION, ALCENTRA NY, LLC, and ALCENTRA LIMITED, | ***ORAL ARGUMENT REQUESTED*** |
| Defendants. | |

**DEFENDANTS' NOTICE OF MOTION**
**TO DISMISS PLAINTIFF'S COMPLAINT**

**PLEASE TAKE NOTICE** that, upon the accompanying Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint, and upon all prior papers and proceedings in this action, Defendants The Bank of New York Mellon Corporation, Alcentra NY, LLC, and Alcentra Limited will move this Court before the Honorable Alison J. Nathan, United States District Judge, at the United States Courthouse located at 40 Foley Square, Courtroom 906, New York, New York 10007, at a date and time to be determined by the Court, for an order, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, dismissing with prejudice all claims alleged against Defendants in the Complaint, and for such other further relief as this Court may deem just and proper.

Dated:  June 22, 2020

Respectfully submitted,

/s/ Michael L. Banks
Michael L. Banks
W. John Lee
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
Tel.: (215) 963-5210
Fax: (215) 963-5001
Michael.Banks@morganlewis.com
W.John.Lee@morganlewis.com

*Attorney for Defendants The Bank of New York Mellon Corporation, Alcentra, NY LLC, and Alcentra Limited*

**<u>CERTIFICATE OF ELECTRONIC FILING AND SERVICE</u>**

I hereby certify that on June 22, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ W. John Lee*
W. John Lee

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JOHN "JACK" YANG,

                Plaintiff,

vs.

THE BANK OF NEW YORK MELLON
CORPORATION, ALCENTRA NY, LLC, and
ALCENTRA LIMITED,

        Defendants.

Case No. 1:20-cv-03179-AJN

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANTS' MOTION TO DISMISS THE COMPLAINT</u>**

MORGAN, LEWIS & BOCKIUS LLP

Michael L. Banks (*pro hac vice*)
W. John Lee (*pro hac vice*)
1701 Market Street
Philadelphia, PA 19103
Tel.: (215) 963-5000
Fax: (215) 963-5001
Michael.Banks@morganlewis.com
W.John.Lee@morganlewis.com

*Attorney for Defendants The Bank of New York Mellon*
*Corporation, Alcentra NY, LLC, and Alcentra Limited*

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ............................................................................................ 1

II.   SUMMARY OF PLAINTIFF'S FACTUAL ALLEGATIONS ........................................ 2

    A.    Defendants BNY Mellon, Alcentra NY, And Alcentra Limited ........................... 2

    B.    Plaintiff John "Jack" Yang Was A Senior Executive At Alcentra And Served On The Board Of The Stira Fund ............................................................ 3

    C.    Alcentra NY Considered Resigning As Subadvisor To The Stira Fund Based On The Fund's Under-Performance ......................................................... 3

    D.    Plaintiff's Alleged Protected Activity Consists Solely Of His Purported Expression of Concern About When Alcentra NY Could Resign Its Subadvisor Role To The Stira Fund ..................................................................... 4

    E.    Alcentra NY's Obligation Regarding When It Could Resign Its Sub-Advisor Role Is Solely Contractual ................................................................. 5

    F.    Mr. Yang's Breach Of Contract Claims Seek To Recover Compensation Under Discretionary Incentive Plans .................................................................. 7

III.  LEGAL STANDARD ..................................................................................... 8

IV.   ARGUMENT ............................................................................................... 9

    A.    The Claim For Whistleblower Retaliation Under Section 806 Of SOX Should Be Dismissed Because Plaintiff Has Not Plausibly Alleged That He Engaged In Protected Activity Under SOX .................................................... 9

        1.    Section 806 of SOX ..................................................................... 9

        2.    Mr. Yang Did Not Engage In Activity Protected by SOX When He Purportedly Raised Concerns About When Alcentra NY Could Resign As Subadvisor To The Stira Fund ................................. 10

    B.    Plaintiff's Second And Third Causes Of Action For Breach Of Long-Term Incentive Plans Fail Because He Seeks Unvested Awards Under Discretionary Incentive Plans That State They Are Not Contracts ................... 16

V.    CONCLUSION ............................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allaire Corp. v. Okumus,*
    433 F.3d 248 (2d Cir. 2006)..............................................................................8

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)......................................................................................8, 12

*Bechtel v. Admin. Review Bd., U.S. Dep't of Labor,*
    710 F.3d 443 (2d Cir. 2013).........................................................................9, 11

*Cortec Indus. Inc. v. Sum Holding L.P.,*
    949 F.2d 42 (2d Cir. 1991)................................................................................9

*Diaz v. Transatlantic Reinsurance Co.,*
    No. 16-1355, 2016 WL 3568071 (S.D.N.Y. June 22, 2016) ......................10, 12, 15

*Grieve v. Barclays Capital Sec. Ltd.,*
    No. 602820/98, 1999 WL 1680653 (Sup. Ct. N.Y. Co. Sept. 10, 1999) ................17

*Hall v. United Parcel Serv. of Am., Inc.,*
    76 N.Y.2d 27, 36 (N.Y. 1990) ...........................................................................17

*Hunt Ltd. v. Lifschultz Fast Freight, Inc.,*
    889 F.2d 1274 (2d Cir. 1989)............................................................................17

*In the Matter of: Anita Johnson, Complainant v. Wellpoint, Inc., Respondent,*
    No. 2010-SOX-00038, 2011 WL 764714 (U.S. Dept. of Labor Feb. 25, 2011) ..............12, 15

*In re Alstom SA,*
    406 F. Supp. 2d 346 (S.D.N.Y. Dec. 22, 2005) .....................................................9

*In re Mylan Sec. N.V. Litig.,*
    No. 16-cv-7926, 2019 WL 1427430 (S.D.N.Y. Mar. 29, 2019).................................8

*Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n,*
    655 F.3d 136 (2d Cir. 2011)...............................................................................9

*Karmilowicz v. Hartford Fin. Servs. Group,*
    No. 11-cv-539, 2011 WL 2936013 (S.D.N.Y. July 4, 2011), *aff'd,* 494 F.
    App'x 153 (2d Cir. 2012)............................................................................. *passim*

*Kavitz v. IBM,*
    458 F. App'x 18 (2d Cir. 2012) ..........................................................................19

*Kramer v. Time Warner, Inc.*,
  937 F.2d 767 (2d Cir. 1991)...................................................................................6, 9

*Lawson v. FMR LLC*,
  571 U.S. 429 (2014)...............................................................................................10

