UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN ("JACK") YANG,<br><br>                    Plaintiff,<br><br>-against-<br><br>THE BANK OF NEW YORK MELLON<br>CORPORATION, ALCENTRA NY, LLC,<br>and ALCENTRA LIMITED,<br><br>                    Defendants. | Civil Action No. 1:20-cv-03179<br><br>ECF Case<br><br><br>**FIRST AMENDED COMPLAINT<br>AND DEMAND FOR JURY TRIAL** |

John ("Jack") Yang ("Mr. Yang"), for his First Amended Complaint against Defendants, The Bank of New York Mellon Corporation ("BNY Mellon"), Alcentra NY, LLC ("Alcentra NY"), and Alcentra Limited (Alcentra Limited together with Alcentra NY, "Alcentra," and together with BNY Mellon, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.       Mr. Yang, a senior executive in the banking industry, brings this action against Defendants, his former employers, for retaliation in violation of Section 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ("Sarbanes-Oxley"). Defendants subjected Mr. Yang to a hostile work environment and ultimately terminated him in retaliation for his good-faith reporting to in-house counsel and management of actions that he reasonably believed constituted imminent violations of non-waivable fiduciary duties owed by Defendant Alcentra NY LLC under Section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6, to act in the best interest of its clients and in good faith, and Rule 206(4)-8 which prohibits investment advisers from making materially false or misleading statements or omissions to investors in a pooled investment vehicle regarding investment strategies; and conduct which could lead to censure or revocation of its

registration under 15 U.S.C. § 80b-3(e) for inducing or procuring any violation of the Securities Act of 1933, which, under 15 U.S.C. § 77q, includes the failure to amend or supplement a prospectus to reflect any post-effective developments.  Mr. Yang made his reports solely to protect the investing public and the legitimate interests of Defendants.  Upon his termination, Defendants failed to pay Mr. Yang compensation owed to him, in violation of their contracts with him, and in further retaliation for his protected activity under Sarbanes-Oxley.

2.      BNY Mellon is a publicly-traded global financial services company.  BNY Mellon is the parent company to BNY Alcentra Group Holdings, Inc. ("BNY Alcentra Group"), a sub-investment grade credit asset manager focusing on the U.S. and European markets.  Alcentra NY and Alcentra Limited are both wholly owned subsidiaries of BNY Alcentra Group.  At times relevant to this Amended Complaint, Alcentra NY and Alcentra Limited were each registered as investment advisers under the Investment Advisers Act of 1940 with the Securities and Exchange Commission (the "SEC").

3.      Mr. Yang has thirty-six years of professional experience in investment banking and alternative investment management.  Mr. Yang was employed by Defendants for over five years, from March 2013 to January 2019.  Mr. Yang began his employment with Defendants in March 2013 as Managing Director and Head of Business Development for the Americas for Alcentra NY.  Mr. Yang was swiftly promoted and named Global Head of Business Development for Alcentra in April 2014.  In January 2016, Mr. Yang was promoted again to Head of the Americas for Alcentra NY.  Mr. Yang also served as the FINRA Series 24 Supervisor for Alcentra NY and Mellon Bank Securities Corporation.  In these positions, Mr. Yang was responsible for leading a team in attracting and securing investors to increase Alcentra's assets under management ("AUM").  Mr. Yang and his team brought in record investor capital commitments to Alcentra

NY.  During Mr. Yang's tenure with Alcentra, the total AUM grew from approximately $15 billion to $40 billion.

4.      Starting in mid-2018, Mr. Yang fell victim to retaliation by Defendants after he raised concerns about the legality of Defendants' asset management practices.  These concerns related to Alcentra NY's role as subadvisor to the Stira Alcentra Global Credit Fund (the "Stira Fund"), an interval fund, and non-diversified, closed-end management investment company registered under the Investment Company Act of 1940, 15 U.S.C. § 80a-3(a).  Because the Stira Fund is an investment company under the Investment Company Act of 1940, it is also considered a "pooled investment vehicle."  17 C.F.R. § 275.206(4)-8(b).  In its role as subadvisor to the Stira Fund, Alcentra NY was responsible for managing the investment portfolio, making investment decisions, and executing on trading strategies.  Alcentra NY also was responsible for keeping the Stira Fund and the fund's advisor, Stira Investment Adviser, LLC (the "Stira Adviser"), informed about the status of the market and portfolio through regular reports, presentations, and participation in meetings of the Stira Fund's Board of Trustees.  Alcentra NY's decision to serve as a subadvisor to Stira Adviser, a non-BNY Mellon affiliate, had been criticized within BNY Mellon, which preferred partnering with BNY Mellon affiliates.  The Stira Fund's modest growth after its launch in 2017 due, in part, to overall declining demand in the market and regulatory delays further compounded this criticism.  Throughout the Summer of 2018, BNY Mellon's Chief Executive Officer ("CEO") of Investment Management, to whom the CEO of Alcentra (David Forbes-Nixon) reported, expressed his opinion that the subadvisory role was a mistake and pressured Mr. Forbes-Nixon to address the Stira Fund's lackluster performance.  Mr. Yang's concerns about the legality of Defendants' practices stemmed from the resulting discussions among Alcentra NY's

management in Summer 2018 about immediately ceasing its subadvisor services to the Stira Fund, notwithstanding explicit representations in the Stira Fund's prospectus.

5.     During an August 21, 2018 meeting of Alcentra's management committee—which consisted of Mr. Yang, Alcentra's CEO (Mr. Forbes-Nixon), Alcentra's then-Chief Investment Officer ("CIO") (Vijay Rajguru), and Alcentra's Chief Financial Officer ("CFO"), who collectively managed Alcentra's global business—Mr. Forbes-Nixon stated that Alcentra NY should resign as subadvisor to the Stira Fund as soon as possible.  The CFO responded, incorrectly, that Alcentra NY could not immediately resign, as it was obligated to give at least ninety days' notice pursuant to its subadvisor agreement.  In fact, the decision to resign following a sixty-day notice period was reserved to Stira Advisor—*not* Alcentra NY—according to the Stira Fund's prospectus.  Nevertheless, following the meeting, Mr. Rajguru, acting at Mr. Forbes-Nixon's direction, directed the co-heads of U.S. direct lending and Mr. Yang to ***immediately*** stop acting as subadvisor and to cease investments, meetings, and updates.  This meant that the co-heads of direct lending would not participate in the next Stira Fund's Board meeting, scheduled for August 23, 2018, or provide the market and portfolio updates required of them during that meeting.

6.     *First*, Mr. Yang was concerned that Alcentra NY's unilateral and immediate cessation of its subadvisor services for the Stira Fund would breach Alcentra NY's non-waivable fiduciary duties codified in Section 206 of Investment Advisers Act of 1940 obligating it to act in the best interests of Stira Advisor, the Stira Fund, and the fund's investors, and to exercise good faith in its decisions.  Mr. Yang believed that Alcentra NY's management of the investment strategy of the Stira Fund (as detailed in the Prospectus) likewise subjected Alcentra NY, as a subadvisor, to the same fiduciary obligations to the Stira Fund as Stira Advisor.

7.     *Second*, Mr. Yang was likewise concerned that statements which Alcentra NY had made to the SEC and the investing public in SEC filings concerning its management of the Stira Fund were materially false and misleading given the contemplated actions.  Mr. Yang believed that Alcentra NY was prohibited from making materially false or misleading statements or omissions regarding, among other things, the investment strategies the Stira Fund would pursue, and the practices a sub-advisor followed such as allocating investment opportunities.  Mr. Yang believed such statements or omissions made while advising a pooled investment vehicle such as the Stira Fund constituted violations of 17 C.F.R § 275.206(4)-8.

8.     *Third*, Mr. Yang believed that Alcentra NY's planned conduct would subject both it and the Stira Fund to liability under Sections 77 and 80 of the Securities Act of 1933 by failing to update the fund's prospectus with material post-effective developments.  *See* 15 U.S.C. § 77q; 5 U.S.C. § 80b-3(e).

9.     To ensure that Alcentra NY would not breach these obligations and duties, on or about August 21 or August 22, 2018, Mr. Yang informed both BNY Mellon's Counsel for the Stira Fund, and the Head of U.S. Compliance at Alcentra NY, regarding Alcentra's management committee directive to Alcentra NY to effectively resign immediately from its position as subadvisor.  Mr. Yang also told BNY Mellon Counsel for the Stira Fund that Alcentra NY's immediate cessation of its subadvisor activities would violate Alcentra NY's fiduciary duties under Investment Advisor Act, subject Alcentra to liability from shareholder lawsuits and regulatory penalties based on misrepresentations in the prospectus, and also breach Alcentra NY's contractual duties under the subadvisory agreement.  Mr. Yang requested that BNY Mellon Counsel for the Stira Fund intervene, explain to Mr. Forbes-Nixon and Mr. Rajguru, Alcentra's CEO and CIO

respectively, their obligations as part of Alcentra's management committee, and provide training regarding compliance issues related to 1940 Act funds and subadvisory responsibilities generally.

10.     As a result of Mr. Yang's swift actions, BNY Mellon Counsel for the Stira Fund instructed members of the management committee that Alcentra NY would continue in its role as sub-advisor to the Stira Fund.  Consequently, Alcentra NY refrained from formally resigning as subadvisor to the Stira Fund in August 2018.

11.     However, even though Alcentra NY did not formally resign from its role as subadvisor in August 2018, Alcentra NY constructively resigned from its duties.  As of September 2018, Alcentra NY ceased implementing the investment strategy set forth in the interval fund's publicly-filed prospectus.  Despite the subadvisor's responsibility to originate and structure loans to place into the interval fund, Alcentra NY did not add any additional loans into the Stira Fund. Instead, Alcentra NY, on several occasions, attempted to buy back the only two direct loans that were in the Stira Fund.

12.     As a result of Mr. Yang's reporting of his concerns about Alcentra NY's formal resignation as subadvisor in August 2018, Alcentra NY's senior management was forced to continue the subadvisory role for the Stira Fund.  Mr. Forbes-Nixon, to whom Mr. Yang reported, was visibly unhappy with Mr. Yang's whistleblowing reports to BNY Mellon Counsel for the Stira Fund and the Head of U.S. Compliance at Alcentra NY.  Mr. Forbes-Nixon retaliated against Mr. Yang by treating him in a hostile manner, giving him a negative performance review, and reducing his compensation.  Finally, in the ultimate act of retaliation, Defendants fired Mr. Yang in January 2019 on pretextual grounds.

13.     *First*, Mr. Forbes-Nixon immediately began to treat Mr. Yang in an unprofessional, hostile, and disrespectful manner.  He yelled at Mr. Yang in group meetings while pounding his

fist on the table.  He also exaggerated the extent and importance of low priority activities and objectives.  Despite Mr. Yang leading Alcentra to record-breaking fundraising numbers, Mr. Forbes-Nixon would upbraid Mr. Yang for minor perceived offenses, such as late expense reports and investor meeting reports submitted by Mr. Yang's team members.  Mr. Forbes-Nixon ignored significant emails Mr. Yang sent that required a timely response.  And Mr. Forbes-Nixon also declined to give Mr. Yang a required 2018 year-end review, in violation of BNY Mellon policy, or to collaborate with Mr. Yang in planning for the same.

14.     *Second*, although Mr. Forbes-Nixon declined to give Mr. Yang his 2018 year-end review while he was employed by Defendants, after he was terminated, Mr. Yang learned that Mr. Forbes-Nixon had rated Mr. Yang "Below Expectations" for 2018.  This review was a marked contrast to Mr. Yang's historical year-end reviews, in which Mr. Yang had consistently received ratings of "Exceeded Expectations" or "Achieved Expectations" and been praised for his work ethic, efforts, and the positive results Mr. Yang secured for Defendants.  In the past, Mr. Forbes-Nixon had repeatedly called Mr. Yang "a star," "a game changer," and "the hardest working employee at Alcentra."  The reason for the "Below Expectations" rating was, apparently, alleged violations of BNY Mellon's email policy.  However, this was a transparent pretext to further retaliate against Mr. Yang.  The emails relied on by Defendants were entirely inconsequential and were neither intended to, nor caused, any harm to Defendants.

15.     *Third*, based on Mr. Forbes-Nixon giving Mr. Yang a "Below Expectations" rating in his 2018 year-end review, Defendants also lowered Mr. Yang's annual incentive compensation. Despite consistently awarding Mr. Yang multi-million dollar annual incentive compensation amounts in the past, Defendants slashed his earnings by eighty percent in 2018.  To date, Defendants have failed to pay Mr. Yang even this reduced bonus amount.

16.     *Finally*, in January 2019, Defendants terminated Mr. Yang.  Defendants claimed that Mr. Yang was terminated for the alleged violations of BNY Mellon's email policy that purportedly justified his "Below Expectations" review, but this, again, was a transparent pretext to further retaliate against Mr. Yang, for the same reasons stated above.  Moreover, not only did Defendants improperly terminate Mr. Yang, they also withheld units granted pursuant to incentive and deferred compensation plans which have since vested and are worth millions of dollars

17.     As a result of Defendants' misconduct, Mr. Yang seeks damages in an amount to be determined at trial, including but not limited to at least $4.2 million in compensation in the form of stock options and units which would have vested but for Defendants' unlawful retaliation and termination, back pay in excess of $4.8 million, front pay in excess of $7 million, special damages including for emotional distress, mental anguish, and injury to reputation, and attorney's fees and costs, for the injuries caused by Defendants' unlawful retaliation against and termination of Mr. Yang in violation of Sarbanes-Oxley, Defendants' unlawful termination of Mr. Yang without cause, and Defendants' failure to pay Mr. Yang amounts owed under their compensation contracts.

