# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

JOHN "JACK" YANG,

               Plaintiff,

vs.

THE BANK OF NEW YORK MELLON
CORPORATION, ALCENTRA NY, LLC, and
ALCENTRA LIMITED,

        Defendants.

Case No. 1:20-cv-03179-AJN

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANTS' MOTION TO DISMISS
# PLAINTIFF'S FIRST AMENDED COMPLAINT

MORGAN, LEWIS & BOCKIUS LLP

Michael L. Banks (*pro hac vice*)
W. John Lee (*pro hac vice*)
Shannon L.C. Ammon (*pro hac vice*)
1701 Market Street
Philadelphia, PA 19103
Tel.: (215) 963-5000
Fax: (215) 963-5001
Michael.Banks@morganlewis.com
W.John.Lee@morganlewis.com

*Attorney for Defendants The Bank of New York Mellon Corporation, Alcentra NY, LLC, and Alcentra Limited*

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     SUMMARY OF PLAINTIFF'S FACTUAL ALLEGATIONS ........................................ 2

    A.      Defendants BNY Mellon, Alcentra NY, And Alcentra Limited. ......................... 2

    B.      Plaintiff John "Jack" Yang Was A Senior Executive At Alcentra And
            Served On The Board Of The Stira Fund. ............................................... 3

    C.      Alcentra NY Considered Resigning As Subadvisor To The Stira Fund
            Based On The Fund's Under-Performance. ............................................. 4

    D.      Plaintiff's Alleged Protected Activity Consisted Solely Of His Purported
            Expression of Concern About *When* Alcentra NY Could Resign Its
            Subadvisor Role To The Stira Fund. ..................................................... 5

    E.      Alcentra NY's Obligation Regarding *When* It Could Resign Its Subadvisor
            Role Is Solely Contractual. ............................................................... 7

    F.      Mr. Yang's Breach Of Contract And Quasi-Contract Claims Seeking To
            Recover Compensation Under Discretionary Incentive Plans. ......................... 8

III.    LEGAL STANDARD ......................................................................................... 10

IV.     ARGUMENT ................................................................................................... 11

    A.      Plaintiff's Claim For Whistleblower Retaliation Under § 806 Of SOX
            Should Be Dismissed Because He Has Not Plausibly Alleged That He
            Engaged In Protected Activity Under SOX. ........................................... 11

        1.      Plaintiff's Unreported Alleged Beliefs Cannot Save His SOX
                Claim. ................................................................................ 12

        2.      Plaintiff's Complaint About When Alcentra NY Could Resign As
                Sub-Advisor Is Not Activity Protected By SOX. ........................... 15

    B.      Plaintiff's Breach Of Contract Claims Fail As A Matter Of Law. .................... 17

        1.      Plaintiff Fails To Allege A Breach Of His Offer Letter and
                Therefore, Count II Should Be Dismissed. .................................. 18

        2.      Plaintiff's Claims For Breach Of Long-Term Incentive Plans Fail
                Because He Seeks Unvested Awards Under Discretionary
                Incentive Plans That State They Are Not Contracts. ...................... 19

    C.      Plaintiff's Quasi-Contract Claims Also Fail. ......................................... 24

V.      CONCLUSION ................................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Aledia v. HSH Nordbank AG*,
  No. 08-4342, 2009 WL 855951 (S.D.N.Y. Mar. 25, 2009) ...................................................24

*Allaire Corp. v. Okumus*,
  433 F.3d 248 (2d Cir. 2006) ...................................................................................................10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................................10

*Bader v. Wells Fargo Home Mortg. Inc.*,
  773 F. Supp. 2d 397 (S.D.N.Y. 2011) ....................................................................................25

*Bechtel v. Admin. Review Bd., U.S. Dep't of Labor*,
  710 F.3d 443 (2d Cir. 2013) .............................................................................................11, 12

*Cortec Indus. Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991) .....................................................................................................11

*Diaz v. Transatlantic Reinsurance Co.*,
  No. 16-1355, 2016 WL 3568071 (S.D.N.Y. June 22, 2016) .......................................12, 16, 19

*Fraser v. Fiduciary Tr. Co. Int'l*,
  417 F. Supp. 2d 310 (S.D.N.Y. 2006) ....................................................................................13

*Geldzahler v. New York Med. Coll.*,
  663 F. Supp. 2d 379 (S.D.N.Y. 2009) ....................................................................................18

*Goldstein v. S.E.C.*,
  451 F.3d 873 (D.C. Cir. 2006) ...............................................................................................16

*Grieve v. Barclays Capital Sec. Ltd.*,
  No. 602820/98, 1999 WL 1680654 (Sup. Ct. N.Y. Co. Sept. 10, 1999) ................................20

*Harris v. Provident Life & Accident Ins. Co.*,
  310 F.3d 73 (2d Cir. 2002) .....................................................................................................25

*Hunt Ltd. v. Lifschultz Fast Freight, Inc.*,
  889 F.2d 1274 (2d Cir. 1989) .................................................................................................18

*In the Matter of: Anita Johnson, Complainant v. Wellpoint, Inc., Respondent*,
  No. 2010-SOX-00038, 2011 WL 764714 (U.S. Dept. of Labor Feb. 25, 2011) ..............16, 17

*In re Mylan Sec. N.V. Litig.*,
  379 F. Supp. 3d 198, 204 (S.D.N.Y. Mar. 29, 2019) .............................................................10

*Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*,
   655 F.3d 136 (2d Cir. 2011).................................................................................11

*Karmilowicz v. Hartford Fin. Servs. Group*,
   No. 11-539, 2011 WL 2936013 (S.D.N.Y. July 4, 2011), *aff'd*, 494 F. App'x
   153 (2d Cir. 2012)........................................................................... *passim*

*Kavitz v. IBM*,
   458 F. App'x 18 (2d Cir. 2012) (Summary Order)................................................22

*Kramer v. Time Warner, Inc.*,
   937 F.2d 767 (2d Cir. 1991)..................................................................................11

*Lawson v. FMR LLC*,
   571 U.S. 429 (2014)..............................................................................................12

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
   906 F.2d 884 (2d Cir. 1990)..................................................................................18

*Nielsen v. AECOM Tech. Corp.*,
   762 F.3d 214 (2d Cir. 2014)..................................................................................17

*O'Dell v. Trans World Entm't Corp.*,
   153 F. Supp. 2d 378 (S.D.N.Y. 2001)...................................................................19

*O'Grady v. BlueCrest Capital Mgmt. LLP*,
   111 F. Supp. 3d 494 (S.D.N.Y. 2015), *aff'd*, 646 F. App'x 2 (2d Cir. 2016).........24

*PaineWebber Inc. v. Bybyk*,
   81 F.3d 1193 (2d Cir. 1996)..................................................................................18

*Rexnord Holdings, Inc. v. Bidermann*,
   21 F.3d 522 (2d Cir. 1994)....................................................................................17

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000)...........................................................................7, 10, 11

*Sasson v. TLG Acquisition LLC*,
   9 N.Y.S.3d 2 (1st Dept. 2015) ..............................................................................18

*SEC v. Charles Schwab Inv. Mgmt. et al.*,
   No. CV-11-0136, 2011 WL 147647 (N.D. Cal. Jan. 11, 2011)..............................14

*Timian v. Johnson & Johnson*,
   No. 15-06125, 2015 WL 6454766 (W.D.N.Y. Oct. 26, 2015) ....................... *passim*