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
  906 F.2d 884 (2d Cir. 1990)....................................................................................16

*Nielsen v. AECOM Tech. Corp.*,
  762 F.3d 214 (2d Cir. 2014)......................................................................13, 15, 16

*O'Dell v. Trans World Entm't Corp.*,
  153 F. Supp. 2d 378 (S.D.N.Y. 2001).....................................................................17

*PaineWebber Inc. v. Bybyk*,
  81 F.3d 1193 (2d Cir. 1996)....................................................................................16

*Rexnord Holdings, Inc. v. Bidermann*,
  21 F.3d 522 (2d Cir. 1994)......................................................................................16

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000).....................................................................................5, 9

*Sasson v. TLG Acquisition LLC*,
  9 N.Y.S.3d 2 (1st Dept. 2015) ................................................................................17

*Sylvester v. Parexel Intl. LLC*,
  ARB Case No. 07-123, 2011 WL 2165854 (ARB, May 25, 2011).........................11

*Timian v. Johnson & Johnson*,
  No. 15-cv-06125, 2015 WL 6454766 (W.D.N.Y. Oct. 26, 2015) ................... *passim*

*Tonra v. Kadmon Holdings, Inc.*,
  405 F. Supp. 3d 576, 589 (S.D.N.Y. 2019)..............................................................9

*Wilson v. Merrill Lynch & Co.*,
  671 F.3d 120 (2d Cir. 2011).....................................................................................8

*Wolff v. Rare Medium, Inc.*,
  210 F. Supp. 2d 490 (S.D.N.Y. 2002)....................................................................16

**STATUTES**

18 U.S.C. § 1514A .............................................................................................. *passim*

Investment Advisers Act of 1940 .......................................................................... *passim*

Investment Company Act of 1940 .......................................................................... *passim*

**OTHER AUTHORITIES**

Advisers Act Rel. No. 5248 (June 5, 2019) ............................................................................13, 14

## I.     INTRODUCTION

Plaintiff John "Jack" Yang is a former senior executive of Defendants Alcentra NY, LLC ("Alcentra NY") and Alcentra Limited (collectively, "Alcentra"), which are wholly owned subsidiaries of Defendant The Bank of New York Mellon Corporation ("BNY Mellon") (together with Alcentra NY and Alcentra Limited, "Defendants").  As Mr. Yang admits in his Complaint, his employment was terminated after he engaged in repeated violations of Defendants' policies on the protection of confidential information and data loss prevention.  Mr. Yang alleges, however, that he was terminated for opposing a plan by Alcentra NY to resign from its role as a sub-adviser to an investment fund, the Stira Alcentra Global Credit Fund ("Stira Fund").  He brings a retaliation claim against Defendants under Section 806 of Sarbanes-Oxley ("Sarbanes-Oxley" or "SOX") and breach of contract claims relating to compensation that he alleges to be owed.  Mr. Yang's claims should be dismissed for failure to state a claim upon which relief can be granted.

Mr. Yang has not alleged facts suggesting that he engaged in protected activity under SOX.  According to Mr. Yang, he expressed concern about the timing of Alcentra NY's resignation from its sub-adviser role to the Stira Fund, and that is why he was terminated.  He does not contend, however, that a fraud was perpetrated or planned by Alcentra NY, nor does he cite any statute or any rule or regulation of the Securities and Exchange Commission that governs this alleged timing issue.  Rather, he suggests that an early resignation as sub-adviser might have breached contractual and other obligations to the Fund.  Such opposition to a proposed business decision by Alcentra NY is not "protected activity" under SOX, and cannot support a SOX retaliation claim.

Mr. Yang's breach of contract claims also fail as a matter of law, for two reasons.  First, Mr. Yang's employment ended before his awards of incentive compensation had vested and

therefore were forfeited under the terms of the controlling plans.  Second, the incentive

compensation plans reserved to Defendants complete discretion to pay or deny the compensation

at issue, and, therefore, Mr. Yang has no right to the compensation he is seeking.

For these reasons, Defendants respectfully request that the Court grants this Motion and

dismiss all of Plaintiff's claims with prejudice.

## II.     SUMMARY OF PLAINTIFF'S FACTUAL ALLEGATIONS[1]

### A.     Defendants BNY Mellon, Alcentra NY, And Alcentra Limited.

Alcentra NY and Alcentra Limited "are registered investment advisers under the

Investment Advisers Act of 1940" and are both wholly owned subsidiaries of BNY Mellon.

Compl. ¶¶ 2, 24-25.  "BNY Mellon is a publicly-traded company that provides banking and

financial services."  *Id.* ¶ 24.

On March 23, 2017, Alcentra NY agreed to serve as a sub-adviser to the Stira Fund,

which is a closed-end registered investment company[2] that is regulated under the Investment

Company Act of 1940, by entering into a Sub-Advisory Agreement with Stira Adviser.  *Id.*

¶¶ 26-27.  "In its role as subadvisor to the Stira Fund, Alcentra NY was responsible for managing

the investment portfolio, making investment decisions, executing on trading strategies, and

keeping the Stira Fund and its advisor, Stira Adviser, informed about the status of the market and

portfolio through regular reports, presentations, and participation in meetings of the Stira Fund's

Board of Trustees."  *Id.* at ¶ 27.  A copy of the Stira Fund's prospectus, as filed with the SEC in

February 2018, outlined the responsibilities of Alcentra NY as the sub-adviser and "the

investment strategy for the Stira Fund."  *Id.* ¶¶ 28, 30-31.

---

[1]     Defendants assume, as they must, that the factual allegations in Complaint are true only
for purposes of this Motion.

[2]     Publicly offered closed-end funds that make periodic offerings to repurchase shares from
shareholders, such as the Stira Fund, are often referred to in the marketplace as "interval funds."

### B. Plaintiff John "Jack" Yang Was A Senior Executive At Alcentra And Served On The Board Of The Stira Fund.

Mr. Yang started working for Defendants as a Managing Director and Head of Business Development for the Americas for Alcentra NY in March 2013.  Compl. ¶¶ 3, 37.  In April 2014, Mr. Yang was promoted to Global Head of Business Development for Alcentra and later promoted in January 2016 to Head of the Americas for Alcentra NY.  *Id.* ¶¶ 3, 38.  Around 2016, "Mr. Yang joined Alcentra's management committee," which "oversaw Alcentra entities' obligations to the various funds in which they were engaged as advisors or subadvisors and evaluated their strategic decisions."  *Id.* ¶ 39.