## PARTIES

18.     Plaintiff Mr. Yang is a resident of New York, New York and citizen of the United States.  Mr. Yang was employed by Defendants from March 2013 until January 2019.  At the time of his termination in January 2019, Mr. Yang was the Head of the Americas for Alcentra NY, the Global Head of Business Development for Alcentra, and the FINRA Series 24 Supervisor for Alcentra NY and Mellon Bank Securities Corporation.  Mr. Yang also held a seat on the Board of Trustees of the Stira Fund from approximately February 2018  until May 2019, when the Stira Fund was dissolved.  During his employment with Defendants, Mr. Yang's compensation was governed by contracts with Alcentra, including the Alcentra NY LLC U.S. Long Term Incentive

Plan (the "LTIP") and the Alcentra Limited and Alcentra NY LLC Long-Term Incentive Cash Award Plan (the "Cash Plan").

19.     Defendant BNY Mellon is a global financial services company, organized under the laws of Delaware, with its corporate headquarters located at 240 Greenwich Street, New York, New York 10286.  BNY Mellon is a publicly-traded company within the meaning of Section 806 of Sarbanes-Oxley.  BNY Mellon issues a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*) and is required to file reports under Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d)).  It is the parent company of BNY Alcentra Group, and the indirect owner of Alcentra NY and Alcentra Limited.

20.     Defendant Alcentra NY is a registered investment adviser pursuant to the Investment Advisers Act of 1940 and a limited liability company, organized under the laws of Delaware, with its corporate headquarters located at 200 Park Avenue, 7th Floor, New York, N.Y. 10166.  Alcentra NY is a subsidiary of BNY Alcentra Group, a sub-investment grade credit asset manager and a wholly-owned subsidiary of BNY Mellon.  As an indirect wholly-owned subsidiary of BNY Mellon, Alcentra NY's information is included in BNY Mellon's consolidated financial statements within the meaning of Sarbanes-Oxley.  Alcentra NY is an agent and contractor of BNY Mellon within the meaning of Sarbanes-Oxley.  Alcentra NY is governed by BNY Mellon's workplace policies, and reliant on BNY Mellon's services including Human Resources, Legal, Corporate Security, and Technology.  During the relevant time period, Alcentra NY was the subadviser to the Stira Fund, pursuant to an investment subadvisory agreement with the Stira Adviser.  Alcentra NY is a party to the compensation agreements at issue with Mr. Yang, the LTIP and the Cash Plan.

21.     Defendant Alcentra Limited is an asset management business and a registered investment adviser with the Securities and Exchange Commission, incorporated under the laws of England and Wales, with its corporate headquarters located at 160 Queen Victoria Street, London, England, EC4V 4LA.  Alcentra Limited is a subsidiary of BNY Alcentra Group, which is a majority-owned subsidiary of BNY Mellon.  Alcentra Limited is a party to the compensation agreements at issue with Mr. Yang, the LTIP and the Cash Plan.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1514A(b)(1)(B), the whistleblower protection provisions of Sarbanes-Oxley, and 28 U.S.C. § 1331, insofar as Mr. Yang asserts a claim arising under the laws of the United States.  This Court has supplemental jurisdiction over Mr. Yang's state law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to Mr. Yang's Sarbanes-Oxley Act claim within the Court's original jurisdiction that they form part of the same case or controversy.

23.     This Court has personal jurisdiction over Defendants because BNY Mellon and Alcentra NY are headquartered in New York; Alcentra NY and Alcentra Limited expressly agreed in a forum selection clause to adjudicate in this District disputes arising from the LTIP; Defendants regularly transact business in New York; and this case arises from Defendants' misconduct in New York.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Mr. Yang's claim occurred in this District, BNY Mellon and Alcentra NY are residents in this District, and Mr. Yang, Alcentra NY, and Alcentra Limited agreed in a forum selection clause to adjudicate in this District disputes arising from the LTIP.

## ADMINISTRATIVE REQUIREMENTS

25.     Mr. Yang has complied with the procedural prerequisites to bringing this Action in this Court.  After Mr. Yang's termination, Mr. Yang entered into certain tolling agreements with Defendants.  On August 31, 2019, Mr. Yang timely filed a complaint against Defendants with the Occupational Safety and Health Administration ("OSHA") of the U.S. Department of Labor, alleging violations of the whistleblower provisions of Sarbanes-Oxley (the "Administrative Complaint").  More than 180 days have passed since the Administrative Complaint was filed and, to date, the Secretary of Labor has not issued a final decision.  This delay is not due to any bad faith on the part of Mr. Yang.  Accordingly, Mr. Yang may bring this Action for *de novo* review, pursuant to 18 U.S.C. § 1514A(b)(1)(B) and 29 C.F.R. § 1980.114(a).

## FACTUAL BACKGROUND

### A.     Defendants' Investment Management Business

26.     BNY Mellon is a publicly-traded company that provides banking and financial services and is subject to the requirements of the Securities and Exchange Act of 1934 and Sarbanes-Oxley.  As part of BNY Mellon's group of asset management boutiques, BNY Mellon owns Alcentra, which specializes in below-investment grade debt management.

27.     Alcentra includes Alcentra NY and Alcentra Limited, which each are registered investment advisers under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.*, and its rules and regulations.   As an investment adviser, Alcentra NY must comply with all the requirements of that statute, and its rules and regulations, including Section 206 which codifies the affirmative fiduciary obligations of investment advisers to act in good faith and in the best interests of its clients, and provide full and fair disclosure of all material facts to its clients.  As an investment adviser, Alcentra NY is prohibited from engaging in any "act, practice, or course of business which is fraudulent, deceptive, or manipulative."  *See* 15 U.S.C § 80b-6.

28.     When Alcentra NY serves as an adviser to a pooled investment vehicle, i.e. any investment company defined in Section 3(a) of the Investment Company Act of 1940, Alcentra NY is also subject to 17 C.F.R. § 275.206(4)–8.  17 C.F.R. § 275.206(4)–8 prohibits investment advisers from making:

> [M]aterially false or misleading statements regarding **investment strategies the pooled investment vehicle will pursue**, the experience and credentials of the adviser (or its associated persons), the risks associated with an investment in the pool, the performance of the pool or other funds advised by the adviser, the valuation of the pool or investor accounts in it, and **practices the adviser follows in the operation of its advisory business such as how the adviser allocates investment opportunities**.[1]

29.     Alcentra NY is Alcentra's U.S. subsidiary.  At the times relevant to this Complaint, Alcentra NY also managed the investment activities of Alcentra Capital Corporation, a BNY Mellon subsidiary and a middle-market business development corporation[2] that provided debt and equity financing solutions.

**B.     Alcentra NY's Role as Subadvisor to the Stira Fund**

30.     In the fall of 2016, Stira Adviser (a non-BNY Mellon affiliate) approached Alcentra NY about a possible collaboration on an interval fund,[3] where Alcentra NY would act as the interval fund's sub-adviser.

---

[1]     A copy of the Final Rule published by the Securities and Exchange Commission is available at https://www.sec.gov/rules/final/2007/ia-2628.pdf.

[2]     A business development corporation is a type of closed-end investment company designed to invest in small and mid-sized companies.

[3]     An interval fund is a closed-end fund whose shares are not traded on the secondary market. Rather than trade on the secondary market, interval funds periodically offer to buy back a percentage of their outstanding shares at net asset value.  Interval funds are comprised of a portfolio of pooled assets that raises a fixed amount of capital through an initial public offering.  Due to their high yields, interval fund are attractive assets to investors.

31.     On March 23, 2017, Alcentra NY entered into an investment subadvisory agreement with Stira Adviser.  Under this agreement, Alcentra NY would serve as subadvisor to the Stira Fund.  The Stira Fund was an interval fund regulated under the Investment Company Act of 1940, and, under Section 3(a) of the Investment Company Act, a "pooled investment vehicle." Stira Adviser delegated substantially all of its portfolio-management obligations to Alcentra NY. In its role as subadvisor to the Stira Fund, Alcentra NY was responsible for managing the investment portfolio, making investment decisions, executing trading strategies, and keeping the Stira Fund and its advisor, Stira Adviser, informed about the status of the market and portfolio through regular reports, presentations, and participation in meetings of the Stira Fund's Board of Trustees.

32.     On February 5, 2018, the Stira Fund filed its prospectus with the SEC.[4]   The prospectus disclosed that the Stira Fund sought to provide "customized financing solutions to lower middle-market and middle-market companies."   Stira Alcentra Global Credit Fund, Prospectus (Form 497), at 1 (Feb. 5, 2018).  In its offering documents, the Stira Fund represented that it would focus its portfolio of investments "on directly originated loans," and that it would "leverage its relationship with Alcentra NY … the Fund's investment sub-adviser … , and its global sourcing and origination platform, to directly source investment opportunities."  *Id*. at i.

33.     In its prospectus, the Stira Fund highlighted Alcentra NY's unique ability to leverage its relationship with BNY Mellon and its investment platform as a means to attract investment and bolster the fund's success.  Specifically, the Stira Fund represented:

> The Fund intends to utilize its ***proprietary access to the BNY Mellon Wealth Management platform*** to source investment opportunities.  *Id*. at 7, 30.

---

[4]    A   true   and   correct   copy   of   the   prospectus   is   available   at https://www.sec.gov/Archives/edgar/data/1688479/000114420418005760/tv484811_497.htm.

As one of the largest sub-investment grade debt investors, Alcentra Group has relationships with a broad number of advisory firms. ***The Sub-Advisor will also source deal flow and referrals from the BNY Wealth Management Platform***. In addition, the Sub-Advisor's team will proactively market the Fund's capabilities directly to businesses through local business networks, local banking relationships and local accounting and advisory groups. The Sub-Adviser's platform works collectively to seek differentiated deals. *Id*. at 38.

The Fund believes that the ***breadth and depth of experience of the principals of the Sub-Adviser*** across different industries, geographic areas and transaction types, coupled with the Sub-Adviser's strong relationships built from managing private funds with similar investment objectives, ***makes the principals particularly qualified to source, analyze and execute investment opportunities***. *Id*.

34.     The prospectus included several explicit representations regarding the responsibilities of the subadvisor and the investment strategy for the interval fund. Specifically, the prospectus stated:

The ***management of the Fund's investment portfolio is the responsibility of the Sub-Adviser***, subject to oversight by the Adviser." *Id*. at 64.

[T]he ***Sub-Adviser will make investment decisions*** for the Fund and ***execute on its trading strategies***. *Id.* at 10.

The ***Sub-Adviser*** will typically ***analyze and discuss in detail*** the portfolio company's ***financial performance with management*** in addition to ***attending regular Board meetings***. *Id*. at 35.

35.     The prospectus explicitly disclosed that:

The Fund's future success depends to a ***significant extent on the continued service and coordination of the Sub-Adviser*** and its senior management team and investment committee. The departure of any members of the Sub-Adviser's senior management team or investment committee could have a ***material adverse effect*** on the Fund's ability to achieve its investment objective. *Id.* at 54.

36.     The prospectus also set forth the investment strategy for the Stira Fund. The capital raised for the fund was initially invested in liquid securities while Alcentra NY directly located and structured originated loans to add to the fund. Specifically, the prospectus represented that:

Under normal market conditions, the Fund intends to invest approximately ***40% of its total assets in non-US securities***, as measured throughout the life of the Fund." *Id*. at 25.

The Fund intends to pursue its investment objective by providing customized financing solutions to Middle-Market Companies in the form of floating and fixed rate senior secured loans, second lien loans and subordinated debt, which, under normal circumstances, will **collectively represent at least 80% of the Fund's net assets**." *Id*.

Such investments will be **originated or structured by the Sub-advisor** or its affiliates. *Id*.

37.     The prospectus stated that the Stira Fund's offering size was up to $3 billion over an offering period of five years. *Id*. at i, 12-13.

38.     As an investment adviser, Alcentra NY, was prohibited from making any false or misleading statements or omissions of material fact regarding investment strategies the Stira Fund would use and practices Alcentra NY would follow, including how to allocate investment opportunities for the Stira Fund.  17 C.F.R § 275.206(4)-8.

39.     Further, the Stira Fund owed a duty to amend or supplement its prospectus to reflect any material post-effective developments. *See* 15 U.S.C. § 77q.

40.     Alcentra NY, as a registered investment adviser, faced regulatory penalties if it induced or procured any violation of the Securities Act of 1933, which includes the failure to amend or supplement a prospectus to reflect material post-effective developments. *See* 15 U.S.C. § 80b-3(e).

**C.     Mr. Yang's Background & Employment by Defendants**

41.     Mr. Yang is an executive with thirty-six years of professional experience and expertise in investment banking and alternative investment management.