*Tonra v. Kadmon Holdings, Inc.*,
   405 F. Supp. 3d 576 (S.D.N.Y. 2019)...................................................................11

*Wilson v. Merrill Lynch & Co.,*
   671 F.3d 120 (2d Cir. 2011)............................................................................10

*Wolff v. Rare Medium, Inc.,*
   210 F. Supp. 2d 490 (S.D.N.Y. 2002)...........................................................18

**STATUTES**

12 Del. C. § 3806(l) (2018)..............................................................................5, 16

15 U.S.C. § 77k.............................................................................................14, 15

15 U.S.C. § 77o.................................................................................................15

15 U.S.C. § 77q.........................................................................................6, 14, 15

15 U.S.C. § 80a–35(a).....................................................................................5, 16

15 U.S.C. § 80b-6.............................................................................................15

18 U.S.C. § 1514A.....................................................................................7, 11, 17

**OTHER AUTHORITIES**

General Information on the Regulation of Investment Advisers, Division of
   Investment Management, SEC (Mar. 11, 2011),
   https://www.sec.gov/divisions/investment/iaregulation/memoia.htm....................................15

## I.      INTRODUCTION

Plaintiff John "Jack" Yang was terminated from his employment as a senior executive at Alcentra NY on January 14, 2019.  He was told that his termination resulted from his repeated breaches of his employer's data privacy policies, but he questions whether that was the real reason for the decision.  Plaintiff contends that his improper sharing of information did not cause harm to Defendant's business or reputation, and that he lacked malicious intent.  Thus, he surmises, his termination must have been prompted by something else:  his opposition to the timing of a planned withdrawal from a contractual relationship between his employer, Alcentra NY, and an investment fund, through which Alcentra NY acted as subadvisor to the investment fund.  Plaintiff alleges that a withdrawal from the contract without sufficient notice would have breached obligations owed to the fund, and that he pointed that out to his superiors before he was terminated.  From that rather benign set of alleged facts, he attempts to construct a retaliation claim under Section 806 of Sarbanes-Oxley ("Sarbanes-Oxley" or "SOX").

Defendants previously moved to dismiss the Complaint under Rule 12(b)(6) because Plaintiff failed to allege facts suggesting he engaged in protected activity under SOX. Specifically, Defendants demonstrated that Plaintiff's alleged protests about the timing of the withdrawal from Alcentra NY's sub-advisory relationship implicated only contractual obligations to a client rather than fraudulent conduct or a violation of any rule or regulation of the Securities and Exchange Commission.  In response, Plaintiff filed the First Amended Complaint (Dkt. 26) ("FAC") adding factual allegations in an attempt to cure the initial pleading defects.

Mr. Yang's amendments are futile, as the FAC still fails to state a claim upon which relief can be granted and, therefore, should be dismissed with prejudice.  Mr. Yang now describes an expanded set of "beliefs" that Alcentra NY's conduct violated certain laws, but

these allegations are immaterial.  He does not allege that he shared these "beliefs" with Defendants and such uncommunicated thoughts cannot constitute protected activity.

Plaintiff has also asserted breach of contract claims seeking to recover unvested incentive awards that would have been paid to him had he remained employed.  Defendants argued that these claims failed as a matter of law because: (1) Mr. Yang's employment ended before these awards of incentive compensation had vested and, therefore, the awards were forfeited under the terms of the controlling plans, and (2) the incentive plans afforded Defendants complete discretion to pay or deny the compensation at issue, which means Plaintiff has no right to the compensation he is seeking.

Plaintiff responds in the FAC by citing his offer letter as a basis for his claim.  But the offer letter states clearly that it does not create a contract for employment or create an entitlement to incentive compensation.  Mr. Yang also adds three quasi-contract claims in his attempt to recover these unvested, entirely discretionary incentive awards:  breach of the implied covenant of good faith and fair dealing, unjust enrichment, and *quantum meruit*.  These claims are duplicative of the breach of contract claims and, therefore, they fail to pass muster.

For these reasons, Defendants respectfully request that the Court grant this Motion and dismiss all of Plaintiff's claims with prejudice.

## II.    SUMMARY OF PLAINTIFF'S FACTUAL ALLEGATIONS[1]

### A.    Defendants BNY Mellon, Alcentra NY, And Alcentra Limited.

Alcentra NY and Alcentra Limited are "registered as investment advisers under the Investment Advisers Act of 1940" and are both wholly owned subsidiaries of BNY Mellon.

---

[1]    Defendants assume, as they must, that the factual allegations in the Amended Complaint are true only for purposes of this Motion.

FAC ¶ 2.  "BNY Mellon is a publicly-traded company that provides banking and financial services."  *Id.* ¶ 26.

On March 23, 2017, Alcentra NY agreed to serve as a subadvisor to the Stira Fund, which is a closed-end interval fund[2] regulated under the Investment Company Act of 1940.  *Id.* ¶ 31.  In its role as subadvisor to the Stira Fund, Alcentra NY participated in meetings of the Stira Fund's Board of Trustees.  A copy of the Stira Fund's prospectus, as filed with the SEC in February 2018, outlined the responsibilities of Alcentra NY as the subadvisor and "the investment strategy for the Stira Fund."  *Id.* ¶¶ 32, 33-36.  The Fund's prospectus further stated that the Fund's future was dependent "to a significant extent on the continued service and coordination of the Sub-Adviser."  *Id.* ¶ 35.

### B.    Plaintiff John "Jack" Yang Was A Senior Executive At Alcentra And Served On The Board Of The Stira Fund.

Mr. Yang started working for Defendants as a Managing Director and Head of Business Development for the Americas for Alcentra NY in March 2013.  FAC ¶¶ 3, 45.  In April 2014, Mr. Yang was promoted to Global Head of Business Development for Alcentra and later promoted in January 2016 to Head of the Americas for Alcentra NY.  *Id.* ¶ 46.  Around 2016, "Mr. Yang joined Alcentra's management committee," which "oversaw Alcentra entities' obligations to the various funds in which they were engaged as advisors or subadvisors and evaluated their strategic decisions."  *Id.* ¶ 47.  From 2013 through 2018, "Alcentra's growth outstripped both its historic performance and industry standards" and its record investor capital commitments grew with total assets under management growing from $15 billion to $40 billion.  *Id.* ¶ 50.

---

[2]    Publicly offered closed-end funds that make periodic offerings to repurchase shares from shareholders, such as the Stira Fund, are often referred to in the marketplace as "interval funds."

Mr. Yang also held a seat on the Board of Trustees of the Stira Fund from approximately February 2018 until May 2019, when the Stira Fund was dissolved.  *Id.* ¶ 18.  "Given Alcentra NY's role as subadvisor to the Stira Fund, Mr. Yang was listed as an interested trustee in the offering materials" and "attended the Stira Fund's quarterly Board meetings as well as the special meetings held in the first-half of 2019, during which time the Stira Fund was considering strategic alternatives."  *Id.* ¶ 54.  The Stira Fund's prospectus highlighted Mr. Yang's "prior experience as a managing partner" and noted that he was "*highly qualified* to serve on the Board."  *Id.* at ¶ 54 (emphasis in original).