"Mr. Yang also held a seat on the Board of Trustees of the Stira Fund from approximately February 2018 until May 2019, when the Stira Fund was dissolved."  *Id.* ¶ 16. "Given Alcentra NY's role as subadvisor to the Stira Fund, Mr. Yang was listed as an interested trustee in the offering materials" and "attended the Stira Fund's quarterly Board meetings as well as the special meetings held in the first-half of 2019, during which time the Stira Fund was considering strategic alternatives."  *Id.* ¶ 46.

### C. Alcentra NY Considered Resigning As Subadvisor To The Stira Fund Based On The Fund's Under-Performance.

In the middle of 2018, members of the Boards of Alcentra NY and Alcentra Limited grew concerned about the Stira Fund because the Fund "had been underperforming."  Compl. ¶ 48. On August 21, 2018, Alcentra's management committee met in London ahead of a board meeting of the Stira Fund to be held on August 23, 2018.  *Id.* ¶ 49.  During the August 21 meeting, Alcentra's CEO David Forbes-Nixon shared "that Alcentra's BNY Mellon Board members were displeased about Stira Adviser serving as advisor to the Stira Fund."  *Id.* ¶¶ 4, 50. Although Mr. Yang believed that "it was premature to consider resignation," Mr. Forbes-Nixon "instructed that Alcentra NY should resign as the Stira Fund's subadvisor as soon as possible."

*Id.* ¶¶ 51-52.  In response, Alcentra's "CFO noted that immediate termination was not possible as Alcentra NY was obligated under the terms of its subadvisor agreement to provide Stira Adviser with ninety days' notice of resignation."  *Id.* ¶ 53.  Mr. Yang alleges that, following this meeting, Alcentra's then-CIO "directed [the co-heads of U.S. direct lending and Plaintiff] to cease carrying out Alcentra NY's responsibilities as subadvisor and stated that there were to be ***no more investments, no more meetings, no more updates*** provided to the interval fund by Alcentra NY."  *Id.* ¶ 55 (emphasis in original); *see also id.* ¶ 39.

> **D.      Plaintiff's Alleged Protected Activity Consists Solely Of His Purported Expression of Concern About *When* Alcentra NY Could Resign Its Subadvisor Role To The Stira Fund.**

On August 21 or 22, 2018, Mr. Yang reached out to the President of the Stira Fund ("President") and informed him that "Alcentra's management committee discussed immediately terminating Alcentra NY's role as subadvisor to the interval fund."  Compl. ¶ 56.  In response, the President indicated that "immediate termination, along the lines Alcentra NY was considering, violated the terms of the subadvisor agreement."  *Id.*  Around that same time, "Mr. Yang informed [BNY Mellon's] Counsel for the Stira Fund of the directive by members of Alcentra's management committee to immediately stop providing subadvisor services to the Stira Fund."  *Id.* ¶ 59.

Mr. Yang alleges that he "engaged in a protected activity within the meaning of 18 U.S.C. § 1514A by reporting that Alcentra's management committee had issued a directive ordering the *immediate resignation* of Alcentra NY as subadvisor to the Stira Fund."  *Id.* ¶ 135 (emphasis added).  Mr. Yang contends that such an immediate resignation would have "constitute[d] violations of the Investment Advisers Act of 1940 and the Investment Company

Act of 1940, and breaches of fiduciary duties and contractual obligations." *Id.*[3]  His reference to the two statutes is purely conclusory, i.e., he does not identify what provisions of the statutes were arguably implicated or how a resignation from the sub-adviser role would have violated any statutory mandates.

### E.   Alcentra NY's Obligation Regarding *When* It Could Resign Its Sub-Advisor Role Is Solely Contractual.

Notably absent from Mr. Yang's Complaint is a reference or citation to any specific law, regulation, rule, or any other legal authority that governs the issue of *when* Alcentra NY could resign as sub-adviser to the Stira Fund.  This is because there is no such authority.  The only source of any purported obligation governing *when* Alcentra NY could resign its role is in the Sub-Advisory Agreement, attached as Exhibit ("Ex.") A.[4]  In other words, any restriction on the timing of a potential resignation was purely contractual, and not statutory or regulatory in nature.

The Sub-Advisory Agreement contains a notice provision regarding when and under what circumstances Alcentra NY could terminate the Sub-Advisory Agreement.  Paragraph 9(b)(ii) of the Sub-Advisory Agreement provides that it "shall automatically terminate . . . at any time, without the payment of any penalty, upon 60 days' written notice by the Adviser, if the Board of Trustees or a majority of the outstanding voting securities of the [Stira] Fund determine that th[e] Agreement should be terminated."  Ex. A, at ¶ 9(b)(ii).  Absent the circumstances

---

[3]     Although Mr. Yang's Complaint includes other allegations related to Alcentra NY's failure to implement the Stira Fund's publicly disclosed investment strategy, *see* Compl. ¶¶ 68-77, Mr. Yang notably does not allege (because he cannot) that he raised concerns about the other miscellaneous allegations to any Defendants.

[4]     The Sub-Advisory Agreement is integral to the Complaint and thus can be considered on a Rule 12(b)(6) motion.  *See Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (noting that in deciding a motion to dismiss, the Court may consider "any statements or documents incorporated in [the complaint] by reference" and "documents that plaintiff[ ] either possessed or knew about and upon which [he] relied in bringing the suit").

outlined in ¶ 9(b) of the Sub-Advisory Agreement, "the Adviser and Sub-Adviser agree[d] not to terminate th[e] Agreement for a period of 24 months from the Effective Date of th[e] Agreement except for 'cause' . . . ." *Id.* at ¶ 9(c).[5]  The Sub-Advisory Agreement became effective "as of the date the Registration Statement [was] declared effective by the SEC." *Id.* at ¶ 9(a).  As public filings show, the SEC declared the Stira Fund's Registration Statement effective on May 8, 2017. *See* Ex. B, Stira Alcentra Global Credit Fund, Notice of Effectiveness (May 8, 2017).[6]  Following the initial 24-month period, "each of the Adviser and the Sub-Adviser c[ould] terminate th[e] Agreement, without any penalty, upon 60 days' written notice to the other party." Ex. A, at ¶ 9(c).  The termination provisions are also discussed in the Stira Fund's public filings with the SEC.  *See, e.g.*, Ex. C, Stira Alcentra Global Credit Fund, Registration Statement for Closed-End Investment Companies (Second Pre-Effective Amendment on Form N-2), at p. B-23 (Apr. 4, 2017).[7]

---

[5]     The Sub-Advisory Agreement defines "cause" to mean "fraud, criminal conduct, willful misconduct, gross negligence or negligent breach of a fiduciary duty by the Adviser or the Sub-Adviser, or a breach of a material term in th[e] Agreement by the Adviser or the Sub-Adviser that is not cured or waived within 5 days of receiving notice of such breach." Ex. A, at ¶ 9(d).