42.     Mr. Yang holds a Master of Business Administration from Columbia Business School and a Bachelor of Arts in Economics from Cornell University.

43.     Prior to working with Defendants, Mr. Yang was the Managing Director at Chemical Securities, Inc. (11 year tenure), the Managing Director and Global Head of Leveraged

Finance at Merrill Lynch (8 year tenure), the President of the broker dealer affiliate at Highland Capital Management (6 year tenure), and the Managing Partner at Onex Credit Partners (2 year tenure). He also served as both the Vice Chairman and Director of the Loan Syndications and Trading Association for over a decade.

44.     In Spring 2013, Mr. Yang joined BNY Mellon and Alcentra. Defendants recruited Mr. Yang through a search firm and hired him pursuant to an offer letter dated March 8, 2013. The offer letter was from Alcentra NY, on letterhead reflecting the logos of both Alcentra NY and BNY Mellon. The offer letter described Alcentra NY as "a subsidiary that is majority owned by The Bank of New York Mellon Corporation," referred to Mr. Yang's "employment with Alcentra NY" and "employment with BNY Mellon, its subsidiaries, affiliates, successors, related companies and assigns." The offer letter further stated that, among other things, Mr. Yang would be subject to the Alcentra Incentive and Long Term Incentive Plan, the Alcentra Limited & Alcentra NY LLC Long Term Incentive Cash Award Plan, BNY Mellon Incentive Plan, the BNY Long Term Incentive Plan, the BNY Personal Securities Trading Policy, and the BNY fingerprinting and background check policies. Mr. Yang was also required to sign the BNY Confidentiality, Notice and Restrictive Covenants Agreement.

45.     Mr. Yang's starting position was Managing Director and Head of Business Development for the Americas at Alcentra NY. In this role, Mr. Yang was tasked with fundraising to increase Alcentra's AUM. To achieve this, Mr. Yang developed a "multi-channel" distribution strategy, using several investor channels to raise large amounts of money quickly. He reorganized the marketing function and entirely redeveloped Alcentra NY's marketing materials, dramatically improving their effectiveness.

46.     Due to these early successes at Alcentra NY, Mr. Yang was swiftly promoted and in April 2014, he was named Global Head of Business Development for Alcentra.  In January 2016, Mr. Yang was again promoted, this time to Head of the Americas for Alcentra NY's business in the United States.  In these roles, Mr. Yang recruited a global business development team and directly managed a global sales team which covered institutional, retail and wealth platform investors and consultants.  Mr. Yang also had direct responsibility for many of Alcentra NY's largest, most profitable, and strategic U.S. based investors and for Alcentra's global fundraising campaigns.

47.     Further, with his promotion to Head of the Americas for Alcentra NY, Mr. Yang joined Alcentra's management committee, together with Alcentra's CEO David Forbes-Nixon, Alcentra's then-CIO Vijay Rajguru, and Alcentra's CFO.  Alcentra's management committee oversaw Alcentra entities' obligations to the various funds in which they were engaged as advisors or subadvisors and evaluated their strategic decisions.

48.     In addition to heading up Alcentra NY's businesses, starting in January 2016, Mr. Yang also oversaw the company's securities activities as the FINRA Series 24 Supervisor for Alcentra NY and Mellon Bank Securities Corporation.  In this role, Mr. Yang was responsible for overseeing all of Alcentra NY's activities that fell under FINRA's jurisdiction, which included, among other things, establishing, managing, and enforcing procedures to supervise compliance with FINRA.

49.     With each of these promotions, Mr. Yang supervised a growing team.  Between his roles as Head of the Americas for Alcentra NY and Global Head of Business Development for Alcentra, Mr. Yang managed a team of approximately sixty-five employees, out of a total of 170 employees at the firm.

50.     Under Mr. Yang's direction from 2013 through 2018, Alcentra's growth outstripped both its historic performance and industry standards.  Mr. Yang's team brought in record investor capital commitments to Alcentra.  During Mr. Yang's tenure, the total AUM grew from approximately $15 billion to $40 billion.

51.     Alcentra's success during this period was recognized within the industry.  Between 2017 and 2018, its ranking among the largest fundraisers of private debt globally vaulted from twenty-fifth to sixteenth, as reported by *Private Debt Investor* magazine.[5]

52.     Prior to 2018, based on Mr. Yang's positive performance, his year-end bonuses consistently represented an almost ten-fold increase of his annual base salary.

53.     During the relevant time period, as Head of the Americas for Alcentra NY, Mr. Yang reported to Mr. Forbes-Nixon.  Mr. Forbes-Nixon, in turn, reported to BNY Mellon's CEO for Investment Management.

54.     In addition to his roles within Alcentra, Mr. Yang was also named to the Board of Trustees of the Stira Fund.  Given Alcentra NY's role as subadvisor to the Stira Fund, Mr. Yang was listed as an interested trustee in the offering materials.  Stira Alcentra Global Credit Fund, Prospectus (Form 497), at B-17 (Feb. 5, 2018).  Mr. Yang served in this role from the inception of the Stira Fund in 2017 until it was sold and dissolved in May 2019.  As a Trustee, Mr. Yang attended the Stira Fund's quarterly Board meetings as well as the special meetings held in the first-half of 2019, during which time the Stira Fund was considering strategic alternatives.  The Stira Fund's prospectus highlighted Mr. Yang's "prior experience as a managing partner, president, vice

---

[5]     *Compare* James Linacre, *Mixing It Up*, PRIVATE DEBT INVESTOR MAG., Dec. 2019/Jan. 2020, at 7, *available at* https://d16yj43vx3i1f6.cloudfront.net/uploads/2019/12/ PDI169_PDI50.pdf (2018 ranking) *with* THE PDI 50 RANKING REPORT, Nov. 2017, at 24 *available at* https://golubcapital.com/wp-content/uploads/2017/11/2017-PDI-50.pdf (2017 ranking).

chairman and director," in noting that "Mr. Yang is *highly qualified* to serve on the Board." *Id.* at B-18 (emphasis added).

**D.     Alcentra NY's Plan to Stop Providing Subadvisory Services to the Stira Fund**

55.     Alcentra NY's role as subadvisor to the Stira Fund was the subject of internal criticism from the start.  BNY Mellon viewed the partnership with Stira Adviser, a non-BNY Mellon affiliate, as a mistake.  When Stira Adviser initially approached Alcentra NY in 2017 regarding engagement as a subadvisor to the proposed Stira Fund, BNY Mellon expressed that Alcentra NY should serve as a subadvisor instead to Dreyfus, a BNY Mellon affiliate.  Alcentra NY countered that the proposed fund product would be targeted directly at independent retail investors, whereas Dreyfus's area of expertise was distributing products through "wire houses," which include UBS, Wells Fargo, and Morgan Stanley.  Stira Adviser's expertise, relationships, and demonstrated success within the industry made it a more natural fit, much to BNY Mellon's dissatisfaction.

56.     However, by the middle of 2018, due in part to a deteriorating market and regulatory delays, the Stira Fund had been underperforming, which became a source of concern among members of the Boards of Alcentra NY and Alcentra Limited.  BNY Mellon seized upon Stira Fund's disappointing performance as evidence that partnering with Stira Adviser was a mistake it had predicted.

57.     On August 21, 2018, Alcentra's management committee convened a meeting in London in advance of Stira Fund's upcoming quarterly Board meeting on August 23, 2018.  Present at the meeting were Mr. Forbes-Nixon, Mr. Rajguru, the then-CFO, and Mr. Yang.  This represented the entirety of the management committee.

58.     During the course of the meeting, Mr. Forbes-Nixon relayed the concerns of BNY Mellon's CEO of Investment Management, including that Alcentra NY's subadvisor role was a

mistake.  He also revealed that Alcentra's BNY Mellon Board members were displeased about Stira Adviser serving as advisor to the Stira Fund, as opposed to a BNY Mellon affiliate.

59.     Mr. Yang explained that the Stira Fund was only a year into a five-year fundraise, and the lagging performance was due to the declining market and regulatory delays.

60.     Mr. Forbes-Nixon nevertheless instructed that Alcentra NY should resign as the Stira Fund's subadvisor as soon as possible, notwithstanding statements in the Stira Fund's prospectus inducing investment based on Alcentra NY's involvement.

61.     In response to the proposed cessation of the subadvisor role, the CFO noted that immediate termination was not possible as Alcentra NY was obligated under the terms of its subadvisor agreement to provide Stira Adviser with ninety days' notice of resignation.

62.     In fact, according to the Prospectus, it was Stira Adviser, and *not* Alcentra NY, who had the option to terminate the relationship upon sixty days' written notice:

> ***Once effective, the Investment Sub-Advisory Agreement will continue in effect for two (2) years***, and thereafter shall continue automatically for successive one-year periods, provided that such continuance is specifically approved at least annually by:  (i) the vote of the Board, including the vote of a majority of the Independent Trustees, or (ii) by the vote of the holders of a majority of the outstanding voting securities of the Fund.  ***The Investment Sub-Advisory Agreement may not be terminated for a period of 24 months from the effective date except*** (i) in the event of an "assignment" (as such term is defined for purposes of construing Section 15(a)(4) of the 1940 Act***); (ii) at any time, without the payment of any penalty, upon 60 days written notice by the Adviser***, if the Board or a majority of the outstanding voting securities of the Fund determine that the Investment Sub-Advisory Agreement should be terminated.  Prospectus at B-23.

63.     Neither Prospectus nor the sub-advisory agreement[6] permitted unilateral termination by Alcentra NY within the first twenty-four months from the effective date of the

---

[6]   The sub-advisory agreement was appended to the Stira Fund's prospectus at Exhibit (G)(2).   A   copy   of   the   agreement   is   available   at https://www.sec.gov/Archives/edgar/data/1688479/000114420417018836/v462883_ex99g2.htm.

agreement.  Because the sub-advisory agreement was signed on March 23, 2017, Stira Advisor and Alcentra NY were still within the twenty-four month time period as of August 21, 2018.

64.     Based on the tone of the meeting and the contents of the discussion, Mr. Yang believed that Mr. Forbes-Nixon and Mr. Rajguru had determined that the relationship with Stira Adviser must end immediately ,and were unwilling to tolerate any opposition, despite the representations made to Stira Adviser, Stira Fund, and the fund's investors.

65.     For example, immediate resignation was wholly incompatible with the explicit representation in the Stira Fund's Prospectus that Alcentra NY "***will make*** investment decisions for the Fund and execute on its trading strategies"  Prospectus at 10 (emphasis added).  Similarly, Alcentra NY's resignation would make the representation that "[s]uch investments will be ***originated or structured by the Sub-advisor*** or its affiliates," *id.* at 25, impossible.  Both statements related to investment strategies the Stira Fund planned to pursue as well as the operation of Alcentra NY's advisory business.

66.     Indeed, following the meeting of the management committee, Mr. Rajguru emailed the co-heads of U.S. direct lending and Mr. Yang.  The email directed its recipients to cease carrying out Alcentra NY's responsibilities as subadvisor and stated that there were to be ***no more investments, no more meetings, no more updates*** provided to the interval fund by Alcentra NY.  This meant that the co-heads of direct lending would neither attend the upcoming Stira Fund's Board meeting, scheduled a ***mere two days*** later on August 23, nor provide the market and portfolio update required of them during that meeting.

67.     On or about August 21 or August 22, Mr. Yang contacted the President of the Stira Fund.  Mr. Yang reported to the President that Alcentra's management committee discussed immediately terminating Alcentra NY's role as subadvisor to the interval fund.  The President of

the Stira Fund expressed that Alcentra NY could not take this unilateral action, particularly in the light of representations made in the Stira Fund's prospectus detailing Alcentra NY's obligations. The President further relayed to Mr. Yang that immediate termination, along the lines Alcentra NY was considering, violated the terms of the subadvisor agreement.  The President emphasized the material economic impact that Alcentra NY's termination would cause to the Stira Fund, and by extension, its investors, who understood Alcentra NY to be working in service of the Stira Fund and who invested based on those representations.

**E.      Mr. Yang's Whistleblowing Reports of Alcentra NY's Plans to BNY Mellon**

68.     Mr. Yang was reasonably concerned that Defendants' conduct would violate Section 206 of the Investment Advisors Act of 1940 by breaching Alcentra NY's non-waivable fiduciary duties of care and loyalty; Rule 206(4)-8 by rendering statements made to Stira Fund's investors regarding the fund's investment strategy and Alcentra NY's advisory operations materially misleading; and would subject Alcentra NY to regulatory penalties under 15 U.S.C. § 80b-3(e) for inducing or procuring a violation of Section 77 of the Securities Exchange Act requiring the Stira Fund to amend or supplement a prospectus to reflect material post-effective developments.

69.     *First*, Mr. Yang believed that the directive to immediately cease acting as sub-advisor violated federal securities laws because he understood Section 206 Investment Advisors Act of 1940 broadly required Alcentra NY to act in the best interests of its clients and was bound by fiduciary duties to those clients.

70.     Mr. Yang believed that the directive to unilaterally withdraw as subadvisor was not issued as a result of any deliberative process within the Alcentra management committee.  Indeed, Mr. Rajguru, the CFO, issued the directive with the knowledge that the subadvisory agreement

provided for a resignation period (although the CFO incorrectly noted that Alcentra NY could issue a termination notice at this time).