### C.    Alcentra NY Considered Resigning As Subadvisor To The Stira Fund Based On The Fund's Under-Performance.

In the middle of 2018, members of the Boards of Alcentra NY and Alcentra Limited grew concerned about the Stira Fund because the Fund "had been underperforming."  FAC ¶ 56.  On August 21, 2018, Alcentra's management committee met in London ahead of a board meeting of the Stira Fund to be held on August 23, 2018.  *Id.* ¶ 57.  At the August 21 meeting, Alcentra's CEO David Forbes-Nixon shared "that Alcentra's BNY Mellon Board members were displeased about Stira Adviser serving as advisor to the Stira Fund."  *Id.* ¶ 58.  Mr. Forbes-Nixon "instructed that Alcentra NY should resign as the Stira Fund's subadvisor as soon as possible."  *Id.* ¶ 60.[3]  In response, Alcentra's "CFO noted that immediate termination was not possible as Alcentra NY was obligated under the terms of its subadvisor agreement to provide Stira Adviser with ninety days' notice of resignation."  *Id.* ¶ 61.  Mr. Yang, who at the time was both an employee of Alcentra NY and served on the Board of Trustees of the Stira Fund, was present at this meeting.  *Id.* ¶¶ 18, 57.

---

[3]    In his original complaint, Mr. Yang alleged that he said it was "premature to consider resignation."  *See* Dkt. No. 1, Compl. ¶ 51.  He no longer makes that allegation.

Mr. Yang alleges that after this meeting, Alcentra's then-CIO directed the co-heads of U.S. direct lending and Plaintiff "to cease carrying out Alcentra NY's responsibilities as subadvisor and stated that there were to be ***no more investments, no more meetings, no more updates*** provided to the interval fund by Alcentra NY." *Id.* ¶ 66 (emphasis in original); *see also id.* ¶ 39. Mr. Yang alleges that this meant that the "co-heads of direct lending would neither attend the upcoming Stira Fund's Board meeting, scheduled a ***mere two days*** later on August 23, nor provide the market and portfolio update required of them during that meeting." *Id.* (emphasis in original). Yet, Mr. Yang admits that he participated in these meetings with Alcentra NY, which therefore necessarily means that the substance of this meeting was known to the Stira Fund because Mr. Yang was a member of the Board of Trustees of the Stira Fund. Indeed, as a trustee of the Stira Fund, Mr. Yang is the one who had a fiduciary duty to the Stira Fund and its shareholders. *See* 15 U.S.C. § 80a–35(a); 12 Del. C. § 3806(l) (2018).

### D. Plaintiff's Alleged Protected Activity Consisted Solely Of His Purported Expression of Concern About *When* Alcentra NY Could Resign Its Subadvisor Role To The Stira Fund.

In his original Complaint, Mr. Yang alleged he engaged in protected activity by reporting his concern about when Alcentra NY could resign as subadvisor. *See* Defs.' Mot. to Dismiss Pl.'s Compl., Dkt. No. 19, at 3-5. This is still the case in the FAC. Plaintiff alleges that, on August 21 or 22, 2018, *i.e.* the day of Alcentra NY's meeting to allegedly discuss resignation or the following day, he reached out to the President of the Stira Fund ("President") and informed him that "Alcentra's management committee discussed immediately terminating Alcentra NY's role as subadvisor to the interval fund." FAC ¶ 67. In response, the President indicated that "immediate termination, along the lines Alcentra NY was considering, violated the terms of the subadvisor agreement" and stated that Alcentra NY could not take this action particularly in light of the prospectus. *Id.*

Around that same time, "Mr. Yang informed [BNY Mellon's] Counsel for the Stira Fund of the directive by members of Alcentra's management committee to immediately stop providing subadvisor services to the Stira Fund." *Id.* ¶ 76.  Mr. Yang also allegedly reported to BNY Mellon's Counsel that Alcentra NY's desire to terminate its role as subadvisor was not in the best interest of the advisor, the Stira Fund, or the Stira Fund's shareholders. *Id.* ¶ 79.

In the FAC, Mr. Yang adds several allegations regarding his alleged *beliefs* about violations of laws. *See* FAC ¶¶ 68-74.  First, Mr. Yang adds the conclusory assertion that he believed that Alcentra NY violated Section 206 of the Investment Advisers Act of 1940 by breaching Alcentra NY's non-waivable fiduciary duties of care and loyalty to act in the best interests of its clients. *Id.* ¶¶ 69-70.  Second, Mr. Yang alleges that he believed that Alcentra NY violated Rule 206(4)-(8) under the Investment Advisers Act of 1940 by rendering statements made to Stira Fund's investors regarding the fund's investment strategy and Alcentra NY's sub-advisory operations materially misleading based on Alcentra NY's purported plans to resign and because Alcentra NY would be absent from the upcoming Stira Fund board meeting. *See id.* ¶¶ 72-73, 68.  Third, Mr. Yang alleges that he believed that Alcentra NY's conduct would subject the Stira Fund to liability for failing to amend the prospectus in violation of Section 17 of the Securities Act of 1933, 15 U.S.C. § 77q. *See id.* ¶¶ 68, 74. [4]

Significantly, Mr. Yang does not allege that he reported the second and third beliefs to anyone at Defendants (and the first belief is the same timing issue raised in the original complaint, which is still legally deficient as explained below).  Mr. Yang adds only the vague allegation that he reported "that Alcentra NY's proposed course of conduct could subject

---

[4]    Though ¶ 68 of the FAC refers to "Section 77 of the Securities Exchange Act," based upon the structure and application of the Securities Act of 1933 and the Securities Exchange Act of 1934, and in looking to other citations used in the FAC regarding this claim, it appears that Mr. Yang intended to instead refer to Section 17 of the Securities Act of 1933, 15 U.S.C. § 77q.

Alcentra NY and BNY Mellon to liability by shareholders and to regulatory penalties, *based on Alcentra NY's planned misrepresentations to investors in the Stira Fund and because investors in the Stira Fund invested in reliance on representations contained in the Stira Fund's prospectus*." *Id.* ¶ 80 (emphasis added).  Notably, in Count I of the FAC, which asserts the SOX retaliation claim, Mr. Yang alleges that he "engaged in a protected activity within the meaning of 18 U.S.C. § 1514A by reporting that Alcentra's management committee had issued a directive ordering the immediate resignation of Alcentra NY as subadvisor to the Stira Fund." *Id.* ¶ 161.

      **E.**     **Alcentra NY's Obligation Regarding *When* It Could Resign Its Subadvisor Role Is Solely Contractual.**

In its original motion to dismiss, BNY Mellon pointed out that Mr. Yang failed to reference or cite any specific law, regulation, rule, or any other legal authority that governs the issue of *when* Alcentra NY could resign as subadvisor to the Stira Fund.  *See* Defs.' Mot. to Dismiss Pl.'s Compl., Dkt. No. 19, at 5.  Mr. Yang has not remedied this in the FAC.  This is because there is no such authority.  The only source of any purported obligation governing *when* Alcentra NY could resign its role is in the contractual terms of the Sub-Advisory Agreement itself, attached as Exhibit ("Ex.") A.[5]  In other words, any restriction on the timing of a potential resignation was purely contractual, not statutory or regulatory in nature.

The Sub-Advisory Agreement contains a notice provision regarding when and under what circumstances Alcentra NY could terminate the Sub-Advisory Agreement.  Paragraph 9(b)(ii) of the Sub-Advisory Agreement provides that it "shall automatically terminate . . . at any time, without the payment of any penalty, upon 60 days' written notice by the Adviser, if the

---

[5]     The Sub-Advisory Agreement is integral to the Amended Complaint and thus, to the extent needed, can be considered on a Rule 12(b)(6) motion.  *See Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (noting that in deciding a motion to dismiss, the Court may consider "any statements or documents incorporated in [the complaint] by reference" and "documents that plaintiff[ ] either possessed or knew about and upon which [he] relied in bringing the suit").