[6]     The Court may take judicial notice of SEC filings regarding the Stira Fund that are referenced in this Memorandum of Law.  *See, e.g.*, *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (determining that "a district court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" (citation omitted)).

[7]     Ex. C states that "[t]he Investment Sub-Advisory Agreement may not be terminated for a period of 24 months from the effective date except (i) in the event of an 'assignment' (as such term is defined for purposes of construing Section 15(a)(4) of the 1940 Act); (ii) *at any time, without the payment of any penalty, upon 60 days' written notice by the Adviser, if the Board or a majority of the outstanding voting securities of the Fund determine that the Investment Sub-Advisory Agreement should be terminated*; and (iii) for "cause" (as defined [in the] Investment Sub-Advisory Agreement)." Ex. C, at p. B-23 (emphasis added).  It also states, "[f]ollowing such period, the Investment Sub-Advisory Agreement may be terminated at any time by the Adviser or the Sub-Adviser, without the payment of any penalty, upon 60 days' written notice to the other party." *Id.*

**F.     Mr. Yang's Breach Of Contract Claims Seek To Recover Compensation Under Discretionary Incentive Plans.**

In Count II, Mr. Yang alleges that he is entitled to recover the value of unvested awards made to him under a long term incentive plan.  Compl. ¶¶ 148, 151.  Mr. Yang does not deny that his employment was terminated before the awards vested, or that under the terms of the plan, any unvested awards were to be forfeited upon termination.  He contends, however, that he should have been paid the value of the unvested awards, and that notwithstanding the plain language of the plan, the failure to pay him such compensation was a breach of contract.  *See id.* ¶¶ 151-52.  In particular, Mr. Yang identifies 163,194 Alcentra Units of one restricted Class B and 1,750,000 Alcentra Units subject to option, both of which were awarded on June 30, 2017, and scheduled to vest on March 7, 2020 – long after Mr. Yang's employment ended.  *Id.* ¶ 150.

The awards at issue in Count II were awarded pursuant to Mr. Yang's 30 June 2017 "Option Agreement" (the "2017 Option Agreement"), attached as Ex. D, and Mr. Yang's 30 June 2017 "Restricted Unit Agreement" (the "2017 Restricted Unit Agreement"), attached as Ex. E. *See* Compl. ¶ 118.  The 2017 Option Agreement and 2017 Restricted Unit Agreement are governed by the Alcentra NY, LLC U.S. Long Term Incentive Plan ("the LTI Plan"), attached as Ex. F.  Section 4.3 of the 2017 Option Agreement and 2017 Restricted Unit Agreement provides, "[t]his is an Award Agreement contemplated in Section 2.3(c) of the Plan. . . .  In the event of any inconsistency between the provisions of this Agreement and the Plan, the Plan shall govern." Exs. D, E; *see* Exs. D (referencing Exhibit A); E (referencing Exhibit A).  Moreover, the LTI Plan provides, at Section 2.3(c), "[e]ach Award shall be confirmed by an agreement (an 'Award Agreement') executed by the Company . . . .  Awards shall be subject to such terms and conditions as shall be determined by the Remuneration Committee at the time of grant of the applicable Award and as set forth in the Award Agreement."  *See* Ex. F.

Mr. Yang alleges in Count III that he is entitled to recover the value of *unvested* awards under Alcentra's Long-Term Incentive Cash Award Plan.  Compl. ¶¶ 156, 159.  He does not contend that the awards actually vested either before or after his employment ended, or that he satisfied the conditions stated in Plan for the payment of the compensation at issue.  On the contrary, he admits that his employment ended before the vesting date.  Nevertheless, he says, his incentive compensation awards would have vested had he not been terminated unlawfully.  *Id.* ¶ 159.  In Count III, Yang identifies certain compensation deferred on March 1 of 2016, 2017, and 2018 – the first of which was to vest on March 1, 2019 and the second on March 1, 2020.  *Id.*  Mr. Yang's deferred compensation is governed by the Alcentra Limited & Alcentra NY, LLC 2016 Long-Term Incentive Cash Award Plan ("LTI Cash Plan"), attached as Ex. G.

## III.   <u>LEGAL STANDARD</u>

Rule 12(b)(6) of the Federal Rules of Civil Procedure requires the dismissal of a complaint that fails to state a claim upon which relief can be granted.  To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *In re Mylan Sec. N.V. Litig.*, No. 16-cv-7926, 2019 WL 1427430, at *3 (S.D.N.Y. Mar. 29, 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011)).  In assessing a motion to dismiss, the court must "accept[ ] as true the factual allegations in the complaint and draw[ ] all inferences in the plaintiff's favor."  *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006) (internal quotations and citation omitted).

In deciding a motion to dismiss, the Court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference"

and "documents that the plaintiff[ ] either possessed or knew about and upon which [he] relied in

bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *see Interpharm, Inc. v.

Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) ( "Where . . . certain contracts

are integral to the complaint, we also consider those documents in deciding the merits of the

motion"); *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 44 (2d Cir. 1991) ("Plaintiffs'

failure to include matters of which as pleaders they had notice and which were integral to their

claim—and that they apparently most wanted to avoid—may not serve as a means of forestalling

the district court's decision on the motion.").

The Court may also take judicial notice of public filings, such as SEC filings. *See*

*Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (taking judicial notice of public

filings); *see also In re Alstom SA*, 406 F. Supp. 2d 346, 352 (S.D.N.Y. Dec. 22, 2005) (noting

that "[t]he Court may consider [SEC] filings on a motion to dismiss 'not to prove the truth of

their contents but only to determine what the documents stated'" (quoting *Kramer*, 937 F.2d at

773-74)).