71.     Mr. Yang further was concerned that the directive was motivated entirely by Alcentra's own desire to prevent its own economic losses and to appease BNY Mellon, who had made clear it viewed the subadvisory role as a mistake.  The Alcentra management committee did not propose resignation in the interest of the Stira Adviser, the Stira Fund, and the Stira Fund's shareholders.  Indeed, the Prospectus made clear, the success of the Stira Fund "***depend[ed]*** to a significant extent on the continued service and coordination" between Alcentra NY and Stira Advisor.  Prospectus at 54.

72.     *Second*, Mr. Yang believed that Alcentra NY's absence from the upcoming Stira Fund board meeting and refusal to provide updates would be inconsistent with the representations and commitments that had been made to the SEC and the public in SEC filings regarding Alcentra NY's management of the Stira Fund.  The Stira Fund marketed itself to the public by promoting Alcentra NY's involvement, expertise, and access to proprietary investing resources.

73.     Mr. Yang further believed that the prospectus was now materially false and misleading to current and prospective investors in the Stira Fund regarding the investment strategy of the fund and Alcentra NY's advisory operations.

74.     *Third*, Mr. Yang believed that Alcentra NY's conduct would subject the Stira Fund to liability for failing to amend the prospectus following Alcentra NY's failure to implement the investment strategy.  Mr. Yang reasoned that Alcentra NY would likely be subject to regulatory penalties as the cause of the materially misleading statements in the prospectus.

75.     During his employment with Defendants, Mr. Yang was aware of prior potential violations of the Investment Company Act of 1940 related to communications, disclosures, and

valuations at Alcentra Capital Corporation that had required BNY Mellon Legal and Compliance departments to intervene and take corrective and/or preventative actions. Thus, to ensure that an Alcentra entity would not breach its legal obligations, contractual obligations, and fiduciary duties, Mr. Yang determined it was necessary to report the matter to BNY Mellon.

76.     On or about August 21 or August 22, 2018, Mr. Yang contacted BNY Mellon's Counsel for the Stira Fund, whose practice also focused on legal issues regarding BNY Mellon's mutual funds and funds regulated pursuant to the Investment Company Act of 1940. Mr. Yang informed Counsel for the Stira Fund of the directive by members of Alcentra's management committee to immediately stop providing subadvisor services to the Stira Fund.

77.     Mr. Yang reported to Counsel for the Stira Fund that Alcentra NY's proposed course of action would breach its fiduciary duties as an investment adviser under the 1940 Act to provide advice to the Stira Adviser, to monitor the Stira Fund, and to act in the best interests of the fund. The directive from Mr. Rajguru not to attend future meetings and not to provide updates would breach Alcentra NY's explicit representations in the Stira Fund prospectus that it would make investment decisions for the Stira Fund, execute on its trading strategies, keep the Stira Adviser updated with financial progress, and attend regular meetings.

78.     Similarly, Mr. Yang reported that Mr. Rajguru issued the directive even after the management committee learned that immediate termination was not possible under the subadvisor agreement.

79.     Further, Mr. Yang reported to Counsel for the Stira Fund that Alcentra NY's decision to terminate its role was not in the best interests of the advisor, the interval fund, or the interval fund's shareholders but instead was based upon Alcentra's internal concerns about the Stira Fund's lagging performance and desire to cut its own losses.

80.     Mr. Yang also reported that Alcentra NY's proposed course of conduct could subject Alcentra NY and BNY Mellon to liability by shareholders and to regulatory penalties, based on Alcentra NY's planned misrepresentations to investors in the Stira Fund and because investors in the Stira Fund invested in reliance on representations contained in the Stira Fund's prospectus.

81.     Upon information and belief, Mr. Yang's report to BNY Mellon's Counsel for the Stira Fund was the first time anyone at BNY Mellon, Alcentra, or the Stira Fund reported Alcentra NY's plans to terminate immediately its role with the Stira Fund.

82.     Mr. Yang viewed the August directive as part of a larger systemic problem with the management of Alcentra which had previously necessitated BNY Mellon's intervention.  As Mr. Yang explained to Counsel for the Stira Fund, he was particularly concerned that Mr. Forbes-Nixon and Mr. Rajguru, who had spent most of their careers based in London, were unfamiliar with U.S. securities laws.  Mr. Yang's concern was based on the fact that both Mr. Forbes-Nixon and Mr. Rajguru, as members of Alcentra's management committee, had issued directives which, if complied with constituted violations of Section 206 of the Investment Advisers Act which codifies an investment advisers' fiduciary duties of care and loyalty, and rendered statements in the Stira Fund's Prospectus materially misleading regarding the fund's investment strategies and Alcentra NY's implementation of those investment strategies.

83.     During his conversation with Counsel for the Stira Fund, Mr. Yang requested that Counsel contact Mr. Forbes-Nixon and Mr. Rajguru to explain Alcentra NY's fiduciary obligations as an investment advisor under the Investment Adviser Act and as set forth in the Stira Fund's prospectus.  Mr. Yang also requested that someone be authorized to participate in the upcoming Stira Fund quarterly Board meeting on August 23, and that Alcentra NY prepare the requisite

reports to present at that time.  He also asked Counsel that the CEO and CIO be provided guidance and receive training on U.S. compliance and legal issues for Alcentra's funds regulated by the 1940 Acts.

84.     Mr. Yang forwarded the email directive he received from Mr. Rajguru (*no more investments, no more meetings, no more updates*) to Counsel for the Stira Fund.  Mr. Yang also forwarded this email to the Head of U.S. Compliance at Alcentra NY.

85.     Upon information and belief, Mr. Yang, through his reporting to Counsel for the Stira Fund in late August 2018, made BNY Mellon aware of Alcentra's management committee's plan to immediately cease Alcentra NY's subadvisor services.  Until then, BNY Mellon had not been party to discussions about the directed resignation.

86.     Mr. Yang's reporting was done in accordance with BNY Mellon's Code of Conduct and related policies.  BNY Mellon publishes a Code of Conduct, to which it expects all employees, including those employed by Alcentra NY, to adhere.[7]  As an employee of BNY Mellon, Mr. Yang received this Code of Conduct and was made aware of its contents.   BNY Mellon routinely circulated to its employees updates to the Code of Conduct and requested that its employees attest to their receiving and reading it.  The Code of Conduct includes a section entitled "Responsibility to ask questions and report concerns" that directs employees:

> [T]o speak up immediately if you have a question or concern about what to do in a certain situation or if you believe someone is doing—*or about to do*—*something that violates the law*, company policy or our Code of Conduct.  If you have a genuine concern, *you must raise it promptly*.  BNY Mellon, *Employee Code of Conduct (2019)* at 8.

_____

[7]   A true and correct copy of the Code of Conduct is publicly available at https://www.bnymellon.com/_global-assets/pdf/csr/employee-code-of-conduct.pdf.

87.     Following Mr. Yang's report, BNY Mellon Counsel for the Stira Fund contacted Mr. Rajguru and advised him that even if Alcentra NY were to give proper notice of termination, it was still responsible for carrying out its duties as subadvisor through the termination date, which would be no sooner than Summer 2019.  In the light of Counsel's instructions to Mr. Rajguru, when Stira Fund held its quarterly Board meeting on August 23, 2018, Alcentra NY authorized one of the co-heads of U.S. direct lending to attend on its behalf.

**F.     Alcentra NY's Failure to Implement The Stira Fund's Investment Strategy**

88.     Because of Mr. Yang's reporting to BNY Mellon, Alcentra NY did not immediately formally resign as subadvisor to the Stira Fund.  However, beginning in September 2018, Alcentra NY effectively resigned from its duties as subadvisor, when it stopped implementing the investment strategy set forth in the Stira Fund's publicly-filed prospectus.

89.     Following the August 23 Stira Fund Board meeting, Mr. Forbes-Nixon announced Alcentra needed to re-evaluate the situation with the Stira Fund and its relationship with the Stira Adviser.  To that end, Alcentra sent to Stira Adviser a list of questions and requests for information, including revised fundraising numbers.

90.     Stira Adviser requested that Mr. Yang review its proposed responses in advance of the scheduled conference call with the Alcentra management committee.  As detailed below, Mr. Yang's review of this presentation—on behalf of Alcentra—later became part of BNY Mellon's purported justification for terminating him.

91.     On a conference call on September 6, members of both Alcentra and Stira Adviser reviewed Stira Adviser's responses and revised fundraising numbers, during which time Mr. Forbes-Nixon made clear his dissatisfaction with the progress of the Stira Fund.  Among the proposals considered during this period, Stira Adviser proposed that Alcentra or BNY Mellon outright buy the fund, an offer which Alcentra declined.

92.     Following the joint conference call between Alcentra and Stira Adviser, Alcentra NY stopped implementing the investment strategy disclosed in the prospectus.  Upon information and belief, this decision was not formalized within Alcentra but was rather discussed in one-off emails and communications.

93.     As set forth in the prospectus, the core investment strategy for the interval fund was to invest in U.S. and European directly originated loans.  Results of the fundraise were initially invested in traded debt until the subadvisor located suitable loans.  By August 2018, the interval fund had two direct loans, and Stira Adviser had made multiple requests to add the fund's first European loan to diversify the fund's holdings.

94.     Alcentra NY stopped implementing the investment strategy for the interval fund as described in the Stira Fund's prospectus in two key ways.  *First*, Alcentra NY attempted to buy back the only two directly originated loans already in the fund.  To purchase these loans, Alcentra NY needed Stira Adviser's approval.  Stira Adviser did not agree to Alcentra NY's request.  In declining the request, Stira Adviser noted the investment strategy provided for loans to be added to the funds and that the loans in question were good assets.

95.     *Second*, instead of investing in U.S. and European loans to middle market companies, and despite Stira Adviser's request for such loans and the investment strategy disclosed in the fund's prospectus, members of Alcentra NY's management committee decided that it would no longer place any additional loans in the interval fund.  Specifically, the decision not to add European loans was made by Mr. Forbes-Nixon and Mr. Rajguru.  The decision not to add U.S. loans was made by the co-heads of U.S. direct lending at Alcentra.

96.     Alcentra NY did not disclose to its investors that it was changing its stated investment strategy for the Stira Fund.  None of the public filings filed with the SEC disclosed this change in strategy.

97.     Mr. Yang was notified of these decisions but he did not participate in the decision-making process.  Indeed, by this point in time, Mr. Yang was the target of an aggressive retaliatory campaign led by Mr. Forbes-Nixon due to Mr. Yang's reporting to BNY Mellon about Mr. Forbes-Nixon and Mr. Rajguru's August management directive.

**G.     Defendants' Unlawful Retaliation Against Mr. Yang**

98.     The BNY Mellon Code of Conduct assures employees of BNY Mellon's "Zero Tolerance for Retaliation," including that:

> Anyone who reports a concern or reports misconduct in good faith, and with the reasonable belief that the information is true, is demonstrating a commitment to [Company] values and following [the Company's] Code of Conduct.  ***The company has zero tolerance for acts of retaliation.  Zero means zero.  No one has the authority to justify an act of retaliation.***  Any employee who engages in retaliation will be subject to disciplinary action, which may include dismissal.  *Code of Conduct* at 9 (emphasis added).

99.     Similarly, BNY Mellon's Employee Complaint Process, Policy Number: II-H-630-US, which Mr. Yang also received as an employee of Defendants, details the reporting process and provides that "retaliation by any employee of BNY Mellon against another employee of BNY Mellon because he or she has brought forward a Concern…will not be tolerated."

100.    After Mr. Yang reported his concerns to BNY Mellon about Alcentra NY immediately resigning as subadvisor to Stira Fund, it became clear that Mr. Forbes-Nixon and Mr. Rajguru were angry that Mr. Yang had protested their plan for Alcentra NY to immediately resign as subadvisor, and were embarrassed that Mr. Yang had raised his concerns about their directive to BNY Mellon counsel.  Mr. Yang's reporting to BNY Mellon painted a target on his back at a particularly sensitive time when Mr. Forbes-Nixon was already in danger of losing his

own job and facing scrutiny from BNY Mellon management about Stira Adviser and the Stira Fund.

101.    As a result of this reporting, Defendants, led by Mr. Forbes-Nixon, engaged in a months-long concerted effort to retaliate against and ultimately remove Mr. Yang from his positions within Alcentra.   In particular, among other things, Defendants retaliated against Mr. Yang by:  1) treating him in a hostile manner, 2) giving him an unwarranted negative year-end performance review, and 3) reducing his compensation.

102.    *First*, immediately following Mr. Yang's report, Alcentra's senior management began treating him in an aggressive manner.  For example, Mr. Forbes-Nixon publicly berated Mr. Yang in the presence of colleagues.  He also pounded the table at group meetings.

103.    Mr. Forbes-Nixon also criticized Mr. Yang's performance on insignificant and low-priority issues.  For example, despite Mr. Yang leading Alcentra to record-breaking fundraising numbers, Mr. Forbes-Nixon would upbraid Mr. Yang for minor perceived offenses, such as late expense reports and client meeting reports submitted by his team members.  Mr. Forbes-Nixon would refuse to give credit for the fundraising successes of Mr. Yang's team if the data was not promptly submitted in Alcentra's formal system.