Board of Trustees or a majority of the outstanding voting securities of the [Stira] Fund determine that th[e] Agreement should be terminated." Ex. A, at ¶ 9(b)(ii).  Absent the circumstances outlined in ¶ 9(b) of the Sub-Advisory Agreement, "the Adviser and Sub-Adviser agree[d] not to terminate th[e] Agreement for a period of 24 months from the Effective Date of th[e] Agreement except for 'cause' . . . ." *Id.* at ¶ 9(c).[6]  Following the initial 24-month period, "each of the Adviser and the Sub-Adviser c[ould] terminate th[e] Agreement, without any penalty, upon 60 days' written notice to the other party." *Id.*[7]

### F.     Mr. Yang's Breach Of Contract And Quasi-Contract Claims Seeking To Recover Compensation Under Discretionary Incentive Plans.

In Count III, Mr. Yang alleges that he is entitled to recover the value of *unvested* awards made to him under the Alcentra NY, LLC U.S. Long Term Incentive Plan ("the LTI Plan").  *See* FAC ¶¶ 190, 194.  Mr. Yang does not deny that his employment was terminated before the awards vested or that, under the terms of the LTI Plan, any unvested awards were to be forfeited upon termination.  He contends, however, that he should have been paid the value of the unvested awards, and that notwithstanding the plain language of the LTI Plan, the failure to pay him such compensation was a breach of contract.  *See id.* ¶¶ 196-97.  In particular, Mr. Yang identifies 163,194 Alcentra Units of one restricted Class B and 1,750,000 Alcentra Units subject to option, both of which were awarded on June 30, 2017, and scheduled to vest on March 7, 2020 – long after Mr. Yang's employment ended.  *Id.* ¶ 194.

---

[6]     The Sub-Advisory Agreement became effective "as of the date the Registration Statement [was] declared effective by the SEC." *Id.* at ¶ 9(a).  As public filings show, the SEC declared the Stira Fund's Registration Statement effective on May 8, 2017.  *See* Ex. B, Stira Alcentra Global Credit Fund, Notice of Effectiveness (May 8, 2017).

[7]     The termination provisions are also discussed in the Stira Fund's public filings with the SEC.  *See, e.g.*, Ex. C, Stira Alcentra Global Credit Fund, Registration Statement for Closed-End Investment Companies (Second Pre-Effective Amendment on Form N-2), at p. B-23 (Apr. 4, 2017).

The awards at issue in Count III were granted pursuant to Mr. Yang's 30 June 2017 "Option Agreement" (the "2017 Option Agreement"), attached as Ex. D, and Mr. Yang's 30 June 2017 "Restricted Unit Agreement" (the "2017 Restricted Unit Agreement"), attached as Ex. E. *See* FAC ¶ 138.  The 2017 Option Agreement and 2017 Restricted Unit Agreement are governed by the LTI Plan, attached as Ex. F.  Section 4.3 of the 2017 Option Agreement and 2017 Restricted Unit Agreement provide, "[t]his is an Award Agreement contemplated in Section 2.3(c) of the Plan. . . .  In the event of any inconsistency between the provisions of this Agreement and the Plan, the Plan shall govern."  Exs. D, E; *see* Exs. D (referencing Exhibit A); E (referencing Exhibit A).  Moreover, the LTI Plan provides, at Section 2.3(c), "[e]ach Award shall be confirmed by an agreement (an 'Award Agreement') executed by the Company . . . .  Awards shall be subject to such terms and conditions as shall be determined by the Remuneration Committee at the time of grant of the applicable Award and as set forth in the Award Agreement."  *See* Ex. F.

Mr. Yang alleges in Count IV that he is also entitled to recover the value of *unvested* awards under the Alcentra Limited & Alcentra NY, LLC 2016 Long-Term Incentive Cash Award Plan ("LTI Cash Plan"), attached as Ex. G.  *See* FAC ¶¶ 206-208.  Again, he does not contend that the awards actually vested before his employment ended or that he satisfied the conditions stated in Plan for the payment of these awards.  On the contrary, he admits that his employment ended before the vesting date.  Nevertheless, he says, his incentive compensation awards would have vested had he not been terminated unlawfully.  *Id.* ¶¶ 209-210.  In Count IV, Mr. Yang identifies certain compensation deferred on March 1 of 2016, 2017, and 2018 – the first of which was to vest on March 1, 2019 and the second on March 1, 2020.  *Id.* at ¶ 208.

After Defendants demonstrated the legal deficiencies in the breach of contract claims, Mr. Yang added four new counts seeking the same relief.  In Count II, Mr. Yang alleges that the

failure to pay him his unvested incentive compensation constitutes a breach of his offer letter and the company's Code of Conduct.  In Count V, Mr. Yang alleges that BNY Mellon breached the implied covenant of good faith and fair dealing by failing to interpret the Plans as granting Mr. Yang his unvested awards despite his termination.  *See id.* ¶¶ 228-230.  In Count VI, Mr. Yang brings a claim of unjust enrichment based on Defendants' purported enrichment "at Mr. Yang's expense, as Alcentra NY and Alcentra Limited received both the value of Mr. Yang's services performed between 2016 and 2019 and the value of the [unvested] restricted stock units and options, which they have withheld from Mr. Yang."  *Id.* ¶ 237.  Finally, in Count VII, Mr. Yang brings a claim for *quantum meruit*, restating his allegation that Defendants accepted Mr. Yang's services, withheld the deferred incentive compensation that would have vested after his termination, and should be required to repay the value of that service.  *Id.* ¶¶ 244-248.

## III.   <u>LEGAL STANDARD</u>

Rule 12(b)(6) of the Federal Rules of Civil Procedure requires the dismissal of a complaint that fails to state a claim upon which relief can be granted.  To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *In re Mylan Sec. N.V. Litig.*, 379 F. Supp. 3d 198, 204 (S.D.N.Y. Mar. 29, 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011)).  In assessing a motion to dismiss, the court must "accept[ ] as true the factual allegations in the complaint and draw[ ] all inferences in the plaintiff's favor."  *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006) (internal quotations and citation omitted).  In deciding a motion to dismiss, the Court may consider "any written instrument attached to [the complaint] as an exhibit or any

statements or documents incorporated in it by reference." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).[8]  The Court may also take judicial notice of public filings, such as SEC filings. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991).

## IV.    ARGUMENT

### A.    Plaintiff's Claim For Whistleblower Retaliation Under § 806 Of SOX Should Be Dismissed Because He Has Not Plausibly Alleged That He Engaged In Protected Activity Under SOX.

"[T]o bring a successful whistleblower claim under SOX § 806, the plaintiff must plead that he (1) 'engaged in protected activity; (2) the employer knew that [he] engaged in the protected activity; (3) [he] suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action.'" *Tonra v. Kadmon Holdings, Inc.*, 405 F. Supp. 3d 576, 589 (S.D.N.Y. 2019) (quoting *Bechtel v. Admin. Review Bd., U.S. Dep't of Labor*, 710 F.3d 443, 447 (2d Cir. 2013) (granting defendants' motion to dismiss as to SOX § 806 claim where "plaintiff d[id] not allege how a disclosure of [results] would impact shareholder decision making or how the study results would change the mix of information made available to shareholders")).