## IV.  **ARGUMENT**

### A.  **The Claim For Whistleblower Retaliation Under Section 806 Of SOX Should Be Dismissed Because Plaintiff Has Not Plausibly Alleged That He Engaged In Protected Activity Under SOX.**

#### 1.  **Section 806 of SOX**

"[T]o bring a successful whistleblower claim under SOX § 806, the plaintiff must plead

that he (1) 'engaged in protected activity; (2) the employer knew that [he] engaged in the

protected activity; (3) [he] suffered an unfavorable personnel action; and (4) the protected

activity was a contributing factor in the unfavorable action.'" *Tonra v. Kadmon Holdings, Inc.*,

405 F. Supp. 3d 576, 589, 591 (S.D.N.Y. 2019) (quoting *Bechtel v. Admin. Review Bd., U.S.

Dep't of Labor*, 710 F.3d 443, 447 (2d Cir. 2013) (granting defendants' motion to dismiss as to

SOX § 806 claim where "plaintiff d[id] not allege how a disclosure of [results] would impact shareholder decision making or how the study results would change the mix of information made available to shareholders")).

To engage in protected activity under SOX, "a plaintiff 'must show that [he] held a reasonable belief that [his employer was] engaged in conduct that violated one of the **enumerated federal laws'** of Section 1514A." *Diaz v. Transatlantic Reinsurance Co.*, No. 16-1355, 2016 WL 3568071, at *5 (S.D.N.Y. June 22, 2016) (citation omitted) (emphasis added). In addition, "a plaintiff's belief about those violations of relevant law must be both subjectively and objectively reasonable." *Id.*

Mr. Yang has not identified any conduct by Defendants that violated one of the laws enumerated in Section 806 of SOX, let alone a protest of unlawful conduct that led to his termination.

> ### 2. Mr. Yang Did Not Engage In Activity Protected by SOX When He Purportedly Raised Concerns About *When* Alcentra NY Could Resign As Subadvisor To The Stira Fund.

Section 806 of SOX protects employees from discharge if they "provide information [to certain individuals] . . . regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the [SEC], or any provision of Federal law relating to fraud against shareholders . . . ." 18 U.S.C. § 1514A(a)(1).  As the Supreme Court observed, the whistleblower protections in SOX are intended primarily to prevent and protect against fraud, as opposed to mere protests about routine business practices.  *See Lawson v. FMR LLC*, 571 U.S. 429, 434–35 (2014) (SOX "aims to 'prevent and punish corporate and criminal fraud, protect the victims of such fraud, preserve evidence of such fraud, and hold wrongdoers accountable for their actions.'" (quoting S. Rep. No. 107–146, at 2 (2002));  *accord Bechtel v.*

*Admin. Review Bd., U.S. Dep't of Labor*, 710 F.3d 443, 446 (2d Cir. 2013) (Section 806 of SOX

"seeks to combat what Congress identified as a corporate 'culture, supported by law, that

discourage[s] employees from reporting fraudulent behavior not only to the proper authorities,

such as the FBI and the SEC, but even internally.'" (quoting S. Rep. No. 107–146, at 5 (2002)).

Here, Mr. Yang presents *no* allegations of fraud, let alone the enumerated statutory fraud

violations that are recited in § 1514A.  He contends, however, that by protesting the timing of

Alcentra NY's potential resignation as sub-adviser, he was invoking a purported violation of a

"rule or regulation" of the SEC.  In support of this allegation, Mr. Yang's Complaint points

broadly to the Investment Company Act of 1940 and the Investment Advisers Act of 1940,

without any reference to a particular section or subsection therein and, in conclusory fashion,

alleges that they were violated.  Beyond this wholly generic statement of an unsupported legal

conclusion, Mr. Yang fails to identify or cite any specific rule or regulation purportedly violated

by Alcentra NY's contemplated resignation from its sub-adviser role, nor does he explain how or

why the timing of the resignation would implicate either of the cited statutes.  Indeed, as

discussed *infra*, this is because the alleged conduct does not violate any such statute, rule, or

regulation.

There are simply no factual allegations in the Complaint which suggest that the timing of

Alcentra NY's planned resignation from its role as sub-adviser to the Stira Fund implicated the

type of fraud or violated any of the other laws enumerated in Section 806.  *See Sylvester v.

Parexel Int'l LLC,* ARB Case No. 07-123, 2011 WL 2165854, at *11 (ARB, May 25, 2011) (en

banc) ("When an entity engages in mail fraud, wire fraud, or any of the six enumerated

categories of violations set forth in Section 806, it does not necessarily engage in immediate

shareholder fraud . . . the violation may be one which . . . is prohibited by law, and the violation

may be merely one step in a process leading to shareholder fraud."). Mr. Yang may have

believed that a premature resignation was unwise or even a breach of a contractual obligation owed to the Stira Fund and/or Stira Adviser, but there was no fraud, deception, manipulation or illegal conduct, scheme or practice at issue.  Unsurprisingly, Mr. Yang fails to identify who was at risk of being defrauded or deceived, nor could he.  He is not suggesting that Alcentra NY would have resigned without telling the Stira Fund, nor is he suggesting that the resignation would have been concealed from the Stira Fund's investors.  He does not allege that Alcentra NY planned to continue secretly to collect management fees after terminating the contract, that Alcentra NY had been overpaid and sought to cover it up, or that Alcentra NY had engaged in some other form of financial misconduct, whatsoever.  In reality, Mr. Yang's Complaint attempts to convert his prior challenge to what he thought might be an unfair business decision into an exposé of some purported nefarious scheme, but his claims are unsupported by fact and his attempt misses the mark.  Thus his SOX claim fails as a matter of law.  *See, e.g.*, *In the Matter of: Anita Johnson, Complainant v. Wellpoint, Inc., Respondent*, No. 2010-SOX-00038, 2011 WL 764714 (U.S. Dept. of Labor Feb. 25, 2011) (concluding that complainant did not engage in protected activity where her comments concerned a breach of only contractual duties); *see also Diaz*, 2016 WL 3568071 at *5 (granting defendant's motion to dismiss where plaintiff's statements to defendant did not "involve[] providing false or fraudulent information to shareholders or to the public").

Perhaps in recognition of this failure to allege a violation of one of the laws enumerated in Section 806, Mr. Yang states in conclusory fashion that he opposed an early resignation from Alcentra NY's role as sub-adviser because it "violate[d] the 1940 Acts."  Compl. ¶ 7.  Beyond this generic assertion, which is insufficient under *Iqbal* and *Twombly*, Mr. Yang does not cite to any statute enumerated in Section 806 of SOX that dictates the timing of such a resignation or requires a certain amount of notice.  There are 65 sections of the Investment Company Act of

1940 and 28 sections of Investment Advisers Act of 1940, yet Mr. Yang's Complaint does not point to any of them that were violated with specificity – because no such section exists. Other than stating blithely that the "1940 Acts" would have been violated, he fails to explain how or why those statutes were implicated, and what specific conduct would have crossed the line into unlawful or fraudulent activity. This pleading failure requires the dismissal of his retaliation claim. *See, e.g.*, *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 223 (2d Cir. 2014) (affirming dismissal of complaint where former employee failed to allege "any facts plausibly suggesting that [the] supposed misconduct implicated any of the enumerated provisions in § 1514A").