104.    In addition, Mr. Forbes-Nixon refused to engage with Mr. Yang on certain matters, even though this was contrary to both his normal practice and what was required by the business. For example, he refused to discuss how bonuses would be awarded to the members of Mr. Yang's team or to provide a response to the reviews that Mr. Yang prepared for his team members.  He also routinely ignored emails sent by Mr. Yang which required a response, when he had not previously done so.  Mr. Forbes-Nixon's systematic refusal to engage with Mr. Yang after he reported concerns to BNY Mellon Counsel contrasted sharply with past practices and with the

professional rapport between them.   Mr. Forbes-Nixon's conduct prevented Mr. Yang from effectively carrying out his daily responsibilities as a manager and impeded his ability to meet his year-end goals, as discussed further below.

105.   Further, despite Mr. Yang's position as a member of Alcentra's management committee, he was side-lined from strategic discussions between September and December 2018, including from discussions about Alcentra NY's implementation of the interval fund's investment strategy.

106.   *Second*, Defendants further retaliated against Mr. Yang by giving him an unfavorable year-end performance review for 2018, despite Mr. Yang meeting or exceeding his professional fundraising and corporate goals for Alcentra.

107.   During his employment by Defendants, and in accordance with BNY Mellon policy, Mr. Forbes-Nixon consistently provided Mr. Yang with mid-year and end-of-year professional evaluations, during which they would meet to discuss his performance, goals, and rating.   In 2018, Mr. Forbes-Nixon failed to provide Mr. Yang with his 2018 year-end review in violation of BNY Mellon's policies.   Mr. Yang later learned, after his termination, that he had given Mr. Yang a "Below Expectations" rating for 2018.   This rating was unwarranted, because Mr. Yang had achieved or exceeded his fundraising goals for the year, despite the challenges posed by a contracting market and declining performance on the investment management side of the business.   Mr. Yang learned that the purported justification offered by Mr. Forbes-Nixon for the rating was alleged email policy violations discussed in detail in Section H below.   This justification is pretextual, however, as those emails were entirely inconsequential and were neither intended to, nor caused, any harm to Defendants.

108.    Defendants' documentation of Mr. Yang's 2018 performance does not reflect grounds for a "Below Expectations" year-end review.  Instead, it reflects that, at year end, Mr. Yang was deemed to have "Achieved Expectations" in the categories "Corporate Goals–Diversity and Inclusion" and "Results-Based Goals."  But, based on a "Below Expectations" rating in the category of "Risk & Compliance" (based on the alleged email policy violations) and a "Below Expectations" rating in the category of "Overall Competencies" (for which no comment or explanation was provided), Mr. Yang's overall year-end rating was lowered to "Below Expectations."

109.    Mr. Yang's 2018 year-end review stood in marked contrast to his prior year-end reviews.  In every other year that Mr. Yang was employed by Defendants, he had received year-end ratings of "Exceeded Expectations" or "Achieved Expectations."   Mr. Forbes-Nixon had repeatedly praised Mr. Yang's work ethic, his efforts, and the positive results he secured for BNY Mellon and Alcentra.  Mr. Forbes-Nixon further called Mr. Yang "a star" and "a game changer." And in the past, Mr. Forbes-Nixon had also told Mr. Yang that he was "the hardest working employee at Alcentra," and that he was "forever indebted" to Mr. Yang.

110.    Mr. Yang had received positive feedback from Mr. Forbes-Nixon as recently as mid-2018.  While Mr. Yang had been disappointed by certain of the other feedback he received from Mr. Forbes-Nixon in mid-2018, by the end of the year, Mr. Yang had largely met his goals and had a strong performance year deserving of a positive rating.  Specifically, in late July 2018, Mr. Forbes-Nixon provided Mr. Yang with a mid-year review.  This July meeting was calendared by Mr. Forbes-Nixon's assistant as Mr. Yang's "mid-year review."  Overall, the tone and contents of the review were positive and in-line with Mr. Yang's performance to date.  Mr. Yang was responsible for raising the initial funds, not managing investment performance at Alcentra.  A

market downturn which, among other things, affected the demand for investment in the Stira Fund, and the fact that Alcentra's *investment* performance was below benchmark made it more difficult for Mr. Yang and his team to market Alcentra's products.  Nonetheless, Mr. Forbes-Nixon noted that Mr. Yang had done an overall "great" job with his fundraising targets, and praised an "outstanding fundraise" Mr. Yang and his team had achieved, notwithstanding the market downturn and Alcentra's investment performance.  Based on Alcentra's fundraising performance at that point, Mr. Yang was on track to meet or exceed his overall fundraising goal by year end.  It was understood, since this was a mid-year review, that Mr. Yang would not have yet met all of his targets yet, as of July 2018.  Nor was Mr. Yang, or any BNY Mellon employee, expected to have met their targets at that stage.  In addition, despite the unexpected departure of some senior staff, Mr. Yang was successfully rebuilding his team.

111.    While BNY Mellon employees typically receive only one mid-year evaluation with their supervisors, just a few weeks later, in August 2018, Mr. Forbes-Nixon inexplicably requested a meeting with Mr. Yang in order to give him a second, unscheduled mid-year review.  This meeting took place in London, while Mr. Yang was in town for Alcentra's August management committee meeting.  Despite no material change in Mr. Yang's performance since the late July review, at this second August review, Mr. Forbes-Nixon informed Mr. Yang that he would formally be receiving a "Below Expectations" mid-year rating.  Mr. Forbes-Nixon cited as a reason for this rating the supposed failure of Mr. Yang to hit his year-end targets by August.  As Mr. Yang pointed out to Mr. Forbes-Nixon during their meeting, it was improper to expect Mr. Yang to have met all of his year-end targets by August, four months before the end of the performance year.  As another reason for the rating, Mr. Forbes-Nixon cited a new ratings system recently adopted by BNY Mellon, which he told Mr. Yang meant that all employees would be rated on a more critical

scale.  However, Mr. Yang pointed out that other employees, including those who reported to Mr. Yang, who similarly had not (entirely reasonably, given the mid-year date) completed all of their goals for the year, were not rated "Below Expectations," even though the new ratings system was in place.  Additionally, BNY Mellon implemented the new ratings system in June.  Because the new system was already in place when Mr. Forbes-Nixon gave Mr. Yang his July mid-year review, Mr. Forbes-Nixon's decision to blame the August rating on the new system made no sense.  When Mr. Yang asked Mr. Forbes-Nixon where he could improve, Mr. Forbes-Nixon did not offer constructive feedback.  Instead, Mr. Forbes-Nixon dismissed the importance of the review, telling Mr. Yang not to worry about it.  He also reiterated that Mr. Yang's rating was a function of the new, more stringent ratings curve for BNY Mellon employees.  Mr. Yang did not receive written documentation of this mid-year rating until a few weeks later, after he reported his concerns to BNY Mellon's Counsel for the Stira Fund.

112.    After Mr. Yang reported his concerns to BNY Mellon's Counsel for the Stira Fund later in August 2018, Mr. Forbes-Nixon impeded Mr. Yang from meeting his non-fundraising goals.  As a manager himself who had, in the past, rated a report "Below Expectations," Mr. Yang was aware of the company protocol which requires managers to provide specific guidance for improvement.  Contrary to this BNY Mellon policy, Mr. Forbes-Nixon did not offer a plan to assist Mr. Yang in improving his rating.  Instead, Mr. Forbes-Nixon actively worked to undermine Mr. Yang's goals.  For example, one of Mr. Yang's non-fundraising year-end goals was to improve customer relationship management ("CRM") and to increase the number of CRM reports sent to Mr. Forbes-Nixon.  Despite Mr. Yang's improvements to, and increase in, the number of reports generated, Mr. Forbes-Nixon refused to respond to emails discussing the CRM project or to confirm that the reports were to his satisfaction.  Nor did Mr. Forbes Nixon respond to Mr. Yang's

own detailed self-evaluation with feedback.  Notwithstanding this lack of engagement or support by Mr. Forbes-Nixon, Mr. Yang nevertheless ended his year strong, having achieved or exceeded almost all of his fundraising goals and other professional goals.  Despite Mr. Yang's efforts and strong performance, Mr. Forbes-Nixon still gave him an overall negative performance rating at year end.

113.   *Third*, Defendants further retaliated against Mr. Yang by lowering his compensation.  Per the terms of Mr. Yang's March 8, 2013 offer letter from BNY Mellon and Alcentra NY, he was entitled to a base salary and annual performance-based discretionary bonuses pursuant to the LTIP.  Mr. Yang's year-end compensation was largely made up by incentive compensation, rather than base salary, and tied to his year-end performance review.  Between 2013 and 2018, Mr. Yang had consistently received multi-million dollar awards, in recognition of his successes on behalf of Alcentra.  As a result of Mr. Forbes-Nixon's decision to rate him "Below Expectations" based on pretextual email violations and in retaliation for his reporting activity, Defendants slashed the incentive compensation he was slated to receive in 2018 by eighty percent as compared to prior years.  Further, when Defendants unlawfully terminated Mr. Yang in January 2019, they also withheld even this reduced 2018 incentive compensation.

**H.    Defendants' Unlawful Termination of Mr. Yang and Fabrication of Purported Cause**

114.   After enduring five months of a hostile work environment, on January 14, 2019, Defendants terminated Mr. Yang based on pretextual violations of BNY Mellon's email policies. The emails relied on by Mr. Forbes-Nixon to terminate Mr. Yang were entirely inconsequential and were neither intended to, nor caused, any harm to Defendants.

*The First Email*

115.   The first alleged email violation occurred in April 2018 when Mr. Yang emailed a BNY Mellon employee who was placed on "garden leave."  Between announcing his departure to

-35-

join a competitor firm and actually departing BNY Mellon, this employee downloaded the entirety of the contents of his Microsoft Outlook, including contacts and calendar events. Because this employee reported directly to Mr. Yang, BNY Mellon's Data Loss Prevention ("DLP") team directed Mr. Yang to contact his former report and advise him that DLP was aware of the data breach, would be in touch, and that he was in violation of the Company's separation agreement.

116.    Although this individual on garden leave was still a BNY Mellon employee and still on the company payroll, he was no longer physically present in the office and no longer had access to his BNY Mellon email account or company-issued electronic devices. As a result, Mr. Yang was forced to email his former report's personal email account to comply with DLP's directives.

117.    Upon information and belief, despite downloading his contact list and leaving BNY Mellon to work for a direct competitor, the employee on garden leave was not subjected to any discipline. Rather, he was only required to sign a certification attesting to the destruction and/or deletion of all confidential, proprietary, or sensitive BNY Mellon information. The employee on garden leave did not forfeit any vested incentive compensation, nor did he incur a financial penalty. BNY Mellon did not pursue subsequent legal action against him.

118.    DLP did not seek a meeting with Mr. Yang following Mr. Yang's email to his former report.

### *The Second Email*

119.    The second alleged email violation occurred on or about August 29 or 30, 2018. Mr. Yang, while traveling on business, sent a presentation he was working on involving the Stira Fund to his personal email address because it could not be accessed on his work phone or iPad. The presentation at issue was Stira Adviser's answers to Alcentra's requests for information sent following the August 23 Board meeting. Stira Fund requested that Mr. Yang review the

presentation before it was sent to Mr. Forbes-Nixon.  In turn, Mr. Forbes-Nixon was pressuring Mr. Yang to finalize the presentation and to provide him with rapid responses to his follow-up questions.

120.    Additionally, Mr. Yang was experiencing technical difficulties with BNY Mellon's remote access Citrix system.  The remote access system was incompatible with Mr. Yang's personal iPad and the iPad which BNY Mellon had provided to him.  Additionally, the software used to create the Stira Fund's presentation was not compatible with Mr. Yang's iPad.  Instead, the presentation needed to be reviewed on a desktop computer.

121.    Given that Mr. Forbes-Nixon was pressuring Mr. Yang to review the presentation in advance of the joint meeting scheduled for September 6, Mr. Yang sent a copy of the presentation to his personal email account and accessed it in the business center of the hotel where he was staying.

122.    DLP did not seek a meeting with Mr. Yang as a result of sending a copy of the presentation to his personal email account for business purposes.  It was not until November 2018 that BNY Mellon notified Mr. Yang that his sending of the presentation to his personal email account violated BNY Mellon's email policy.

123.    Mr. Yang did not share the presentation with any unauthorized parties, nor did working on the presentation at Mr. Forbes-Nixon's direction cause harm to BNY Mellon's business or reputation.  To the contrary, Mr. Yang's efforts resulted in his efficient transmission of information Mr. Forbes-Nixon needed, particularly given the pressing deadline he set. Moreover, to ensure that future technical difficulties would not impair his ability to work, Mr. Yang invested in new desktop and laptop computers, which he configured for use with BNY

Mellon's remote access system.  BNY Mellon never reimbursed Mr. Yang for the costs of these new computers.

### The Third Email

124.    It was not until Mr. Yang inadvertently forwarded an attachment to his wife on November 27, 2018, that Mr. Forbes-Nixon seized on the prior two emails to justify terminating Mr. Yang.