Section 806 of SOX protects employees from discharge if they "provide information [to certain individuals] . . . regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the [SEC], or any provision of Federal law relating to fraud against shareholders . . . ." 18 U.S.C. § 1514A(a)(1).  As the Supreme Court

---

[8]    *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) ( "Where . . . certain contracts are integral to the complaint, we also consider those documents in deciding the merits of the motion"); *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 44 (2d Cir. 1991) ("Plaintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim—and that they apparently most wanted to avoid—may not serve as a means of forestalling the district court's decision on the motion.").

observed, the whistleblower protections in SOX are intended primarily to prevent and protect against fraud, as opposed to mere protests about routine business practices. *See Lawson v. FMR LLC*, 571 U.S. 429, 434–35 (2014) (SOX "aims to 'prevent and punish corporate and criminal fraud, protect the victims of such fraud, preserve evidence of such fraud, and hold wrongdoers accountable for their actions.'" (quoting S. Rep. No. 107–146, at 2 (2002)); *accord Bechtel v. Admin. Review Bd., U.S. Dep't of Labor*, 710 F.3d 443, 446 (2d Cir. 2013) (Section 806 of SOX "seeks to combat what Congress identified as a corporate 'culture, supported by law, that discourage[s] employees from reporting fraudulent behavior not only to the proper authorities, such as the FBI and the SEC, but even internally.'" (quoting S. Rep. No. 107–146, at 5 (2002)). In addition, "a plaintiff's belief about those violations of relevant law must be both subjectively and objectively reasonable." *Diaz v. Transatlantic Reinsurance Co.*, No. 16-1355, 2016 WL 3568071, at *5 (S.D.N.Y. June 22, 2016).

### 1.       Plaintiff's Unreported Alleged Beliefs Cannot Save His SOX Claim.

In his original complaint, the only concern that Mr. Yang claims to have reported was the timing of Alcentra NY's resignation as subadvisor. Defendants demonstrated that the alleged conduct that Mr. Yang was challenging (i.e., planning for an early withdrawal from the sub-advisory relationship with the Stira Fund) did not violate any such statute, rule, or regulation. *See* Defs.' Mot. to Dismiss Pl.'s Compl., Dkt. No. 19, at 10-16. In an attempt to fill a gaping hole in his pleading, Mr. Yang now alleges that he held two other *beliefs* about the planned withdrawal from the advisory relationship with the Stira Fund.

***First***, Mr. Yang alleges that he believed that Alcentra NY violated Rule 206(4)-(8) under the Investment Advisers Act of 1940 by rendering statements made to Stira Fund's investors regarding the Stira Fund's investment strategy and Alcentra NY's sub-advisory operations materially misleading based on its purported plans to resign as subadvisor and because Alcentra

NY would be absent from the upcoming Stira Fund board meeting.  FAC ¶ 68.  He explains that he believed that Alcentra NY's planned absence from the upcoming Stira Fund board meeting and refusal to provide updates violated this rule because these planned actions would be inconsistent with the Stira Fund's prospectus.  *Id.* ¶¶ 72-73.

Mr. Yang does not allege, however, that he reported this "belief" to anyone at Defendants, nor could he do so truthfully.  Therefore, his uncommunicated "belief" is irrelevant. *See, e.g.*, *Fraser v. Fiduciary Tr. Co. Int'l*, 417 F. Supp. 2d 310, 323 (S.D.N.Y. 2006) (dismissing allegations under SOX for failing to constitute protected activity as the employee's activity was "more a complaint that his advice was not being followed" and failed to "indicat[e] that [he] believed the company to be violating any provision related to fraud on shareholders"). Rather, Mr. Yang alleges that he reported "that Alcentra NY's proposed course of conduct could subject Alcentra NY and BNY Mellon to liability by shareholders and to regulatory penalties, based on Alcentra NY's planned misrepresentations to investors in the Stira Fund and because investors in the Stira Fund invested in reliance on representations contained in the Stira Fund's prospectus."  *Id.* ¶ 80.  Mr. Yang does not explain what "proposed course of conduct" he reported, whether this "course of conduct" related to the representations in the Stira Fund prospectus, or to whom he reported it.  Moreover, the comma in the middle of paragraph 80 following the phrase "regulatory penalties" appears deliberately vague, as Mr. Yang does not make clear whether in reporting the unspecified "course of conduct" he also reported his alleged belief regarding planned misrepresentations to investors in the Stira Fund.  Even if Mr. Yang had reported this concern (which he did not), he states no factual basis for the claim that Alcentra NY violated (or was going to imminently violate) Rule 206(4)-8.  Alcentra NY did, in fact, disclose to the Stira Fund its intention to resign its role as subadvisor.  *Id.* ¶ 67.

**Second**, Mr. Yang alleges that Alcentra NY would violate Section 17 of the Securities Act of 1933, 15 U.S.C. § 77q, by failing to amend or supplement the Fund's prospectus to reflect any post-effective developments. Again, because Mr. Yang does not allege that he reported his alleged belief about the failure to amend the prospectus to anyone at Defendants, this alleged belief cannot save his claims from dismissal.

Even if he had reported his concern, Mr. Yang admits that the Stira Fund was on notice of the potential early termination by Alcentra NY. If at any time thereafter the Stira Fund believed that Alcentra NY would resign from its role as subadvisor, or if Alcentra NY had actually or constructively resigned, then it would always have been the obligation of the Stira Fund and/or Stira (as the primary advisor of the Stira Fund), and never the obligation of Alcentra NY as merely the Stira Fund's advisor, to supplement the Stira Fund's offering documents to correct any information that had become materially inaccurate or materially incomplete. *See* 15 U.S.C. § 77k (explaining that *only* a person who signed the registration statement or was a director or partner at the time of filing; every accountant, engineer, or appraiser who prepares or certified a part of the registration statement; or any underwriter can be sued for material misrepresentations in a registration statement)*; see also* Complaint, *SEC v. Charles Schwab Inv. Mgmt. et al*, No. CV-11-0136, 2011 WL 147647 (N.D. Cal. Jan. 11, 2011) (SEC alleging that fund's primary adviser [here, Stira and not Alcentra NY] violated 15 U.S.C. § 77q(a)(2) and (3) for failure to disclose the risks of investing in the fund in offering documents).

Indeed, Mr. Yang admits that the Stira Fund and its primary advisor (Stira) were legally responsible for ensuring that the Stira Fund's prospectus was materially complete and accurate. *See* FAC ¶ 39 ("[T]he Stira Fund owed a duty to amend or supplement its prospectus to reflect any material post-effective developments. *See* 15 U.S.C. § 77q."). Mr. Yang does not suggest that Alcentra NY as subadvisor was obligated, by contract or law, to update the Stira Fund's

14

offering documents.  And, as Plaintiff admits, if there were any material misstatements or omissions in the Stira Fund's offering documents, the responsibility to correct this would fall on the Stira Fund and/or Stira.  *See id.* ¶ 39 (citing 15 U.S.C. § 77q); s*ee also* 15 U.S.C. §§ 77k (permitting investors to sue *only* a person who signed the registration statement or was a director or partner at the time of filing; every accountant, engineer, or appraiser who prepares or certified a part of the registration statement; or any underwriter for material misrepresentations in a registration statement); 77o (explaining that *only* persons with stock ownership or agency are liable under sections 77k).[9]  If Mr. Yang was aware through his role with Alcentra NY of an imminent change that would have made the Stira Fund's offering documents materially inaccurate, then the Fund was simultaneously aware of the same through its Trustee, Mr. Yang.