Mr. Yang attaches another conclusory label to the planned resignation from the sub-adviser role, alleging that an early separation would have breached a fiduciary duty. Again, he has not explained how or why a resignation would have been a fiduciary breach, other than to declare it in the most general of terms. The basis for that assertion is a mystery, and is certainly not supported by any legal authority. Notably, the SEC's most recent pronouncement of an adviser's fiduciary duty – a 42-page release that restated more than 50 years of law and guidance – contains ***no*** discussion of a sub-adviser's fiduciary duty as inclusive of an obligation to continue to provide sub-advisory services, particularly where a primary adviser would remain in place as a result of a sub-adviser terminating its contract. *See* Ex. H, Advisers Act Rel. No. 5248 (June 5, 2019). Nor are we aware of any other statute, regulation, guidance, interpretation or court holding that has interpreted a sub-adviser's fiduciary duty as such.

Of course, even if the timing of Alcentra NY's resignation would potentially have breached a duty of care or duty of loyalty owed to the Stira Fund, that alone would not have ramifications under SOX. As the SEC has explained, an investment adviser's fiduciary duties are quite broad, and include "a duty of care and a duty of loyalty." *See* Ex. H, Advisers Act Rel. No. 5248, at p. 2 (June 5, 2019). The fiduciary duty requires the adviser to "adopt the principal's

goals, objectives or ends," and "serve the best interest of its client and not subordinate its client's interests to its own." *Id.* at p. 8.  But quite obviously, not every arguable breach of a duty of care owed to a client constitutes a fraud of the type that implicates SOX.  An employee of an investment adviser may complain that a particular investment is not in the best interests of a client or that the adviser is not exercising sufficient care in adopting or executing on an investment strategy, but viewpoints on whether an adviser is doing the best possible job for a client do not indicate the presence of fraudulent, deceptive, or manipulative behavior *per se*.

And that argumentative leap is where Mr. Yang's SOX retaliation claim falls short.  Mr. Yang claims that Defendants planned a resignation that, in his view, would have breached a duty of care, but he does not outline any opposition to a purported fraud of any kind.  Nor could he make such an allegation.  In fact, he concedes as much in his complaint, stating that as of August 21 or 22, 2018, he informed the President of the Stira Fund that "Alcentra's management committee discussed immediately terminating Alcentra NY's role as subadvisor to the interval fund."  Compl. ¶ 56.  Thus, the planned resignation was fully disclosed.  Whatever disagreement Mr. Yang may have had with Alcentra NY's business decision to resign as sub-adviser, his alleged opposition was not protected activity under SOX, regardless of how valid and honorable he believes his opposition may have been.

In reality, the timing of Alcentra NY's resignation from its role as sub-adviser to the Stira Fund raises only *contractual* questions.  Mr. Yang concedes that the issue of *when* Alcentra NY could resign as sub-adviser is contractual, as he alleges that he informed Counsel for the Stira Fund that Alcentra NY's immediate cessation of its sub-advisory activities would "breach Alcentra NY's contractual [ ] duties . . . ."  Compl. ¶ 7; *see also id.* ¶ 56 ("The President of the Stira Fund relayed to Mr. Yang that immediate termination, along the lines Alcentra NY was considering, violated the terms of the subadvisor agreement.").  Although it is unclear from Mr.

Yang's Complaint which specific provision of the Sub-Advisory Agreement he is relying on, such a determination is immaterial because all of the provisions regarding when Alcentra NY could resign as sub-adviser to the Stira Fund arise from the Sub-Advisory Agreement. *See supra* Section II (E), at pp. 5-6.[8] Where, as here, the issue underlying the alleged protected activity is only, at a most, a breach of contract as opposed to a violation of law enumerated by SOX, it is not protected activity as a matter of law. *See, e.g.*, *In the Matter of: Anita Johnson, Complainant v. Wellpoint, Inc., Respondent*, No. 2010-SOX-00038, 2011 WL 764714 (U.S. Dept. of Labor Feb. 25, 2011) ("*Johnson*") (concluding that complainant did not engage in protected activity where her comments concerned a breach of only contractual duties); *Diaz*, 2016 WL 3568071, at *5-6 (concluding that complainant did not engage in protected activity where her comments concerned a purported conflict of interest policy violation).[9]

Further, there are no factual allegations suggesting that it was objectively reasonable for Mr. Yang to believe that this timing issue rose to the level of fraud. Indeed, given Mr. Yang's extensive knowledge of the Stira Fund and U.S. securities law (*see, e.g.*, Compl. ¶¶ 33, 35, 36, 40, 61), it was not objectively reasonable for him to believe that a breach of the Sub-Advisory Agreement would constitute a violation of law or regulation enumerated in § 1514A. *See*

---

[8]     Paragraph 9(b)(ii) of the Sub-Advisory Agreement provides that "[the] Agreement shall automatically terminate . . . at any time, without the payment of any penalty, upon 60 days' written notice by the Adviser, if the Board of Trustees or a majority of the outstanding voting securities of the Fund determine that this Agreement should be terminated." Ex. A, at ¶ 9(b)(ii). Absent the circumstances outlined in ¶ 9(b) of the Agreement, "the Adviser and Sub-Adviser agree[d] not to terminate th[e] Agreement for a period of 24 months from the Effective Date of th[e] Agreement except for 'cause' [ ]." *Id.* at ¶ 9(c). Following this 24-month period, "each of the Adviser and the Sub-Adviser c[ould] terminate th[e] Agreement, without any penalty, upon 60 days' written notice to the other party." *Id.*

[9]     Although the Administrative Law Judge ("ALJ") in *Johnson* relied on the outdated "definitively and specifically standard," *see Nielsen*, 762 F.3d at 220-21, the ALJ's holding that allegations of routine contract breaches, without more, do not amount to the type of activities protected by SOX remains unchanged. Here, it was not objectively reasonable for Mr. Yang to believe that a breach of contractual duty is protected by SOX. *See supra*, at p. 15.

*Nielsen*, 762 F.3d at 222 ("The objective prong of the reasonable belief test focuses on the 'basis of knowledge available to a reasonable person in the circumstances with the employee's training and experience.'").