125.    In November 2018, Mr. Yang received an email announcing that Alcentra entities had broken records for fundraising.  Mr. Yang was eager and proud to share the good news with his wife, who did not work.  Without realizing that the congratulatory email contained an attachment with Alcentra NY's client names, Mr. Yang forwarded the email to his wife.  Neither the email nor the attachment was shared with anyone other than Mr. Yang's wife.

126.    DLP flagged that Mr. Yang had shared the attachment containing a list of Alcentra NY's clients.  DLP then notified Mr. Forbes-Nixon of this fact on November 29, 2018 and followed up with him on December 4, 2018.  In its email, DLP noted that "[a]s this is Mr. Yang's third violation, Human Resources *may be notified if there is another incident report filed*."  DLP also asked Mr. Forbes-Nixon to review the email and attachment which Mr. Yang had sent, advise if they were "deemed sensitive and/or confidential information," and share with DLP any other concerns he may have.  Mr. Forbes-Nixon initially did not respond to DLP's November 29 email, prompting DLP to send him a second email on December 4.

127.    On December 4, 2018, Mr. Forbes-Nixon contacted Mr. Yang regarding the email but made no mention of any attachment.  Without understanding the context of Mr. Forbes-Nixon's email, Mr. Yang thought he was being criticized for merely sending a generic congratulatory email to his wife.  Mr. Yang learned that he had sent an attachment externally only when DLP made him aware of that fact during an investigation into the matter.  Upon learning this, Mr. Yang

immediately instructed his wife to delete the email and confirmed the deletion to Mr. Forbes-Nixon.

128.    DLP team routinely monitors emails sent external to the BNY Mellon network, and will notify an employee's supervisor of emails sent externally.  Upon information and belief, DLP does not have the authority to terminate employees.  Such decisions are at the discretion of the employee's supervisor, who can act upon the recommendation of DLP or ignore it.  Here, Mr. Forbes-Nixon exercised his discretion and terminated Mr. Yang, allegedly "for cause" on January 14, 2019.

129.    During Mr. Yang's termination meeting, BNY Mellon's then-head of Human Resources admitted that everybody occasionally sends email to their personal email address.  She also told Mr. Yang that she disagreed with the determination to terminate him for the email violations.  Mr. Yang noted in the meeting that other BNY Mellon employees had committed far more significant violations of company email policy without being disciplined, let alone terminated.

130.    For example, in Mr. Yang's capacity as FINRA Supervisor, he routinely reviewed emails sent by BNY Mellon employees that constituted violations of FINRA.  Mr. Yang was aware of instances where employees had over ten BNY Mellon/FINRA email infractions in a single month.  Upon information and belief, these employees were not terminated by BNY Mellon as a result.

131.    Further, during one of Mr. Yang's monthly meetings with the Head of U.S. Compliance, he raised the fact that Mr. Yang had a few email violations.  The Head of U.S. Compliance acknowledged that the bank's email policy was frequently violated and that employees routinely emailed work documents to their personal email accounts in order to work

remotely.  He also observed that email policy violations that also constituted violations of FINRA regulations (unlike Mr. Yang's) were taken more seriously by the bank than email policy violations that did not run afoul of FINRA (like Mr. Yang sending work documents to his personal email account in order to work while at home or traveling for business).

132.    At no time did Mr. Yang's conduct cause harm to Defendants' business or reputation.  Further, Mr. Yang's conduct lacked any malicious intent.  Upon information and belief, BNY Mellon has not terminated employees for violations of its email policies when there has been no harm to BNY Mellon's business, or when the employee's actions were done in furtherance of their job responsibilities and not intended to harm the company.

**I.    Mr. Yang Suffers Economic and Emotional Harm as a Result of Defendants' Unlawful Retaliation and Termination**

133.    Defendants' unlawful retaliation against and termination of Mr. Yang has caused him significant economic and emotional damages.

### *Economic Harm*

134.    Defendants have denied Mr. Yang both performance-based incentive compensation and deferred compensation, including for restricted units and options that would have vested but for Defendants' unlawful retaliation against Mr. Yang.  Forfeiture of Mr. Yang's deferred and incentive compensation by virtue of his termination for purported cause constitutes further ongoing retaliation against Mr. Yang for reporting his good-faith concerns.

### Incentive Compensation

135.    As a senior-level employee at Alcentra, a portion of Mr. Yang's compensation was paid out as restricted units pursuant to Award Agreements governed by the Alcentra NY LLC U.S. Long Term Incentive Plan (defined above as the "LTIP").  Mr. Yang also received units subject to option pursuant to the LTIP.

136.    Section 3.1(a) of the Award Agreement granting Mr. Yang restricted units sets forth

the three-year vesting period for such units:

> *Vesting; Settlement*.  Subject to Sections 3.1(c), 3.2 and 4.6 of this Agreement, if
> you remain continuously employed by [Alcentra NY], Alcentra UK or any other
> Company Group Member[8] through the close of business on the third anniversary of
> the Grant Date, the **Restricted Units** shall vest in full and no longer be subject to
> forfeiture on the date of such anniversary.

137.    In addition, Section 3.1(a) of the Award Agreement granting Mr. Yang units subject

to option sets forth the three-year vesting period for such units:

> *Vesting*.  Subject to Sections 3.1(e), 3.2 and 4.6 of this Agreement, if you remain
> continuously employed by [Alcentra NY], Alcentra UK or any other Company
> Group Member through the close of business on the third anniversary of the Grant
> Date, the **Option** shall vest in full and no longer be subject to forfeiture on the date
> of such third anniversary.

138.    On June 30, 2017, Mr. Yang was awarded 163,194 Alcentra units, each consisting

of one restricted Class B Unit of Alcentra NY and one restricted stock unit with respect to a UK

Share of Alcentra Limited.  Also on June 30, 2017, Mr. Yang received 1,750,000 Alcentra Units

subject to option, consisting of one Class B Unit Alcentra NY and one UK Share of Alcentra

Limited.

139.    The restricted units and the options vested on March 7, 2020, or would have vested

on March 7, 2020 but for Defendants' withholding of the units awarded in violation of the LTIP

and applicable law.

140.    The LTIP does not permit Alcentra NY to cancel Mr. Yang's units in these

circumstances.  Section 2.6 of the LTIP, titled "Forfeiture and Repayment," does not provide for

forfeiture in these circumstances.  Section 2.6 permits Alcentra NY to cancel units when an

employee has "engaged in conduct **materially adverse** to the interests of the Company Group in

---

[8]    The LTIP does not define the terms "Company Group" or "Company Group Member."

breach of [his or her] duties to the Company Group."  Mr. Yang has not engaged in such conduct, nor did Defendants make such a finding in order to find Mr. Yang forfeited those units.  Indeed, the first two emails that allegedly violated BNY Mellon's email policy were sent at the *direction* of BNY Mellon and/or to *advance* the interests of BNY Mellon's business.   Mr. Yang inadvertently sending the third email to his wife, who subsequently deleted it, was not a "material" event, nor was such action adverse to the interests of Defendants BNY Mellon, Alcentra NY, and/or Alcentra Limited.  Accordingly, Mr. Yang is entitled to the vested units.

141.    In addition, Mr. Yang's units would have vested but for Defendants' unlawful termination of Mr. Yang in violation of the terms of the Award Agreements.

142.    Section 3.1(d) of the Award Agreements governed by the LTIP, titled "Forfeiture upon Termination of Employment," does not provide for forfeiture upon termination of employment where, as here, such termination was in retaliation for protected conduct.  Section 3.1(d) provides for forfeiture except as "prohibited by local law."

Deferred Compensation

143.    Mr. Yang also participated in the Alcentra Limited and Alcentra NY LLC Long-Term Incentive Cash Award Plan (defined above as the "Cash Plan"), a component of the LTIP.

144.    Section 1.1(b) of the Cash Plan specifies the employees eligible to participate in the Cash Plan:

> [I]n the case of any employee other than the CEO of [Alcentra NY], the CEO of [Alcentra NY] shall designate which Employees are eligible to receive awards under this Plan for such Plan Year.

145.    A portion of Mr. Yang's compensation for work already performed was credited annually each March 1 following the grant of an award under the Cash Plan, which was subject to a three-year vesting period.  Specifically, Section 2.4 of the Cash Plan provides that:

Each participant shall become 100% vested in that portion of his or her Measurement Account attributable to an Award Amount on the third anniversary of the Grant Date (with respect to each such Award Amount, its "Determination Date") provided s/he on such date is, and has continuously been through the vesting period, an Employee.

146.   On March 1 of 2016, 2017, and 2018, a portion of Mr. Yang's compensation for services already performed was deferred pursuant to the Cash Plan.  Defendants terminated Mr. Yang a mere two months before his first payment was to vest on March 1, 2019.

147.   The awards granted on each of March 1, 2016 and 2017 vested on March 1, 2019 and March 1, 2020, respectively, or would have vested on these dates but for Defendants' withholding of the units in violation of the terms of the LTIP and Defendants' unlawful termination of Mr. Yang.

148.   Defendants have wrongfully adopted the position that because Mr. Yang was terminated for purported cause, he is not entitled to the vested awards.  However, the Cash Plan does not permit Alcentra NY to cancel Mr. Yang's awards in these circumstances.

149.   Section 3.3 of the Cash Plan, which describes how a Participant may forfeit his or her awards in the Plan, permits BNY Mellon to reduce a Participant's awards if the Participant "has engaged in *fraud* or *conduct* that directly or indirectly causes or *contributes to any financial restatements or irregularities* of [Alcentra NY]."  Here, there is no claim that Mr. Yang has engaged in any such fraud or conduct.  In fact, the purported email policy violations fall far short of this standard for the same reasons discussed above.

150.   In addition, although Mr. Yang's termination was purportedly based on email policy violations, this was transparent pretext for Defendants' unlawful retaliation.  The Cash Plan does not provide for forfeiture upon termination of employment where, as here, such termination was in retaliation for protected conduct and prohibited by law.

151.   Accordingly, Mr. Yang is entitled to the vested awards.

*Emotional Distress*

152.    Defendants' conduct toward Mr. Yang has also caused him to suffer emotional distress and reputational injury.  Mr. Yang, in addition to providing for his immediate family, also furnishes financial support to his extended family.  Despite actively and earnestly seeking alternative employment, Mr. Yang has been unsuccessful to date.  The seizure of Mr. Yang's compensation by Defendants BNY Mellon, Alcentra NY, and Alcentra Limited has prevented him from providing that necessary support, which has placed both Mr. Yang and those who depend upon him under considerable stress.  Further, the stresses of the past nearly two years as a result of Defendants' unlawful and retaliatory conduct have caused Mr. Yang to suffer physically.

153.    Moreover, Mr. Yang's efforts to find alternative employment have been complicated by the nature of his departure from Defendants.  Based on the retaliation that Mr. Yang has suffered, and the purported cause that Defendants have used to justify Mr. Yang's termination, Mr. Yang cannot rely on Defendants to provide an accurate reference regarding Mr. Yang to prospective employers.  Further, during the pendency of the OSHA proceedings against Defendants, Mr. Yang has been hesitant to discuss the true circumstances surrounding his departure from Defendants with prospective employers, and Mr. Yang believes that prospective employers may be suspicious regarding the reasons for Mr. Yang's sudden unemployment.

## FIRST CAUSE OF ACTION

### For Violations of Section 806 of Sarbanes-Oxley, 18 U.S.C. § 1514A
### Against BNY Mellon, Alcentra NY, and Alcentra Limited

154.    Mr. Yang repeats and realleges each and every allegation above as though fully set forth herein.

155.   This cause of action is brought by Mr. Yang against Defendants BNY Mellon, Alcentra NY, and Alcentra Limited for violations of Section 806 of Sarbanes-Oxley, 18 U.S.C. § 1514A.

156.   BNY Mellon is a publicly traded company, the securities of which are registered under Section 12 of the Securities Exchange Act of 1934, within the meaning of 18 U.S.C. § 1514A.  BNY Mellon is required to file reports under Section 15(d) of the Securities Exchange Act of 1934, within the meaning of 18 U.S.C. § 1514A.

157.   Alcentra NY is a wholly-owned subsidiary of BNY Alcentra Group, whose financial information is included in the consolidated financial statements of BNY Mellon.  At all relevant times, Alcentra NY was acting as an agent and contractor of BNY Mellon, within the meaning of 18 U.S.C. § 1514A.

158.   Alcentra NY is an investment adviser regulated by the Investment Advisers Act of 1940.  As an investment adviser, Alcentra NY must comply with all the requirements of that statute, and its rules and regulations, including that it act in accordance with its fiduciary obligations to its clients, and must act in good faith and in the best interests of its clients.  Alcentra NY was prohibited from engaging in any "act, practice, or course of business which is fraudulent, deceptive, or manipulative."  *See* 15 U.S.C § 80b-6.  When Alcentra NY serves as an adviser to a pooled investment vehicle, Alcentra NY is also subject to 17 C.F.R. § 275.206(4)–8, which prohibits investment advisers from making materially false or misleading statements or omissions regarding investment strategies the pooled investment vehicle will pursue and practices the adviser follows in the operation of its advisory business such as how the adviser allocates investment opportunities.