### 2. Plaintiff's Complaint About When Alcentra NY Could Resign As Sub-Advisor Is Not Activity Protected By SOX.

What remains, therefore, is Mr. Yang's original claimed protected activity: his complaint that the timing of Alcentra NY's resignation as subadvisor would breach contractual obligations to the Stira Fund.  This is inadequate to sustain a claim.  Mr. Yang's addition of a citation to Section 206 of the Investment Advisers Act of 1940 in the FAC does nothing to turn a contractual duty into a SOX issue.  Section 206 of the Investment Advisers Act of 1940 "prohibits misstatements or misleading omissions of material facts and other *fraudulent* acts and practices in connection with the conduct of an investment advisory business."  Ex. H, Gen. Info. on the Regulation of Investment Advisers, Div. of Investment Mgmt., SEC (Mar. 11, 2011) ; *see* 15 U.S.C. § 80b-6.

---

[9]     Mr. Yang does not cite (because he cannot) any rule or regulation requiring Alcentra NY to update or supplement the Stira Fund's offering documents.  Because the Stira Fund and Stira knew immediately of this business disagreement and potential resignation by Alcentra NY, there is no subjective or objective basis for Mr. Yang's claimed belief that Alcentra NY's planned conduct could subject the Stira Fund and Alcentra NY to liability.

Here, Alcentra NY owed duties only to the Stira Fund, not to investors in the fund.  *See Goldstein v. S.E.C.*, 451 F.3d 873, 881 (D.C. Cir. 2006) ("The adviser owes fiduciary duties only to the fund, not to the fund's investors.").  Alcentra NY could not logically mislead, misstate, or commit any fraudulent act with respect to the Stira Fund in Mr. Yang's presence because Mr. Yang was a Trustee of the Stira Fund, so any belief or knowledge he held would be imputed to the Stira Fund.  *See, e.g.*, FAC ¶ 54.  As a trustee of the Stira Fund, it is *Mr. Yang* who had a fiduciary duty to the Stira Fund and its shareholders.  15 U.S.C. § 80a–35(a); *see* 12 Del. C. § 3806(l) (2018).  According to Mr. Yang, he told the Stira Fund's President either the same day or the very next day of Alcentra NY's alleged desire to terminate the sub-advisory agreement.  FAC ¶ 67.  Between August 23 and September 6, Alcentra NY and the Stira Fund discussed the possibility of Alcentra NY resigning its role.  *See id.* ¶¶ 89, 91.  Clearly, there was no fraud or scheme afoot for Alcentra NY to secretly cease acting as sub-advisor to the Stira Fund.

In reality, the timing of Alcentra NY's resignation from its role as subadvisor to the Stira Fund raises only *contractual* questions.  Mr. Yang concedes that the issue of *when* Alcentra NY could resign as subadvisor is contractual, as he alleges that he informed BNY Mellon's Counsel that was responsible for the relationship with the Stira Fund that Alcentra NY's immediate cessation of its sub-advisory activities would "breach Alcentra NY's contractual duties under the subadvisor[] agreement."  Compl. ¶ 9; *see also id.* ¶ 67 ("The President [of the Stira Fund] further relayed to Mr. Yang that immediate termination, along the lines Alcentra NY was considering, violated the terms of the subadvisor agreement.").  Where, as here, the issue underlying the alleged protected activity is, at most, a breach of contract as opposed to a violation of law enumerated by SOX, it is not protected activity as a matter of law.  *See, e.g.*, *In the Matter of: Anita Johnson, Complainant v. Wellpoint, Inc., Respondent*, No. 2010-SOX-00038, 2011 WL 764714 (U.S. Dept. of Labor Feb. 25, 2011) ("*Johnson*") (concluding that

complainant did not engage in protected activity where her comments concerned a breach of only contractual duties); *Diaz*, 2016 WL 3568071, at *5-6 (concluding that complainant did not engage in protected activity where her comments concerned a purported conflict of interest).[10]

Given this background, Mr. Yang cannot show that it was objectively reasonable for him to believe that this timing issue rose to the level of fraud or a violation of securities laws. Indeed, given Mr. Yang's extensive knowledge of the Stira Fund and U.S. securities law (*see, e.g.*, FAC ¶¶ 41, 43, 44, 48), it was not objectively reasonable to believe that a breach of the Sub-Advisory Agreement would constitute a violation of law or regulation enumerated in § 1514A. *See Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 222 (2d Cir. 2014) ("The objective prong of the reasonable belief test focuses on the 'basis of knowledge available to a reasonable person in the circumstances with the employee's training and experience.'").[11]

In sum, Mr. Yang has not plausibly alleged that he engaged in protected activity under SOX, so his retaliation claim under Section 806 of SOX should be dismissed as a matter of law.

## B.   Plaintiff's Breach Of Contract Claims Fail As A Matter Of Law.

To state a claim for breach of contract under New York law, a plaintiff must allege (1) a contract between the parties; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages flowing from the breach. *E.g.*, *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994). "When pleading these elements, a plaintiff must

---

[10]   Although the Administrative Law Judge ("ALJ") in *Johnson* relied on the outdated "definitively and specifically standard," *see Nielsen*, 762 F.3d at 220-21, the ALJ's holding that allegations of routine contract breaches, without more, do not amount to the type of activities protected by SOX remains unchanged.  Here, it was not objectively reasonable for Mr. Yang to believe that a breach of contractual duty is protected by SOX. *See supra*, at p. 17.

[11]   Notably, the SEC's most recent pronouncement of an adviser's fiduciary duty – a 42-page release that restated more than 50 years of law and guidance – contains ***no*** discussion of a subadvisor's fiduciary duty as inclusive of an obligation to continue to provide sub-advisory services, particularly where a primary advisor would remain in place after a subadvisor had terminated its contract. *See* Ex. I, Advisers Act Rel. No. 5248 (June 5, 2019).

identify the specific provision of the contract that was breached as a result of the acts at issue." *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 494 (S.D.N.Y. 2002).

"In a contract action, the court's general objective should be to give effect to the intentions of the parties in entering into the agreement[ ]." *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990). Where a contract is "unambiguous on its face, its proper construction is a question of law." *Metro. Life Ins.*, 906 F.2d at 889; *see also PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) ("[W]here 'the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law,' and a claim turning on that interpretation may thus be determined . . . by [a motion to dismiss]."). Although one party may assert a different meaning for a particular term, "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989); *see also Sasson v. TLG Acquisition LLC*, 9 N.Y.S.3d 2, 4 (1st Dept. 2015).

## 1.   Plaintiff Fails To Allege A Breach Of His Offer Letter and Therefore, Count II Should Be Dismissed.

Mr. Yang attempts to construct a breach of contract claim based on his offer letter and Alcentra NY's Code of Conduct. In both respects, he fails to state a claim for relief.

***First***, Mr. Yang's offer letter stated that he was an "at will" employee and that his employment may be terminated at any time with or without cause. That unambiguous language precludes him from asserting a breach of contract claim based on his termination. *See* Ex. J (Mr. Yang's Offer Letter); *Geldzahler v. New York Med. Coll.*, 663 F. Supp. 2d 379, 388 (S.D.N.Y. 2009) (granting motion to dismiss plaintiff's breach of contract claim because "New York law is clear that . . . an employee at will . . . can have no breach of contract claim under New York law").