In sum, Mr. Yang has not plausibly alleged that he engaged in protected activity under SOX. His purported concern about when Alcentra NY could resign as sub-adviser to the Stira Fund is purely contractual and thus not protected by the statute. Therefore, Mr. Yang's cause of action for whistleblower retaliation under Section 806 of SOX should be dismissed.

### B.   Plaintiff's Second And Third Causes Of Action For Breach Of Long-Term Incentive Plans Fail Because He Seeks Unvested Awards Under Discretionary Incentive Plans That State They Are Not Contracts.

To state a claim for breach of contract under New York law, a plaintiff must allege (1) a contract between the parties; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages flowing from the breach. *E.g.*, *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994). "When pleading these elements, a plaintiff must identify the specific provision of the contract that was breached as a result of the acts at issue." *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 494 (S.D.N.Y. 2002).

"In a contract action, the court's general objective should be to give effect to the intentions of the parties in entering into the agreement[ ]." *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990). Where a contract is "unambiguous on its face, its proper construction is a question of law. *Metro. Life Ins*., 906 F.2d at 889 (discussing New York law); *see also PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) ("[W]here 'the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law,' and a claim turning on that interpretation may thus be determined . . . by [a motion to dismiss]."). Although one party may assert a different meaning for a particular term, "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different

interpretations." *Hunt Ltd. v. Lifschultz Fast Freight, Inc*., 889 F.2d 1274, 1277 (2d Cir. 1989);

*see also Sasson v. TLG Acquisition LLC*, 9 N.Y.S.3d 2, 4 (1st Dept. 2015).

It is well established under New York law that "[a]n employee's entitlement to a bonus is

governed by the terms of the employer's bonus plan.'" *O'Dell v. Trans World Entm't Corp*., 153

F. Supp. 2d 378, 397 (S.D.N.Y. 2001) (quoting *Hall v. United Parcel Serv. of Am., Inc*., 76

N.Y.2d 27, 36 (1990)).  And, the law is clear that "an employee has no enforceable right to

compensation under a discretionary compensation or bonus plan." *Grieve v. Barclays Capital*

*Sec. Ltd.*, No. 602820/98, 1999 WL 1680654 at *4 (Sup. Ct. N.Y. Co. Sept. 10, 1999).  This

same analysis applies where, as here, the "bonus" forming the basis of the plaintiff's contractual

claim is a long-term incentive award.  *See, e.g.*, *Karmilowicz v. Hartford Fin. Servs. Group*, No.

11-cv-539, 2011 WL 2936013, at *7 (S.D.N.Y. July 4, 2011), *aff'd*, 494 F. App'x 153 (2d Cir.

2012); *Timian v. Johnson & Johnson*, No. 6:15-CV-06125 MAT, 2015 WL 6454766 (W.D.N.Y.

Oct. 26, 2015).

Based on the governing incentive plan documents and controlling case law, Mr. Yang's

breach of contract claims should be dismissed as a matter of law, for several reasons.

***First***, the LTI Plan and LTI Cash Plan (collectively referred to as "the Plans") state that

the Plans do not create a contract or alter Mr. Yang's employment with Alcentra.  The LTI Plan

provides:

> Neither the adoption of the Plan nor any action of the Board of
> Directors of the Company or any Affiliate, the Remuneration
> Committee or the Compensation Oversight Committee pursuant to
> the Plan shall be deemed to give any employee any right to be
> granted any Award under the Plan.  Nothing in the Plan, in any
> Award under the Plan or in any Award Agreement shall confer any
> right to any employee to continue in the employ of the Company or
> any Affiliate or interfere in any way with the rights of the Company
> or any Affiliate to terminate the employment of any employee at any
> time.

Ex. F, Section VII.[10]  Similarly, the LTI Cash Plan in Section 9.5 entitled "Not a Contract of Employment" provides that "[t]he terms and conditions of this Plan shall not be deemed to constitute a contract of employment between the Company or its Affiliates and any Participant or other person[.]."  Ex. G.  Based on this unambiguous language, Mr. Yang cannot contrive breach of contract claims based on these Plans, particularly ones based on the termination of his employment.

*Second*, the Plans state unequivocally that unvested awards are forfeited upon the termination of employment:  The LTI Plan provides, "Upon the effective date *of a termination for any reason* not specified in paragraphs 3.4(a) to 3.4(f) inclusive of this Section 3.4, *all Alcentra Units . . . immediately shall be forfeited* to Alcentra UK . . . ."  Ex.  F (Section 3.4(h)) (emphases added)).[11]  Section 3.4 lists circumstances in which unvested awards are treated differently, including terminations of employment because of death (3.4(a)), retirement (3.4(b)), disability (3.4(c)), redundancy (3.4(d)), business sale (3.4(e)), and intra-group transfer (3.4(f)).  None of those circumstances apply to Mr. Yang's termination.  Accordingly, his unvested shares were terminated properly when his employment ended, and Count II fails as a matter of law.  *See*

---

[10]    The 2017 Restricted Unit Agreement providing the Award under the LTI Plan further provides, "Neither the award of Restricted Units nor anything else contained in this Agreement or the Plan shall be deemed to limit or restrict the right of any Company Group Member to terminate your employment."  Ex. E (Section 4.1).

[11]    The 2017 Restricted Unit Agreement and 2017 Option Agreement also plainly state that the unvested awards are forfeited upon termination of employment.  *See* Ex. E (2017 Restricted Unit Agreement) (Section 3.1(b):  "Except as set forth in Section 3.2 below or as prohibited by local law, upon the *effective date of the termination of your employment with the Company* . . . *all unvested Restricted Units shall immediately be forfeited* and returned to the Company . . . ." (emphases added)); Ex. D (2017 Option Agreement) (Section 3.1(d) states that "*upon the effective date of the termination of your employment* with the Company . . .  *all unvested portion of the Option shall immediately be forfeited* and returned to the Company . . . ." (emphases added)).

*Timian*, 2015 WL 6454766 at * 7 ("Viewing the phrase 'any reason' objectively and in the context of the LTI Plan and RSU Certificate, the Court simply cannot find any ambiguity.").

The LTI Cash Plan similarly provides:

> A Participant shall become 100% vested . . . on the third anniversary of its Grant Date or such later date for vesting as is set out in a Participant's Award Letter . . . ***if (and only if, except as may otherwise be expressly provided herein) the Participant on such date is, and has continuously been through such date, an Employee.*** Each Participant shall be 0% vested in that portion of the applicable Measurement Account attributable to an Award Amount until it becomes vested pursuant to the previous sentence, and ***shall forfeit 100% thereof upon a Termination of Employment prior to the applicable Vesting Date***.