159.     Alcentra Limited is a wholly-owned subsidiary of BNY Alcentra Group, whose financial information is included in the consolidated financial statements of BNY Mellon.  At all relevant times, Alcentra Limited was acting as an agent and contractor of BNY Mellon, within the meaning of 18 U.S.C. § 1514A.

160.     At all relevant times, Mr. Yang was an employee of Defendants BNY Mellon, Alcentra NY, and Alcentra Limited.

161.     Mr. Yang engaged in a protected activity within the meaning of 18 U.S.C. § 1514A by reporting that Alcentra's management committee had issued a directive ordering the immediate resignation of Alcentra NY as subadvisor to the Stira Fund.

162.     Mr. Yang was reasonably concerned that Defendants' conduct would violate Section 206 of the Investment Advisors Act of 1940 by breaching Alcentra NY's non-waivable fiduciary duties of care and loyalty; Rule 206(4)-8 by rendering statements made to Stira Fund's investors regarding the fund's investment strategy and Alcentra NY's advisory operations materially misleading; and subject Alcentra NY to regulatory penalties under 15 U.S.C. § 80b-3(e) for inducing or procuring a violation of Section 77 of the Securities Exchange Act requiring the Stira Fund to amend or supplement a prospectus to reflect any post-effective developments.

163.     Mr. Yang believed Alcentra NY's immediate resignation as a subadvisor to the Stira Fund constituted precisely the type of fraudulent, deceptive, or manipulative conduct Sarbanes-Oxley prohibits.  *See* 15 U.S.C § 80b-6.

164.     Mr. Yang was aware of prior conduct involving the same members of the Alcentra management committee who issued the August 21, 2018 directive, which violated or was not in compliance with the Investment Companies Act of 1940.  Mr. Yang believed that the August 21, 2018 directive was part of a pattern of non-compliance by the London-based members of the

committee who were unfamiliar with U.S. securities laws.  Mr. Yang further believed that additional training and/or guidance was necessary to prevent a breach of Alcentra NY's fiduciary duties, to correct material misrepresentations in a prospectus regarding Alcentra NY's conduct as advisor and the investment strategies pursued by the Stira Fund, and to guard against future violations.

165.    Mr. Yang provided information to BNY Mellon's Counsel for the Stira Fund and Alcentra NY's Head of Compliance to assist in an investigation regarding this conduct.  Mr. Yang reported to individuals within BNY Mellon and Alcentra who had supervisory authority over Mr. Yang and/or the authority to investigate, discover, or terminate misconduct.

166.    As a direct result of the information that Mr. Yang provided to BNY Mellon Counsel for the Stira Fund and the Head of Compliance for Alcentra NY, Defendants, acting through agents, including the CEO of Alcentra, harassed Mr. Yang, discriminated against Mr. Yang in the conditions of his employment, subjected Mr. Yang to a hostile work environment, took adverse employment actions against Mr. Yang, and ultimately wrongfully terminated Mr. Yang in January 2019, in retaliation for his reporting of Defendants' plan up the chain of command to BNY Mellon's Counsel for the Stira Fund and the Head of U.S. Compliance at Alcentra NY.

167.    Defendants BNY Mellon, Alcentra NY, and Alcentra Limited are vicariously liable for the actions of its employees, including those of the CEO of Alcentra.

168.    The circumstances surrounding Mr. Yang's termination show that his protected activity was the reason for the CEO's decision to terminate Mr. Yang's employment with Defendants BNY Mellon, Alcentra NY, and Alcentra Limited.

169.    The harassment suffered by Mr. Yang, as stated above, perpetrated by Defendants was a direct violation of Section 806 of Sarbanes-Oxley.

170.    As a direct and proximate result of Defendant BNY Mellon, Alcentra NY, and Alcentra Limited's retaliatory conduct, Mr. Yang has suffered and continues to suffer significant economic damages, including but not limited to loss of his incentive and deferred compensation, emotional harm, and reputational injuries.

171.    By virtue of the conduct alleged herein, Defendants BNY Mellon, Alcentra NY, and Alcentra Limited have violated Section 806 of Sarbanes-Oxley, and are liable to Mr. Yang for damages in an amount to be determined at trial.

172.    Mr. Yang requests back pay, calculated based upon his base salary, as set forth in the March 8, 2013 offer letter, together with his historical annual bonus while employed by Defendants, of at least $4.8 million, and including the restoration of his incentive and deferred compensation of at least $4.2 million pursuant to the LTIP and Cash Plan, to which Defendants Alcentra NY and Alcentra Limited are parties.

173.    Upon information and belief, Mr. Yang does not believe he can return to work for Defendants under the circumstances.  Based on Defendants' unlawful retaliation against Mr. Yang, and the concern that Defendants will not provide a favorable reference on Mr. Yang's behalf to prospective employers, Mr. Yang's successful decades-long career at the senior-executive level has come to a standstill.  There are few alternative positions available in the industry commensurate with the seniority and compensation level Mr. Yang had while employed by Defendants.  Despite his good faith and wide-ranging efforts to secure comparable employment, Mr. Yang has been unsuccessful in finding another suitable position.

174.     Mr. Yang requests a "make whole" remedy of at least $7 million that includes a continuation of his income at his base salary, as set forth in the March 8, 2013 offer letter, together with his historical annual bonus, along with the value of the fringe benefits provided during his employment by Defendants calculated to his expected retirement age of 65.

175.     Mr. Yang also seeks special damages for injury to his health and reputation, including but not limited to reimbursement for pain and suffering, as well as payment of all associated attorneys' fees and costs as also called for by Section 806 of Sarbanes Oxley.

## SECOND CAUSE OF ACTION

### For Breach of the Offer Letter Against BNY Mellon and Alcentra NY LLC

176.     Mr. Yang repeats and realleges each and every allegation above as though fully set forth herein.

177.     Mr. Yang entered into the valid and enforceable offer letter with BNY Mellon Alcentra NY on March 8, 2013, pursuant to which Mr. Yang agreed to render services to BNY Mellon and Alcentra NY.

178.     During Mr. Yang's employment with Defendants, Alcentra's growth outstripped both its historic performance and industry standards.  Mr. Yang was responsible for securing record investor capital commitments to Alcentra.  Under Mr. Yang's direction, the total assets under management grew from approximately $15 billion to $40 billion.  As a result, Alcentra's global rankings among the largest fundraisers of private debt globally vaulted from twenty-fifth to sixteenth, as reported by *Private Debt Investor* magazine.

179.     Until 2018, Mr. Yang received year-end ratings of "Exceeded Expectations" or "Achieved Expectations."  Mr. Forbes-Nixon repeatedly praised Mr. Yang's work ethic, his efforts, and the positive results Mr. Yang secured for Defendants.  By the end of 2018, Mr. Yang had largely met his goals and had a strong performance deserving of a positive rating.

180.    The March 8, 2013 offer letter provided that in exchange for Mr. Yang's services, his "compensation will be comprised of a base salary and an annual bonus award opportunity, of which a portion will be awarded as long-term incentive."

181.    At the time Mr. Yang was hired, and from time to time, Mr. Yang was provided with BNY Mellon's Code of Conduct which provided that an employee, complying with the terms of the Code of Conduct and reporting a suspected violation of the laws, would not be subject to retaliation.

182.    At all relevant times, BNY Mellon's Employee Complaint Process policy protected a BNY Mellon employee who "brought forward a concern" from "retaliation by any employee of BNY Mellon."

183.    Mr. Yang agreed to and did fully and faithfully perform services in accordance with the March 8, 2013 offer letter and with BNY Mellon's Code of Conduct, including reporting his good faith concerns in August 2018 that BNY Mellon/Alcentra NY employees were "about to do something that violates the law."

184.    Defendants BNY Mellon and Alcentra NY, violated their agreement with Mr. Yang by failing to adhere to the language of the Code of Conduct and the Employee Complaint Process Policy which provided that employees, such as Mr. Yang, would not be retaliated against for reporting in good faith suspected and imminent violations of the law.

185.    As a result of Mr. Yang's reporting about imminent violations of law—which was *required* of him under the Code of Conduct—Defendants subjected Mr. Yang to a hostile work environment, ultimately terminating him.

186.    Defendants' retaliatory conduct, which violated the terms of the Code of Conduct and the Employee Complaint Process, deprived Mr. Yang of his rights to receive benefits under

the terms of the offer letter, which included deferred and incentive compensation already awarded to him in the form of restricted stock units and options under the LTIP and Cash Plan.

187.    Specifically, the value of units and options awarded to Mr. Yang is at least $4.2 million, which would have vested but for Defendants' retaliatory conduct.

188.    As a direct and proximate result of Defendants' retaliatory conduct, Mr. Yang has suffered damages, including but not limited to deferred and incentive compensation units which would have vested but for Defendants' retaliatory actions.

### THIRD CAUSE OF ACTION

**For Breach of the Alcentra NY LLC Long-Term Incentive Plan ("LTIP")
Against Alcentra NY LLC and Alcentra Limited**

189.    Mr. Yang repeats and realleges each and every allegation above as though fully set forth herein.

190.    Mr. Yang entered into the valid and enforceable LTIP with Alcentra NY and Alcentra Limited, pursuant to which Mr. Yang agreed to provide services to Alcentra NY and Alcentra Limited.

191.    During Mr. Yang's employment with Defendants, Alcentra's growth outstripped both its historic performance and industry standards.  Mr. Yang was responsible for securing record investor capital commitments to Alcentra.  Under Mr. Yang's direction, the total assets under management grew from approximately $15 billion to $40 billion.  As a result, Alcentra's global rankings among the largest fundraisers of private debt globally vaulted from twenty-fifth to sixteenth, as reported by *Private Debt Investor* magazine.

192.    Until 2018, Mr. Yang received year-end ratings of "Exceeded Expectations" or "Achieved Expectations."   Mr. Forbes-Nixon repeatedly praised Mr. Yang's work ethic, his

efforts, and the positive results Mr. Yang secured for Defendants.  By the end of 2018, Mr. Yang had largely met his goals and had a strong performance deserving of a positive rating.

193.    As a senior-level employee, a portion of Mr. Yang's compensation was paid out as units pursuant to the LTIP.  Under the LTIP, as part of his compensation, Mr. Yang was awarded restricted units and options in Alcentra NY and Alcentra Limited.  According to Section 3.1(a) of the Award Agreements under the LTIP, the restricted units and units subject to option granted under this agreement are subject to a three-year vesting period.

194.    On June 30, 2017, Mr. Yang was awarded 163,194 Alcentra Units, each consisting of one restricted Class B Unit of Alcentra NY and one restricted stock unit with respect to a UK Share of Alcentra Limited.  Also on June 30, 2017, Mr. Yang received 1,750,000 Alcentra Units subject to option, consisting of one Class B Unit Alcentra NY LLC and one UK Share of Alcentra Limited.  Both the restricted units and the options vested on March 7, 2020, or would have vested on March 7, 2020 but for Defendants' unlawful termination of Mr. Yang.

195.    Alcentra NY and Alcentra Limited breached their contractual obligations by holding that Mr. Yang has forfeited his units and withholding the units which have since vested.

196.    *First*, Mr. Yang's conduct did not trigger the forfeiture provisions of the LTIP. Section 2.6 of the LTIP permits Alcentra NY to cancel units when an employee has "engaged in conduct materially adverse to the interests of the Company Group in breach of [his or her] duties to the Company Group."  The first two emails that allegedly violated BNY Mellon's email policy were sent at the direction of BNY Mellon and/or to advance the interests of BNY Mellon's business.  Mr. Yang inadvertently sending the third email to his wife, who subsequently deleted it, was not a "material" event, nor was such action adverse to the interests of Defendants BNY

Mellon, Alcentra NY, and/or Alcentra Limited.   Nor did Defendants issue such a finding of "materiality."

197.   *Second*, section 3.1(b) of the Award Agreements issued under the LTIP, titled "Forfeiture upon Termination of Employment," provides that all unvested units shall immediately be forfeited "***except…as prohibited by local law***."

198.   The LTIP does not provide for forfeiture upon termination of employment where, as here, such termination was in retaliation for protected conduct and prohibited by law.

199.   As discussed above, Defendants terminated Mr. Yang in retaliation for reporting, which is protected activity under Section 806 of Sarbanes-Oxley, or prohibited by law.

200.   As a direct and proximate result of Alcentra NY and Alcentra Limited's breaches of the LTIP, Mr. Yang has suffered economic harm.

201.   Mr. Yang has suffered damages of at least $4.2 million as a result of Alcentra NY and Alcentra Limited's combined breaches of the LTIP and Cash Plan, discussed below.

## FOURTH CAUSE OF ACTION

**For Breach of the Alcentra Limited & Alcentra NY LLC U.S. Long-Term Incentive Cash Award Plan (the "Cash Plan") Against Alcentra NY LLC and Alcentra Limited**

202.   Mr. Yang repeats and realleges each and every allegation above as though fully set forth herein.

203.   As a senior executive, Mr. Yang entered into the valid and enforceable Cash Plan with Alcentra NY and Alcentra Limited, pursuant to which Mr. Yang agreed to render services to Alcentra NY and Alcentra Limited.   The Cash Plan, which is a component of LTIP, governs deferred compensation for the CEO of Alcentra NY and any employees designated by the CEO.