Even if the employment at will language is disregarded, there would be no basis for a claim arising from the offer letter.  Mr. Yang fails to point to any "specific provision" of the offer letter that was ostensibly breached.  Mr. Yang cites only to the statement that his "compensation will be comprised of a base salary and an annual bonus award opportunity, of which a portion will be awarded as long-term incentive."  FAC ¶ 180.  Mr. Yang admits that Alcentra NY paid him a salary and provided with an additional bonus award *opportunity*.  *See, e.g.*, *id.* ¶¶ 52, 113.  Moreover, the offer letter expressly provides that Mr. Yang's participation in annual incentive awards shall "be governed by and construed in accordance with, the terms and conditions" of the incentive plan.  Ex. J at 1.  He does not identify a provision in the incentive plan that was breached, nor can he.

*Second*, Mr. Yang cites to the Alcentra NY Code of Conduct.  While not entirely clear, Mr. Yang appears to contend that Alcentra NY breached the Code of Conduct by terminating him.  *See* FAC ¶¶ 184-186.  The Code of Conduct, however, states explicitly that it "does not alter the terms and conditions of [his] employment."  Ex. K at 1, BNY Mellon Code of Conduct (Nov. 2019).  Thus, it did not create a contract that would have limited the right of Alcentra NY to terminate an at will employee.  *See, e.g.*, *Diaz v. Transatlantic Reinsurance Co.*, No. 16 CIV. 1355, 2016 WL 3568071, at *6 (S.D.N.Y. June 22, 2016) (dismissing plaintiff's breach of contract claim based on employer's codes of conduct because "New York law is . . . clear that employment guides or codes of conducts may not provide the basis for breach of contract claims").

### 2. Plaintiff's Claims For Breach Of Long-Term Incentive Plans Fail Because He Seeks Unvested Awards Under Discretionary Incentive Plans That State They Are Not Contracts.

"An employee's entitlement to a bonus is governed by the terms of the employer's bonus plan."  *O'Dell v. Trans World Entm't Corp.*, 153 F. Supp. 2d 378, 397 (S.D.N.Y. 2001) (citation

omitted).  The law is clear that "an employee has no enforceable right to compensation under a discretionary compensation or bonus plan." *Grieve v. Barclays Capital Sec. Ltd.*, No. 602820/98, 1999 WL 1680654 at *4 (Sup. Ct. N.Y. Co. Sept. 10, 1999).  This same analysis applies where, as here, the "bonus" forming the basis of a contractual claim is a long-term incentive award.  *See, e.g.*, *Karmilowicz v. Hartford Fin. Servs. Group*, No. 11-539, 2011 WL 2936013, at *7 (S.D.N.Y. July 4, 2011), *aff'd*, 494 F. App'x 153 (2d Cir. 2012); *Timian v. Johnson & Johnson*, No. 15-06125, 2015 WL 6454766 (W.D.N.Y. Oct. 26, 2015).  Based on the governing incentive plan documents and controlling case law, Mr. Yang's breach of contract claims for his unvested awards should be dismissed as a matter of law for several reasons.

*First*, the LTI Plan and LTI Cash Plan (collectively referred to as "the Plans") did not create a right to continued employment or to receive compensation other than as stated explicitly in the Plan documents.  The LTI Plan states that:

> *Neither the adoption of the Plan nor any action of the Board of Directors* . . . pursuant to the Plan *shall be deemed to give any employee any right to be granted any Award under the Plan*.  Nothing in the Plan, in any Award under the Plan or in any Award Agreement shall confer any right to any employee to continue in the employ of the Company or any Affiliate or interfere in any way with the rights of the Company or any Affiliate to terminate the employment of any employee at any time.

Ex. F, Section VII (emphases added).[12]  Similarly, Section 9.5 of the LTI Cash Plan, titled "Not a Contract of Employment," states that "[t]he terms and conditions of this Plan shall not be deemed to constitute a contract of employment between the Company or its Affiliates and any Participant or other person[.]."  Ex. G.

---

[12]     The 2017 Restricted Unit Agreement providing the Award under the LTI Plan further provides, "Neither the award of Restricted Units nor anything else contained in this Agreement or the Plan shall be deemed to limit or restrict the right of any Company Group Member to terminate your employment."  Ex. E (Section 4.1).

**Second**, the Plans state unequivocally that unvested awards are forfeited upon the termination of employment:  The LTI Plan provides, "Upon the effective date **of a termination for any reason** not specified in paragraphs 3.4(a) to 3.4(f) inclusive of this Section 3.4, **all Alcentra Units . . . immediately shall be forfeited** to Alcentra UK . . . ."  Ex.  F (Section 3.4(h) (emphases added)).[13]  Section 3.4 lists circumstances in which unvested awards are treated differently, including terminations of employment because of death (3.4(a)), retirement (3.4(b)), disability (3.4(c)), redundancy (3.4(d)), business sale (3.4(e)), and intra-group transfer (3.4(f)).  None of those circumstances apply to Mr. Yang's termination.  Accordingly, his unvested shares were terminated properly when his employment ended, and Count III fails as a matter of law.  *See Timian*, 2015 WL 6454766 at * 7 ("Viewing the phrase 'any reason' objectively and in the context of the LTI Plan and RSU Certificate, the Court simply cannot find any ambiguity.").

The LTI Cash Plan similarly states that:

> A Participant shall become 100% vested . . . on the third anniversary of its Grant Date or such later date for vesting as is set out in a Participant's Award Letter . . . **if (and only if, except as may otherwise be expressly provided herein) the Participant on such date is, and has continuously been through such date, an Employee.**  Each Participant shall be 0% vested in that portion of the applicable Measurement Account attributable to an Award Amount until it becomes vested pursuant to the previous sentence, and **shall forfeit 100% thereof upon a Termination of Employment prior to the applicable Vesting Date**.

Ex. G, Section 2.4 (emphases added).  Therefore, Count III also fails as a matter of law.

---

[13]    The 2017 Restricted Unit Agreement and 2017 Option Agreement also plainly state that the unvested awards are forfeited upon termination of employment.  *See* Ex. E (2017 Restricted Unit Agreement) (Section 3.1(b):  "Except as set forth in Section 3.2 below or as prohibited by local law, upon the **effective date of the termination of your employment with the Company** . . . **all unvested Restricted Units shall immediately be forfeited** and returned to the Company . . . ." (emphases added)); Ex. D (2017 Option Agreement) (Section 3.1(d) states that "**upon the effective date of the termination of your employment** with the Company . . . **all unvested portion of the Option shall immediately be forfeited** and returned to the Company . . . ." (emphases added)).

When Alcentra terminated Mr. Yang, based on the plain language of the Plans, Mr. Yang forfeited all unvested awards.  If Mr. Yang had a legitimate wrongful discharge or SOX retaliation claim – he does not, as discussed above – and if he were to prevail on such a claim, he might be able to recover lost incentive compensation as damages.  But he cannot create a separate cause of action for breach of contract when he clearly failed to satisfy the expressly stated conditions for the payment of incentive awards.