Ex. G, Section 2.4 (emphases added).  Therefore, Count III also fails as a matter of law.

Moreover, neither Plan provides an exception for an allegedly unlawful or wrongful termination which Mr. Yang asks this Court to add to the governing Plans.  Ultimately, when Alcentra terminated Mr. Yang, based on the plain language of the Plans, Mr. Yang forfeited all unvested awards.  While Mr. Yang is attempting to challenge the lawfulness of his termination, that does not change the meaning or language of the purported contracts on which his Second and Third Causes of Action are based.

***Third***, because the Plans give Alcentra exclusive authority and discretion to pay compensation pursuant to the awards, Mr. Yang cannot sustain breach of contract claims based on the Plans.  Where, as here, the employer retains unfettered discretion to adjust, interpret, or even cancel an incentive plan entirely, then that plan cannot create an enforceable contract.  *See, e.g.*, *Karmilowicz*, 494 F. App'x at 153; *Kavitz v. IBM*, 458 F. App'x 18, 20 (2d Cir. 2012) (Summary Order) (Notwithstanding language limiting IBM's right to amend plan if "incentive payments have been earned under its terms," the fact "that IBM retained unfettered discretion . . . to adjust its terms or even to cancel the [p]lan entirely confirm[ed]" that plan was "not an enforceable contract.").  In *Karmilowicz*, the compensation plans at issue granted the employer

"full power, discretion and authority to interpret, construe and administer the Plan"; cautioned

that all "decisions, determinations or actions of the Committee made or taken pursuant to grants

of authority under the Plan shall be made or taken in the sole discretion of the Committee"; and

provided that such decisions were final, conclusive and binding on all persons for all purposes.

494 F. App'x at 157 (concluding that based on this language the plaintiff could not sustain a

breach of contract claim).   Similarly in *Timian*, 2015 WL 6454766, the Court dismissed breach

of contract claims finding the incentive plan at issue (similar to the plans in *Karmilowicz*)

provided the Plan Administrator with wide-ranging and exclusive authority "to do all things that

it determines to be necessary or appropriate in connection with the administration of the Plan"

including, for example, the authority to determine the employees to be granted awards; the

timing of awards and any conditions that must be satisfied before an award is granted; and the

circumstances under which awards become exercisable or vested or are forfeited to expire.  *Id.* at

*6 (also nothing that according to the LTI Plan the "decisions, determinations, interpretations

and actions taken by the Administrator regarding the [LTI] Plan . . . shall be conclusive and

binding on all parties concerned[.]").

Here, the Plan documents give Alcentra the right to modify and interpret the Plans and to

issue final, binding decisions on claims for compensation.  Section 2.1 of the LTI Plan states

that:

> The Remuneration Committee shall have the authority in its sole
> discretion from time to time: (i) ***to designate the individuals who
> are eligible to participate in the Plan***; (ii) to grant Awards, as
> hereinafter defined, under the Plan; (iii) ***to prescribe such additional
> limitations, restrictions and conditions at the time of grant of any
> such Award as the Remuneration Committee shall deem
> appropriate***; (iv) ***to interpret the Plan***; (v) subject to Section below,
> to adopt, amend and rescind rules and regulations relating to the
> Plan; (vi) to approve the share/price valuation pursuant to Section
> 3.5 hereof; (vii) to approve any acceleration or exceptions to the
> treatment of Awards upon termination of employment pursuant to
> Section 3.4; (viii) to authorize Affiliates to make grants to their own

> officers and employees subject to such terms and restrictions which the Remuneration Committee may from time to time specify; and (ix) **to make all other determinations and take all other action necessary or advisable for the implementation and administration of the Plan**.  Determinations made by the Remuneration Committee hereunder shall be final, binding and conclusive with respect to the Participants.

Ex. F (emphases added).

The LTI Cash Plan also provides the Plan Administrator with exclusive authority.

Section 7.1 states:

> The Administrator shall, subject to the authority of the HRCC and BNY Mellon, have the complete discretion and authority to (i) **make, amend and enforce all appropriate rules and regulations for the administration of this Plan or the Award Letter** and (ii) **interpret this Plan or the Award Letter and all such rules and regulations and otherwise resolve any and all questions including interpretations of this Plan or the Award Letter as may arise in connection with this Plan** or the Award Letter, **with all such interpretations to be conclusive and binding on all persons and otherwise accorded the maximum deference permitted by law**.

Ex. G (emphases added); *see also id.* ("6.1 Termination.  Although the Company anticipates that it will continue this Plan for an indefinite period of time, the HRCC has the right to terminate this Plan and any award letter at any time.").

Just like the incentive plans at issue in *Karmilowicz* and *Timian*, the Plans underlying Plaintiff's purported contract claims give Alcentra exclusive authority to interpret or modify the Plans and they give the Administrator the right to make final, binding, and conclusive determinations with respect to claims by Participants.  Therefore, Mr. Yang cannot sustain his breach of contract claims.

Finally, even if Mr. Yang's breach of contract claims did not fail based on the plain language of the Plans (which they do), the claims nonetheless should be dismissed as both are merely derivative of Mr. Yang's SOX claim.  Mr. Yang alleges that he is entitled to unvested awards because his termination was unlawful under SOX and, therefore, under his theory, he

should have remained employed through the vesting dates.  At most, that is a claim for damages

on his SOX retaliation claim that is addressed above.  It is not the basis for independent breach

of contract claims.

## V.   CONCLUSION

For all the foregoing reasons, Defendants respectfully request that this Court grant their

Motion to Dismiss Mr. Yang's Complaint in its entirety.


Dated:  June 22, 2020                          Respectfully submitted,

                                               */s/ Michael L. Banks*
                                               Michael L. Banks
                                               W. John Lee
                                               MORGAN, LEWIS & BOCKIUS LLP
                                               1701 Market Street
                                               Philadelphia, PA  19103
                                               Tel.: (215) 963-5210
                                               Fax: (215) 963-5001
                                               Michael.Banks@morganlewis.com
                                               W.John.Lee@morganlewis.com

                                               *Attorneys for Defendants The Bank of New*
                                               *York Mellon Corporation, Alcentra NY, LLC,*
                                               *and Alcentra Limited*

## <u>CERTIFICATE OF ELECTRONIC FILING AND SERVICE</u>

I hereby certify that on June 22, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ W. John Lee*
W. John Lee