204.   During Mr. Yang's employment with Defendants, Alcentra's growth outstripped both its historic performance and industry standards.   Mr. Yang was responsible for securing

record investor capital commitments to Alcentra.  Under Mr. Yang's direction, the total assets under management grew from approximately $15 billion to $40 billion.  As a result, Alcentra's global rankings among the largest fundraisers of private debt globally vaulted from twenty-fifth to sixteenth, as reported by *Private Debt Investor* magazine.

205.    Until 2018, Mr. Yang received year-end ratings of "Exceeded Expectations" or "Achieved Expectations."   Mr. Forbes-Nixon repeatedly praised Mr. Yang's work ethic, his efforts, and the positive results Mr. Yang secured for Defendants.  By the end of 2018, Mr. Yang had largely met his goals and had a strong performance deserving of a positive rating.

206.    Under the Cash Plan, a portion of Mr. Yang's annual compensation for work already performed was deferred with a three-year vesting schedule.

207.    A portion of Mr. Yang's compensation was credited each March 1 following the grant of an award under the Cash Plan, which was subject to a three-year vesting period. Specifically, Section 2.3 of the Cash Plan provides that:

> ***Each participant shall become 100% vested*** in that portion of his or her Measurement Account attributable to an Award Amount ***on the third anniversary of the Grant Date*** (with respect to each such Award Amount, its "Determination Date") provided s/he on such date is, and has continuously been through the vesting period, an Employee.

208.    On March 1 of 2016, 2017, and 2018, a portion of Mr. Yang's compensation was deferred pursuant to the Cash Plan.  Defendants terminated Mr. Yang a mere two months before his first award was to vest on March 1, 2019.  The awards granted on each of March 1, 2016 and 2017 vested on March 1, 2019 and March 1, 2020, respectively, or would have vested on these dates but for Defendants' unlawful termination of Mr. Yang.  Upon information and belief, the deferred compensation owed Mr. Yang, which has vested, is worth millions.

209.    Alcentra NY and Alcentra Limited breached their contractual obligations by holding that Mr. Yang has forfeited his units and withholding the units which have since vested.

210.     *First*, Defendants have wrongfully adopted the position that because Mr. Yang was terminated for purported cause, he is not entitled to the awards that have vested, nor is he entitled to information provided to investors to properly value the worth of the compensation he is due. The Cash Plan does not permit Alcentra NY to cancel Mr. Yang's awards in these circumstances. As discussed above, although Mr. Yang's termination was purportedly based on email policy violations, this was transparent pretext for Defendants' unlawful retaliation.

211.     The Cash Plan does not provide for forfeiture upon termination of employment where, as here, such termination was in retaliation for protected conduct and prohibited by law.

212.     As discussed above, Defendants terminated Mr. Yang in retaliation for reporting, which is protected activity under Section 806 of Sarbanes-Oxley, or prohibited by law.

213.     *Second*, Mr. Yang's conduct does not meet the standard set out in the Cash Plan sufficient to forfeit his awards.  Section 3.3 of the Cash Plan, which describes how a Participant may forfeit his or her awards in the Plan, does permit BNY Mellon to reduce a Participant's awards if the Participant "has engaged in ***fraud*** or conduct that ***directly or indirectly causes or contributes to any financial restatements or irregularities*** of [Alcentra NY]."   Mr. Yang's email policy violations, the purported cause for his termination, consisted of two emails that were sent at the *direction* of BNY Mellon and/or to *advance* the interests of BNY Mellon's business, and a third email inadvertently sent to his wife, who subsequently deleted it.  Defendants have made no allegations of fraud or contribution to financial restatements or irregularities with respect to these emails, or with respect to any other conduct of Mr. Yang.

214.     Accordingly, Mr. Yang is entitled to the vested awards.

215.     As a direct and proximate result of Alcentra NY and Alcentra Limited's breaches of the Cash Plan, Mr. Yang has suffered economic harm.

216.     Mr. Yang has suffered damages of at least $4.2 million as a result of Alcentra NY and Alcentra Limited's combined breaches of the LTIP and Cash Plan.

## FIFTH CAUSE OF ACTION

### In the Alternative, For Breach of the Implied Covenant of Good Faith and Fair Dealing Against Alcentra NY LLC and Alcentra Limited

217.     Mr. Yang repeats and realleges each and every allegation above as though fully set forth herein.

218.     During Mr. Yang's employment with Defendants, Alcentra's growth outstripped both its historic performance and industry standards.  Mr. Yang was responsible for securing record investor capital commitments to Alcentra.  Under Mr. Yang's direction, the total assets under management grew from approximately $15 billion to $40 billion.  As a result, Alcentra's global rankings among the largest fundraisers of private debt globally vaulted from twenty-fifth to sixteenth, as reported by *Private Debt Investor* magazine.

219.     Until 2018, Mr. Yang received year-end ratings of "Exceeded Expectations" or "Achieved Expectations."   Mr. Forbes-Nixon repeatedly praised Mr. Yang's work ethic, his efforts, and the positive results Mr. Yang secured for Defendants.  By the end of 2018, Mr. Yang had largely met his goals and had a strong performance deserving of a positive rating.

220.     Under New York law, every contract implies good faith and fair dealing between the parties to it.

221.     Where a contract contemplates the exercise of discretion by the parties, it includes a promise not to act arbitrarily or irrationally in exercising that discretion.

222.     The LTIP provides that the Alcentra Remuneration Committee has, among other things, "the authority in its sole discretion from time to time…(iv) to **interpret the Plan** [and] (vii)

to approve any acceleration or ***exceptions*** to the treatment of Awards upon termination of employment pursuant to Section 3.4."

223.    Section 3.4 of the LTIP lists certain scenarios in which an employee who is terminated does not forfeit unvested units.

224.    Defendants are obligated to act reasonably, in good faith, and in compliance with their other legal obligations in the exercise of their discretion to interpret the LTIP, which includes whether to vest the units of an employee who is terminated.

225.    Defendants have taken the position that an employee who is terminated but whose conduct is not listed as triggering forfeiture under Section 2.6 ("Forfeiture") of the LTIP nevertheless forfeits any unvested units.

226.    Mr. Yang's conduct does not merit forfeiture as defined in the LTIP.  Section 2.6 of the LTIP permits Alcentra NY to cancel units when an employee has "engaged in conduct materially adverse to the interests of the Company Group in breach of [his or her] duties to the Company Group."  The first two emails that allegedly violated BNY Mellon's email policy were sent at the direction of BNY Mellon and/or to advance the interests of BNY Mellon's business. Mr. Yang inadvertently sending the third email to his wife, who subsequently deleted it, was not a "material" event, nor was such action adverse to the interests of Defendants BNY Mellon, Alcentra NY, and/or Alcentra Limited.

227.    Defendants did not make a finding that Mr. Yang's conduct was "materially adverse" to Defendants BNY Mellon, Alcentra NY, and/or Alcentra Limited.

228.    Nor is Defendants' interpretation in compliance with their other legal obligations not to retaliate against an employee who is protected both under Section 806 of Sarbanes-Oxley and BNY Mellon's Code of Conduct.

229.    Defendants' interpretation of the LTIP to withhold the entirety of Mr. Yang's unvested units is neither reasonable nor was made in good faith.

230.    The value of Mr. Yang's unvested units under the LTIP and Cash Plan is at least $4.2 million.

231.    Mr. Yang is entitled to the cash value of the units and options, which would have vested but for Alcentra NY and Alcentra Limited's illegal retaliation and termination of Mr. Yang, and failure to use good faith in interpreting the terms of the LTIP and Cash Plan.

## SIXTH CAUSE OF ACTION

### In the Alternative, For Unjust Enrichment
### Against Alcentra NY LLC and Alcentra Limited

232.    Mr. Yang repeats and realleges each and every allegation above as though fully set forth herein.

233.    During Mr. Yang's employment with Defendants, Alcentra's growth outstripped both its historic performance and industry standards.  Mr. Yang was responsible for securing record investor capital commitments to Alcentra.  Under Mr. Yang's direction, the total assets under management grew from approximately $15 billion to $40 billion.  As a result, Alcentra's global rankings among the largest fundraisers of private debt globally vaulted from twenty-fifth to sixteenth, as reported by *Private Debt Investor* magazine.

234.    Until 2018, Mr. Yang received year-end ratings of "Exceeded Expectations" or "Achieved Expectations."  Mr. Forbes-Nixon repeatedly praised Mr. Yang's work ethic, his efforts, and the positive results Mr. Yang secured for Defendants.  By the end of 2018, Mr. Yang had largely met his goals and had a strong performance deserving of a positive rating.

235.    In exchange for Mr. Yang's services rendered between 2016 and his termination on January 14, 2019, Alcentra NY and Alcentra Limited withheld the majority of Mr. Yang's

compensation.  Instead, the majority of Mr. Yang's compensation was in the form of restricted stock units and options, subject to a three-year vesting schedule.

236.    When Defendants terminated Mr. Yang on January 14, 2019, Defendants withheld all compensation which had been awarded to Mr. Yang from 2016 onward in the form of restricted stock units and options in exchange for his performance as an employee.

237.    Alcentra NY and Alcentra Limited were enriched at Mr. Yang's expense, as Alcentra NY and Alcentra Limited received both the value of Mr. Yang's services performed between 2016 and 2019 and the value of the restricted stock units and options, which they have withheld from Mr. Yang.

238.    Allowing Alcentra NY and Alcentra Limited to retain the units and options which would have vested but for their illegal retaliation and termination of Mr. Yang is against equity and good conscience.

239.    The value of Mr. Yang's services to Alcentra NY and Alcentra Limited is at least $4.2 million.

240.    Mr. Yang is entitled to the cash value of the units and options which would have vested but for Alcentra NY and Alcentra Limited's illegal retaliation and termination of Mr. Yang.

### SEVENTH CAUSE OF ACTION

**In the Alternative, For *Quantum Meruit* Against Alcentra NY LLC and Alcentra Limited**

241.    Mr. Yang repeats and realleges each and every allegation above as though fully set forth herein.

242.    During Mr. Yang's employment with Defendants, Alcentra's growth outstripped both its historic performance and industry standards.  Mr. Yang was responsible for securing record investor capital commitments to Alcentra.  Under Mr. Yang's direction, the total assets under management grew from approximately $15 billion to $40 billion.  As a result, Alcentra's

global rankings among the largest fundraisers of private debt globally vaulted from twenty-fifth to sixteenth, as reported by *Private Debt Investor* magazine.

243.   Until 2018, Mr. Yang received year-end ratings of "Exceeded Expectations" or "Achieved Expectations."   Mr. Forbes-Nixon repeatedly praised Mr. Yang's work ethic, his efforts, and the positive results Mr. Yang secured for Defendants.  By the end of 2018, Mr. Yang had largely met his goals and had a strong performance deserving of a positive rating.

244.   Mr. Yang provided services to Alcentra NY and Alcentra Limited with the understanding that payment would be remitted and not withheld arbitrarily or unreasonably.

245.   Alcentra NY and Alcentra Limited knowingly accepted the services Mr. Yang rendered.

246.   The reasonable value of Mr. Yang's services to Alcentra NY and Alcentra Limited between 2016 and January 14, 2019 is at least $4.2 million.

247.   Alcentra NY and Alcentra Limited have withheld all deferred and incentive compensation which had been awarded to Mr. Yang from 2016 onward in the form of restricted stock units and options awarded under the LTIP.

248.   Mr. Yang is entitled to the value of the services he performed for Alcentra NY and Alcentra Limited which Alcentra NY and Alcentra Limited have withheld from him.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Yang prays for relief and judgment as follows:

A.   An order entering judgment in favor of Mr. Yang against Defendants;

B.   An order awarding Mr. Yang back pay, reflecting bonuses and base pay of at least $4.8 million, deferred compensation of at least $4.2 million, raises, and benefits in an amount to be determined at trial together with pre- and post-judgment interest as may be provided by contract or law;

C.   An order finding that reinstatement is not appropriate;

D.      An order awarding Mr. Yang front pay of at least $7 million, together with pre- and post-judgment interest as may be provided by contract or law;

E.      An order awarding special damages for Mr. Yang's emotional distress and loss of reputation;

F.      Pre-judgment and post-judgment interest on all amounts due;

G.      An order awarding costs and expenses, as well as reasonable attorneys' fees, incurred by Mr. Yang in this action to the fullest extent permitted by law;

H.      An order requiring Defendants to refrain from any further violations of the whistleblower provisions of Sarbanes-Oxley; and

I.      Such other relief, including equitable or injunctive relief, as is just and proper under the circumstances.


DATED:    New York, New York
          July 13, 2020                    QUINN EMANUEL URQUHART &
                                              SULLIVAN, LLP


                                    By:/s/ Peter E. Calamari
                                       Peter E. Calamari
                                       Manisha M. Sheth
                                       Kimberly E. Carson
                                       petercalamari@quinnemanuel.com
                                       manishasheth@quinnemanuel.com
                                       kimberlycarson@quinnemanuel.com

                                    51 Madison Avenue, 22nd Floor
                                    New York, New York 10010-1601
                                    (212) 849-7000

                                    *Attorneys for Plaintiff John ("Jack") Yang*