*Third*, because the Plans give Alcentra NY exclusive authority and discretion to pay compensation pursuant to the awards, Mr. Yang cannot sustain breach of contract claims based on the Plans.  Where, as here, the employer retains unfettered discretion to adjust, interpret, or even cancel an incentive plan entirely, then that plan cannot create an enforceable contract.  *See, e.g.*, *Karmilowicz*, 494 F. App'x at 153; *Kavitz v. IBM*, 458 F. App'x 18, 20 (2d Cir. 2012) (Summary Order) (Notwithstanding language limiting IBM's right to amend plan if "incentive payments have been earned under its terms[,]" the fact "that IBM retained unfettered discretion . . . to adjust its terms or even to cancel the [p]lan entirely confirm[ed]" that plan was "not an enforceable contract.").  In *Karmilowicz*, the compensation plans at issue granted the employer "full power, discretion and authority to interpret, construe and administer the Plan"; cautioned that all "decisions, determinations or actions of the Committee . . . shall be made or taken in the sole discretion of the Committee"; and provided that such decisions were conclusive and binding.  494 F. App'x at 157 (concluding that based on this language the plaintiff could not sustain a breach of contract claim).  Similarly in *Timian*, 2015 WL 6454766 at *6, the Court dismissed breach of contract claims finding the incentive plan at issue provided the Plan Administrator with wide-ranging and exclusive authority "to do all things that it determines to be necessary or appropriate in connection with the administration of the Plan."  Of note, the Plan Administrator had authority to determine the timing of awards (including any conditions that

must be satisfied before an award is granted) and the circumstances under which awards become

vested or are forfeited to expire.  *Id.* at *6 (also noting that according to the LTI Plan the decision

taken by the Administrator were conclusive and binding).

Here, the Plan documents give Alcentra the right to modify and interpret the Plans and to

issue final, binding decisions on claims for compensation.  Section 2.1(b) of the LTI Plan states

that:

> The Remuneration Committee shall have the authority in its sole discretion from time to time: (i) **to designate the individuals who are eligible to participate in the Plan**; (ii) to grant Awards, as hereinafter defined, under the Plan; (iii) **to prescribe such additional limitations, restrictions and conditions at the time of grant of any such Award as the Remuneration Committee shall deem appropriate**; (iv) **to interpret the Plan**; . . . (vii) to approve any acceleration or exceptions to the treatment of Awards upon termination of employment pursuant to Section 3.4; (viii) to authorize Affiliates to make grants to their own officers and employees subject to such terms and restrictions which the Remuneration Committee may from time to time specify; and (ix) **to make all other determinations and take all other action necessary or advisable for the implementation and administration of the Plan**. Determinations made by the Remuneration Committee hereunder shall be final, binding and conclusive with respect to the Participants.

Ex. F (emphases added).  The LTI Cash Plan also provides the Plan Administrator with exclusive

authority.  Section 7.1 states:

> The Administrator shall, subject to the authority of the HRCC and BNY Mellon, have the complete discretion and authority to (i) **make, amend and enforce all appropriate rules and regulations for the administration of this Plan or the Award Letter** and (ii) **interpret this Plan or the Award Letter and all such rules and regulations and otherwise resolve any and all questions including interpretations of this Plan or the Award Letter as may arise in connection with this Plan** or the Award Letter, **with all such interpretations to be conclusive and binding on all persons and otherwise accorded the maximum deference permitted by law**.

Ex. G (emphases added); *see also id.* ("6.1 Termination. Although the Company anticipates that

it will continue this Plan for an indefinite period of time, the HRCC has the right to terminate

this Plan and any award letter at any time.").

Just like the incentive plans at issue in *Karmilowicz* and *Timian*, the Plans underlying Plaintiff's breach of contract claims provide Alcentra NY with exclusive authority to interpret or modify the Plans and the Administrator the right to make binding and conclusive determinations with respect to claims by Participants.  Therefore, as a matter of law, Mr. Yang cannot sustain his breach of contract claims based on these Plans.

Finally, even if Mr. Yang's breach of contract claims did not fail based on the plain language of the Plans (which they do), the claims should be dismissed because they are derivative of his SOX claim.  Mr. Yang alleges that he is entitled to unvested awards because his termination was unlawful under SOX and, therefore, under his theory, he should have remained employed through the vesting dates.  At most, that is a claim for damages on his SOX retaliation claim as addressed above.  It is not the basis for independent breach of contract claims.

### C.    Plaintiff's Quasi-Contract Claims Also Fail.

In yet another attempt to recover his unvested awards, Mr. Yang now asserts three quasi-contract claims:  breach of the implied covenant of good faith and fair dealing (Count V), unjust enrichment (Count VI), and *quantum meruit* (Count VII).  These claims all seek to recover the value that Mr. Yang attributes to his unvested awards, i.e. $4.2 million.

It is well-settled under New York law that a Plaintiff cannot sustain quasi-contract claims when Plaintiff also brings breach of contract claims based on an alleged contract covering the same subject matter.  *Aledia v. HSH Nordbank AG*, No. 08-4342, 2009 WL 855951, at **3-4 (S.D.N.Y. Mar. 25, 2009) (dismissing *quantum meruit* and good faith and fair dealing claims where an employment agreement addressed the "subject matter" of the quasi-contract claims even if the agreement terms were ambiguous); *see O'Grady v. BlueCrest Capital Mgmt. LLP*, 111 F. Supp. 3d 494, 504 (S.D.N.Y. 2015), *aff'd*, 646 F. App'x 2 (2d Cir. 2016) (dismissing plaintiff's "impermissibly duplicative" quasi-contractual claims of *quantum meruit* and breach of

the implied covenant of good faith and fair dealing, among others, based on his employment agreement setting forth his compensation scheme).[14]

Mr. Yang alleges that he was subject to *both* an offer letter and the Plan documents addressing his compensation and incentive award payments.  He brings breach of contract claims relative to each of these documents.  It is also undisputed that the Plans provide a comprehensively detailed methodology for incentive awards.  Thus, Plaintiff's quasi-contract claims must be dismissed.  *See, e.g.*, *Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 414 (S.D.N.Y. 2011) (dismissing plaintiff's *quantum meruit* claims regarding bonus compensation stating that "[i]n New York, a plaintiff cannot state a cause of action for quantum meruit where there is a written employment agreement already in place"); *Karmilowicz*, 494 F. App'x at 157–58 (affirming the district court's dismissal of plaintiff's quasi-contractual theories of recovery, including claims for quantum meruit/unjust enrichment and breach for the duty of good faith and fair dealing because "[u]nder New York law, 'quasi-contractual . . . relief is unavailable where [as here] an express contract covers the subject matter'").

## V.    CONCLUSION

For all the foregoing reasons, Defendants respectfully request that this Court grant their Motion to Dismiss Mr. Yang's Amended Complaint in its entirety with prejudice.

---

[14]    *See also Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) ("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.").

Dated:  July 27, 2020

Respectfully submitted,

/s/ Michael L. Banks
Michael L. Banks
W. John Lee
Shannon L.C. Ammon
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
Tel.: (215) 963-5210
Fax: (215) 963-5001
Michael.Banks@morganlewis.com
W.John.Lee@morganlewis.com
Shannon.Ammon@morganlewis.com

*Attorneys for Defendants The Bank of New York Mellon Corporation, Alcentra NY, LLC, and Alcentra Limited*

## <u>CERTIFICATE OF ELECTRONIC FILING AND SERVICE</u>

I hereby certify that on July 27, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

<i>/s/ W. John Lee</i>     <br>W. John Lee